## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

DONALD J. TRUMP FOR
PRESIDENT, INC., MATTHEW
SEELY, ALEXANDRA SEELY,
PHILIP O'HALLORAN, ERIC
OSTERGREN, MARIAN
SHERIDAN, MERCEDES WIRSING,
and CAMERON TARSA,

     *Plaintiffs*,

v.                                                     No. _____

JOCELYN BENSON, in her official
capacity as Michigan Secretary of
State, MICHIGAN BOARD OF
STATE CANVASSERS, WAYNE
COUNTY, MICHIGAN, and
WAYNE COUNTY BOARD OF
COUNTY CANVASSERS,

     *Defendants*.
_____/

Mark F. (Thor) Hearne, II (P40231)
Stephen S. Davis (*pro hac* forthcoming)
TRUE NORTH LAW, LLC
112 S. Hanley Road, Suite 200
St. Louis, MO 63105
(314) 296-4000
thor@truenorthlawgroup.com

_____

## COMPLAINT FOR DECLARATORY, EMERGENCY,
## AND PERMANENT INJUNCTIVE RELIEF

_____

## SUMMARY OF THIS LAWSUIT[1]

Our United States Constitution provides that state legislatures determine the manner in which presidential electors are selected.  U.S. Const. Article II, Section 1.  See also Chiafalo, et al. v. Washington, 591 U.S. ___ (2020).  Justice Kagan, for a unanimous Court, wrote, "Every four years, millions of Americans cast a ballot for a presidential candidate. Their votes, though, actually go toward selecting members of the Electoral College. Those few 'electors' then choose the President." Id.  The Constitution assigns state legislatures the authority to prescribe each state's process for selection of electors.

The United States Constitution guarantees due process of law and equal protection under the law.  In an election for President and Vice President of the United States, this means that states must conduct the election in a manner that equally values each eligible citizen's lawfully-cast vote.  The process for choosing Michigan's sixteen presidential electors is governed by the election code the Michigan Legislature adopted.

Michigan's election code contains a host of provisions intended to prevent fraudulent ballots from being counted. A fraudulent ballot, if counted, disenfranchises a lawful voter.  Michigan's election code vests Secretary of State Jocelyn Benson, as Michigan's "chief election officer," with the responsibility to direct and oversee Michigan's counties, townships, and villages' conduct of elections.

Unfortunately, Wayne County did not conduct (and is not conducting) this election as required by Michigan law, and Secretary of State Benson did not require Wayne County to follow Michigan's election code.  Among other things, election officials in Wayne County refused to permit statutorily designated challengers to observe the conduct of the election and the processing of ballots.  Some election officials pre-dated ballots that were not eligible to be counted by altering the date the ballot was received.

Ballots that are ineligible to be counted will cancel out ballots Michigan eligible voters cast, effectively disenfranchising the votes cast by Michigan citizens.  The Michigan Election Code provides detailed rules for the conduct of elections, and the Michigan Election Code should be uniformly and equally followed by all Michigan election authorities so that all Michigan voters have an equal opportunity to cast a lawful ballot.

We ask this Court to enjoin the Michigan board of state canvassers and the Wayne County canvassing boards from certifying any tally of

---

[1] This summary is not part of the Complaint but is provided for the convenience of the Court and parties.

*ballots containing fraudulent or unlawfully cast ballots. Likewise, we ask the Court to enjoin the Wayne County canvassing board and the state canvassing board from certifying any tally that includes ballots received after election day and ballots that were processed when statutorily designated challengers were excluded from a meaningful opportunity to observe the processing of ballots. And finally, ballots that were tabulated with defective or malfunctioning tabulating machines or software must be excluded from the tally or hand-counted to confirm they are accurately counted and may be included in any certified canvass.*

## JURISDICTION AND VENUE

1.      This Court has subject matter under 28 U.S.C. 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

2.      This Court also has subject matter jurisdiction under 28 U.S.C. 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

3.      The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

4.      This Court has jurisdiction over the related Michigan constitutional claims and state-law claims under 28 U.S.C. 1367.

5.      Venue is proper because Secretary Benson and the board of state canvassers are located in Lansing, Michigan. The Office of the Secretary of State is in Lansing, Michigan. The board of state canvassers meets in Lansing, Michigan. 28 U.S.C. 1391(b) & (c).

## PARTIES

6.      The entity, Donald J. Trump for President, Inc., is the campaign committee for the reelection of President Donald J. Trump and Vice President Michael R. Pence. President Trump and Vice President Pence have a substantial interest in assuring that Michigan election officials process and count Michigan citizens' ballots as required by the United States Constitution, the Michigan Constitution, and Michigan law so that every Michigan voter's lawfully-cast ballot is fairly and equally counted.

7.      Matthew and Alexandra Seely, Philip O'Halloran, Eric Ostergren, Marian Sheridan, Mercedes Wirsing, and Cameron Tarsa are Michigan citizens and registered voters.    Matthew and Alexandra Seely, Philip O'Halloran, Eric Ostergren, Marian Sheridan, and Mercedes Wirsing voted in the November 3, 2020 presidential election and served as credentialed election challengers in that election.  Matthew and Alexandra Seely are residents and registered voters in Wayne County, Michigan.  Philip O'Halloran is a resident and registered voter in Oakland County, Michigan.  Eric Ostergren is a resident and registered voter in Roscommon County, Michigan.  Marian Sheridan is a resident and registered voter in Oakland County, Michigan.  Mercedes Wirsing is a resident and registered voter in Oakland County, Michigan.  Cameron Tarsa is a resident and registered voter in Leelanau County, Michigan.

8.      Jocelyn Benson, Michigan's Secretary of State, is a defendant in her official capacity.  Jocelyn Benson is the "chief elections officer" responsible for overseeing the conduct of Michigan elections.  MCL 168.21 ("The secretary of state shall be the chief election officer of the state and shall have supervisory control over local election officials in the performance of their duties under the provisions of this act."); MCL 168.31(1)(a)

(the "Secretary of State shall … issue instructions and promulgate rules … for the conduct of elections and registrations in accordance with the laws of this state").  Local election officials must follow Secretary Benson's instructions regarding the conduct of elections. Michigan law provides that Secretary Benson "[a]dvise and direct local election officials as to the proper methods of conducting elections."  MCL 168.31(1)(b).  *See also Hare v. Berrien Co Bd. of Election*, 129 N.W.2d 864 (Mich. 1964); *Davis v. Secretary of State*, 2020 Mich. App. LEXIS 6128, at *9 (Mich. Ct. App. Sep. 16, 2020).  Secretary Benson is responsible for assuring Michigan's local election officials conduct elections in a fair, just, and lawful manner.  *See* MCL 168.21; 168.31; 168.32.  *See also League of Women Voters of Michigan v. Secretary of State*, 2020 Mich. App. LEXIS 709, *3 (Mich. Ct. App. Jan. 27, 2020); *Citizens Protecting Michigan's Constitution v. Secretary of State*, 922 N.W.2d 404 (Mich. Ct. App. 2018), aff'd 921 N.W.2d 247 (Mich. 2018); *Fitzpatrick v. Secretary of State*, 440 N.W.2d 45 (Mich. Ct. App. 1989).

9.     The Michigan board of state canvassers is "responsible for approv[ing] voting equipment for use in the state, certify[ing] the result of elections held statewide …." Michigan Election Officials' Manual, p. 4.  *See also* MCL 168.841, *et seq*.

10.     Wayne County is a political subdivision of the State of Michigan.  Wayne County has an Elections Division that conducts elections taking place within Wayne County under and subject to Secretary of State Benson's supervision and direction.

11.     The Wayne County board of county canvassers is "responsible for canvassing the votes cast within the county [it] serve[s].  The Board members certify elections for local, countywide and district offices which are contained entirely within the county they serve.  The Board members are also responsible for inspecting the county's

ballot containers every four years."  Michigan Election Officials' Manual, p. 5.  *See also* MCL 168.821, *et seq*.

**THE RELEVANT PROVISIONS OF THE UNITED STATES AND MICHIGAN CONSTITUTIONS AND MICHIGAN STATUTE**

12.    The Fourteenth Amendment to the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

13.    Article I, Section 4 of the United States Constitution provides that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof."

14.    Article II, Section 1 of the United States Constitution provides the manner in which the President and Vice President are chosen:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress….
>
> The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

15.    The Twelfth Amendment to the United States Constitution provides:

> The Electors shall meet in their respective states and vote by ballot for President and Vice-President … they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate….

16.    Michigan's Constitution declares that "[n]o person shall be denied the equal protection of the laws …."  Mich. Const. 1963, art 1, §2.

17.     The Michigan Constitution's "purity of elections" clause states that "the legislature shall enact laws to regulate the time, place and manner of all nominations and elections, to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting." Mich. Const. 1963, art 2, §4(2).

## BACKGROUND

I.     **Secretary Benson and Wayne County election officials did not follow Michigan's Election Code and allowed fraud and incompetence to corrupt the conduct of the 2020 general election.**

   A.     **Michigan law requires Secretary Benson and local election officials to provide designated challengers a meaningful opportunity to observe the conduct of elections.**

18.     Challengers representing a political party, candidate, or organization interested in the outcome of the election provide a critical role in protecting the integrity of elections including the prevention of voter fraud and other conduct (whether maliciously undertaken or by incompetence) that could affect the conduct of the election. *See* MCL 168.730-738.

19.     Michigan requires Secretary of State Benson, local election authorities, and state and county canvassing boards to provide challengers the opportunity to meaningfully participate in, and oversee, the conduct of Michigan elections and the counting of ballots.

20.     Michigan's election code provides that challengers shall have the following rights and responsibilities:

   a.     An election challenger shall be provided a space within a polling place where they can observe the election procedure and each person applying to vote. MCL 168.733(1).

   b.     An election challenger must be allowed opportunity to inspect poll books as ballots are issued to electors and witness the electors' names being entered in the poll book. MCL 168.733(1)(a).

c.      An election Challenger must be allowed to observe the manner in which the duties of the election inspectors are being performed.  MCL 168.733(1)(b).

d.      An election challenger is authorized to challenge the voting rights of a person who the challenger has good reason to believe is not a registered elector.  MCL 168.733(1)(c).

e.      An election challenger is authorized to challenge an election procedure that is not being properly performed.  MCL 168.733(1)(d).

f.      An election challenger may bring to an election inspector's attention any of the following: (1) improper handling of a ballot by an elector or election inspector; (2) a violation of a regulation made by the board of election inspectors with regard to the time in which an elector may remain in the polling place; (3) campaigning and fundraising being performed by an election inspector or other person covered by MCL 168.744; and/or (4) any other violation of election law or other prescribed election procedure.  MCL 168.733(1)(e).

g.      An election challenger may remain present during the canvass of votes and until the statement of returns is duly signed and made.  MCL 168.733(1)(f).

h.      An election challenger may examine each ballot as it is being counted.  MCL 168.733(1)(g).

i.      An election challenger may keep records of votes cast and other election procedures as the challenger desires.  MCL 168.733(1)(h).

j.      An election challenger may observe the recording of absent voter ballots on voting machines.  MCL 168.733(1)(i).

21.    The Michigan Legislature adopted these provisions to prevent and deter vote fraud, require the conduct of Michigan elections to be transparent, and to assure public confidence in the outcome of the election no matter how close the final ballot tally may be.

22.    Michigan values the important role challengers perform in assuring the transparency and integrity of elections.  For example, Michigan law provides it is a felony punishable by up to two years in state prison for any person to threaten or intimidate a challenger who is performing any activity described in Michigan law.  MCL 168.734(4).  It is a felony punishable by up to two years in state prison for any person to prevent the

presence of a challenger exercising their rights or to fail to provide a challenger with "conveniences for the performance of the[ir] duties." MCL 168.734.

23.     The responsibilities of challengers are established by Michigan statute. MCL 168.730 states:

(1)     At an election, a political party or [an organization] interested in preserving the purity of elections and in guarding against the abuse of the elective franchise, may designate challengers as provided in this act. Except as otherwise provided in this act, a political party [or interested organization] may designate not more than 2 challengers to serve in a precinct at any 1 time. A political party [or interested organization] may designate not more than 1 challenger to serve at each counting board.

(2)     A challenger shall be a registered elector of this state. . . . A candidate for the office of delegate to a county convention may serve as a challenger in a precinct other than the 1 in which he or she is a candidate. . . .

(3)     A challenger may be designated to serve in more than 1 precinct. The political party [or interested organization] shall indicate which precincts the challenger will serve when designating challengers under subsection (1). If more than 1 challenger of a political party [or interested organization] is serving in a precinct at any 1 time, only 1 of the challengers has the authority to initiate a challenge at any given time. The challengers shall indicate to the board of election inspectors which of the 2 will have this authority. The challengers may change this authority and shall indicate the change to the board of election inspectors.

24.     Secretary Benson and Wayne County violated these provisions of Michigan law and violated the constitutional rights of Michigan citizens and voters when they did not conduct this general election in conformity with Michigan law and the United States Constitution.

25.     More than one hundred credentialed election challengers provided sworn affidavits. These affidavits stated, among other matters, that these credentialed challengers were denied a meaningful opportunity to review election officials in Wayne County handling ballots, processing absent voter ballots, validating the legitimacy of absent voter

ballots, and the general conduct of the election and ballot counting.  *See* Exhibit 1 (affidavits of election challengers).

> **B.      Michigan voters were denied a fair, honest, and transparent election because, among other things, election challengers were denied opportunity to meaningfully observe the processing and counting of ballots.**

26.      Wayne County excluded certified challengers from meaningfully observing the conduct of the election.  This allowed a substantial number of ineligible ballots to be counted.  The following affidavits describe the specifics that were observed.  This conduct was pervasive in Wayne County as attested to in the affidavits attached at **Exhibit 1**.

27.      Many individuals designated as challengers to observe the conduct of the election were denied meaningful opportunity to observe the conduct of the election.  For example, challengers designated by the Republican Party or Republican candidates were denied access to the TCF Center (formerly called Cobo Hall) ballot counting location in Detroit while Democratic challengers were allowed access.  Exhibit 1 (Deluca aff. ¶¶7-9, 16-18; Langer aff. ¶3; Papsdorf aff. ¶3; Frego aff. ¶9; Downing aff. ¶¶2-9, 11, 15, 22; Sankey aff. ¶¶5-8; Ostin aff. ¶¶5-7; Cavaliere aff. ¶3; Cassin aff. ¶4; Rose aff. ¶18; Zimmerman aff. ¶8; Langer aff. ¶3; Poplawski aff. ¶3; Henderson aff. ¶7; Fuqua-Frey aff. ¶5; Ungar aff. ¶4; Eilf aff. ¶¶9, 17; Jeup aff. ¶¶6-7; Tietz aff. ¶¶9-18; McCall aff. ¶¶5-6; Arnoldy aff. ¶¶5, 8-9 (unlimited members of the media were also allowed inside regardless of COVID restrictions while Republican challengers were excluded)).

28.      Many challengers stated that Republican challengers who had been admitted to the TCF Center but who left were not allowed to return.  Exhibit 1 (Bomer aff. ¶16; Paschke aff. ¶4; Schneider aff., p. 2; Arnoldy aff. ¶6; Boller aff. ¶¶13-15 (removed and not allowed to serve as challenger); Kilunen aff. ¶7; Gorman aff. ¶¶6-8; Wirsing aff.,

p. 1;  Rose aff. ¶19; Krause aff. ¶¶9, 11; Roush aff. ¶16; M. Seely aff. ¶6; Fracassi aff. ¶6; Whitmore aff. ¶5).  Furthermore, Republican challengers who left the TCF Center were not allowed to be replaced by other Republican challengers while Democratic challengers were replaced.  *See id.*

29.     As a result of Republican challengers not being admitted or re-admitted, while Democratic challengers were freely admitted, there were many more Democratic challengers allowed to observe the processing and counting of absent voter ballots than Republican challengers.  Exhibit 1 (Helminen aff. ¶12 (Democratic challengers out-numbered Republican challengers by at least a two-to-one ratio); Daavettila aff., p. 2 (ten times as many Democratic challengers as Republican); A. Seely aff. ¶19; Schneider aff., p. 2; Wirsing aff., p. 1; Rauf aff. ¶21; Roush aff. ¶¶16-17; Topini aff. ¶4).

30.     Many challengers testified that election officials strictly and exactingly enforced a six-foot distancing rule for Republican challengers but not for Democratic challengers.  Exhibit 1 (Paschke aff. ¶4; Wirsing aff., p. 1; Montie aff. ¶4; Harris aff. ¶3; Krause aff. ¶7; Vaupel aff. ¶5; Russel aff. ¶7; Duus aff. ¶9; Topini aff. ¶6).  As a result, Republican challengers were not allowed to meaningfully observe the ballot counting process.  *Id.*

31.     Many challengers testified that their ability to view the handling, processing, and counting of ballots was physically and intentionally blocked by election officials. Exhibit 1 (A. Seely aff. ¶15; Miller aff. ¶¶13-14; Pennala aff. ¶4; Tyson aff. ¶¶12-13, 16;  Ballew aff. ¶8; Schornak aff. ¶4; Williamson aff. ¶¶3, 6; Steffans aff. ¶¶15-16, 23-24; Zaplitny aff. ¶15; Sawyer aff. ¶5; Cassin aff. ¶9; Atkins aff. ¶3; Krause aff. ¶5; Sherer

aff. ¶¶15, 24; Basler aff. ¶¶7-8; Early aff. ¶7; Posch aff. ¶7; Chopjian aff. ¶11; Shock aff. ¶7; Schmidt aff. ¶¶7-8; M. Seely aff. ¶4; Topini aff. ¶8).

32.     At least three challengers said they were physically pushed away from counting tables by election officials to a distance that was too far to observe the counting. Exhibit 1 (Helminen aff. ¶4; Modlin aff. ¶¶4, 6; Sitek aff. ¶4).  Challenger Glen Sitek reported that he was pushed twice by an election worker, the second time in the presence of police officers.  *Id.* (Sitek aff. ¶4).  Sitek filed a police complaint.  *Id.*

33.     Challenger Pauline Montie stated that she was prevented from viewing the computer monitor because election workers kept pushing it further away and made her stand back away from the table.  Exhibit 1 (Montie aff. ¶¶4-7).  When Pauline Montie told an election worker that she was not able to see the monitor because they pushed it farther away from her, the election worker responded, "too bad."  *Id.* ¶8.

34.     Many challengers witnessed Wayne County election officials covering the windows of the TCF Center ballot counting center so that observers could not observe the ballot counting process.  Exhibit 1 (A. Seely aff. ¶¶9, 18; Helminen aff. ¶¶9, 12; Deluca aff. ¶13; Steffans aff. ¶22; Frego aff. ¶11; Downing aff. ¶21; Sankey aff. ¶14; Daavettila aff., p. 4; Zimmerman aff. ¶10; Krause aff. ¶12; Sherer aff. ¶22; Johnson aff. ¶7; Posch aff. ¶10; Rauf aff. ¶23; Luke aff., p. 1; M. Seely aff. ¶8; Zelasko aff. ¶8; Ungar aff. ¶12; Storm aff. ¶7; Fracassi aff. ¶8; Eilf aff. ¶25; McCall aff. ¶9).

35.     Many challengers testified that they were intimidated, threatened, and harassed by election officials during the ballot processing and counting process.  Exhibit 1 (Ballew aff. ¶¶7, 9; Gaicobazzi aff. ¶¶12-14 (threatened repeatedly and removed); Schneider aff., p. 1; Piontek aff. ¶11; Steffans aff. ¶26 (intimidation made her feel too afraid

to make challenges); Cizmar aff. ¶8(G); Antonie aff. ¶3; Zaplitny aff. ¶20; Moss aff. ¶4; Daavettila aff., pp. 2-3; Tocco aff. ¶¶1-2; Cavaliere ¶3; Kerstein aff. ¶3; Rose aff. ¶16; Zimmerman aff. ¶5; Langer aff. ¶3; Krause aff. ¶4; Sherer aff. ¶24; Vaupel aff. ¶4; Basler aff. ¶8; Russell aff. ¶5; Burton aff. ¶5; Early aff. ¶7; Pannebecker aff. ¶10; Sitek aff. ¶4; Klamer aff. ¶4; Leonard aff. ¶¶6, 15; Posch aff. ¶¶7, 14; Rauf aff. ¶24; Chopjian aff. ¶10; Cooper aff. ¶12; Shock aff. ¶9; Schmidt aff. ¶¶9-10; Duus aff. ¶10; M. Seely aff. ¶4; Storm aff. ¶¶5, 7; DePerno aff. ¶¶5-6; McCall aff. ¶¶5, 13). Articia Bomer was called a "racist name" by an election worker and also harassed by other election workers. *Id.* (Bomer aff. ¶7). Zachary Vaupel reported that an election supervisor called him an "obscene name" and told him not to ask questions about ballot processing and counting. *Id.* (Vaupel aff. ¶4). Kim Tocco was personally intimidated and insulted by election workers. *Id.* (Tocco aff. ¶¶1-2). Qian Schmidt was the target of racist comments and asked, "what gives you the right to be here since you are not American?" *Id.* (Schmidt aff. ¶9). Other challengers were threatened with removal from the counting area if they continued to ask questions about the ballot counting process. *Id.* (A. Seely aff. ¶¶6, 13, 15; Pennala aff. ¶5).

36.     Challenger Kathleen Daavettila observed that Democratic challengers distributed a packet of information among themselves entitled, "Tactics to Distract GOP Challengers." *Id.* (Daavettila aff., p. 2). An election official told challenger Ulrike Sherer that the election authority had a police SWAT team waiting outside if Republican challengers argued too much. *Id.* (Sherer aff. ¶24). An election worker told challenger Jazmine Early that since "English was not [her] first language…[she] should not be taking part in this process." *Id.* (Early aff. ¶11).

37.     Election officials at the TCF Center in Detroit participated in the intimidation experienced by Republican challengers when election officials would applaud, cheer, and yell whenever a Republican challenger was ejected from the counting area.   Exhibit 1 (Helminen aff. ¶9; Pennala aff. ¶5; Ballew aff. ¶9; Piontek aff. ¶11; Papsdorf aff. ¶3; Steffans aff. ¶25; Cizmar aff. ¶8(D); Kilunen aff. ¶5; Daavettila aff., p. 4; Cavaliere aff. ¶3; Cassin aff. ¶10; Langer aff. ¶3; Johnson aff. ¶5; Early aff. ¶13; Klamer aff. ¶8; Posch aff. ¶12; Rauf aff. ¶22; Chopjian aff. ¶13; Shock aff. ¶10).

**C.     Illegal and ineligible ballots were counted.**

38.     There is a difference between a ballot and a vote.  A ballot is a piece of paper.  A vote is a ballot that has been completed by a citizen registered to vote who has the right to cast a vote and has done so in compliance with Michigan election law by, among other things, verifying their identity and casting the ballot on or before Election Day.  It is the task of Secretary Benson and Michigan election officials to assure that only ballots cast by individuals entitled to cast a vote in the election are counted and to make sure that all ballots cast by lawful voters are counted and the election is conducted in accord with Michigan's Election Code uniformly throughout Michigan.

39.     Challengers provide the transparency and accountability to assure ballots are lawfully cast and counted as provided in Michigan's Election Code and voters can be confident the outcome of the election was honestly and fairly determined by eligible voters.

40.     Unfortunately, this did not happen in Wayne County.  Many challengers testified that their challenges to ballots were ignored and disregarded.  Exhibit 1 (A. Seely aff. ¶4; Helminen aff. ¶5; Miller aff. ¶¶10-11; Schornak aff. ¶¶9, 15; Piontek aff. ¶6; Daavettila aff., p. 3; Valice aff. ¶2; Sawyer aff. ¶7; Kerstein aff. ¶3; Modlin aff. ¶4; Cassin

aff. ¶6; Brigmon aff. ¶5; Sherer aff. ¶11; Early aff. ¶18; Pannebecker aff. ¶9; Vanker aff. ¶5; M. Seely aff. ¶11; Ungar aff. ¶¶16-17; Fracassi aff. ¶4).

41.     As an example of challenges being disregarded and ignored, challenger Alexandra Seely stated that at least ten challenges she made were not recorded.  *Id.* (A. Seely aff. ¶4).  Articia Bomer observed that ballots with votes for Trump were separated from other ballots.  *Id.* (Bomer aff. ¶5).  Articia Bomer stated, "I witnessed election workers open ballots with Donald Trump votes and respond by rolling their eyes and showing it to other poll workers.  I believe some of these ballots may not have been properly counted." *Id.* ¶8.  Braden Gaicobazzi challenged thirty-five ballots for whom the voter records did not exist in the poll book, but his challenge was ignored and disregarded.  Exhibit 1 (Giacobazzi aff. ¶10).  When Christopher Schornak attempted to challenge the counting of ballots, an election official told him, "We are not talking to you, you cannot challenge this." *Id.* (Schornak aff. ¶15).  When Stephanie Krause attempted to challenge ballots, an election worker told her that challenges were no longer being accepted because the "rules 'no longer applied.'"  *Id.* (Krause aff. ¶13).

### i.     Unlawful ballot duplication.

42.     If a ballot is rejected by a ballot-tabulator machine and cannot be read by the machine, the ballot must be duplicated onto a new ballot.  The Michigan Secretary of State has instructed, "If the rejection is due to a false read the ballot must be duplicated by *two election inspectors who have expressed a preference for different political parties*." Michigan Election Officials' Manual, ch. 8, p. 6 (emphasis added).  Thus, the ballot-duplicating process must be performed by bipartisan teams of election officials.  It must also be performed where it can be observed by challengers.

43. But Wayne County prevented many challengers from observing the ballot duplicating process. Exhibit 1 (Miller aff. ¶¶6-8; Steffans aff. ¶¶15-16, 23-24; Mandelbaum aff. ¶6; Sherer aff. ¶¶16-17; Burton aff. ¶7; Drzewiecki aff. ¶7; Klamer aff. ¶9; Chopjian aff. ¶10; Schmidt aff. ¶7; Champagne aff. ¶12; Shinkle aff., p. 1). Challenger John Miller said he was not allowed to observe election workers duplicating a ballot because the "duplication process was personal like voting." *Id.* (Miller aff. ¶8). Challenger Mary Shinkle stated that she was told by an election worker that she was not allowed to observe a ballot duplication because "if we make a mistake then you would be all over us." *Id.* (Shinkle aff., p. 1).

44. Many challengers testified that ballot duplication was performed only by Democratic election workers, not bipartisan teams. Exhibit 1 (Pettibone aff. ¶3; Kinney aff., p. 1; Wasilewski aff., p. 1; Schornak aff. ¶¶18-19; Dixon aff., p. 1; Kolanagireddy aff., p. 1; Kordenbrock aff. ¶¶3-4; Seidl aff., p. 1; Kerstein aff. ¶4; Harris aff. ¶3; Sitek aff. ¶4).

### ii. Ineligible ballots were counted – some multiple times.

45. Challengers reported that batches of ballots were repeatedly run through the vote tabulation machines. Exhibit 1 (Helminen aff. ¶4; Waskilewski aff., p. 1; Mandelbaum aff. ¶5; Rose aff. ¶¶4-14; Sitek aff. ¶3; Posch aff. ¶8; Champagne aff. ¶8). Challenger Patricia Rose stated she observed a stack of about fifty ballots being fed multiple times into a ballot scanner counting machine. *Id.* (Rose aff. ¶¶4-14). Challenger Articia Bomer stated, "I observed a station where election workers were working on scanned ballots that had issues that needed to be manually corrected. I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates." *Id.* (Bomer aff. ¶9). Articia Bomer further stated that she

witnessed the same group of ballots being rescanned into the counting machine "at least five times." *Id.* ¶12.

46.     Many challengers stated that the ballot number on the ballot did not match the number on the ballot envelope, but when they raised a challenge, those challenges were disregarded and ignored by election officials, not recorded, and the ballots were processed and counted.  Exhibit 1 (A. Seely aff. ¶15; Wasilewski aff., p. 1; Schornak aff. ¶13; Brunell aff. ¶¶17, 19; Papsdorf aff. ¶3; Spalding aff. ¶¶8, 11; Antonie aff. ¶3; Daavettila aff., p. 3; Atkins aff. ¶3; Harris aff. ¶3; Sherer aff. ¶21; Drzewiecki aff. ¶¶5-6; Klamer aff. ¶4; Rauf aff. ¶¶9-14; Roush aff. ¶¶5-7; Kinney aff. ¶5).  For example, when challenger Abbie Helminen raised a challenge that the name on the ballot envelope did not match the name on the voter list, she was told by an election official to "get away" and that the counting table she was observing had "a different process than other tables."  *Id.* (Helminen aff. ¶5).

47.     Many challengers reported that when a voter was not in the poll book, the election officials would enter a new record for that voter with a birth date of January 1, 1900.  Exhibit 1 (Gaicobazzi aff. ¶10; Piontek aff. ¶10; Cizmer aff. ¶8(F); Wirsing aff., p. 1; Cassin aff. ¶9; Langer aff. ¶3; Harris aff. ¶3; Brigmon aff. ¶5; Sherer aff. ¶¶10-11; Henderson aff. ¶9; Early ¶16; Klamer aff. ¶13; Shock aff. ¶8; M. Seely aff. ¶9).  *See also id.* (Gorman aff. ¶¶23-26; Chopjian aff. ¶12; Ungar aff. ¶15; Valden aff. ¶17).  Braden Gaicobazzi reported that a stack of thirty-five ballots was counted even though there was no voter record.  *Id.* (Giacobazzi aff. ¶10).

48.     At least two challengers observed ballots being counted where there was no signature or postmark on the ballot envelope.  Exhibit 1 (Brunell aff. ¶¶17, 19; Spalding aff. ¶13; Sherer aff. ¶13).  Challenger Anne Vanker observed that "60% or more of [ballot]

envelopes [in a batch] bore the same signature on the opened outer envelope." *Id.* (Vanker aff. ¶5).

49.     Challenger William Henderson observed that a counting table of election workers lost eight ballot envelopes.  Exhibit 1 (Henderson aff. ¶8).

50.     At least two challengers observed spoiled ballots being counted.  Exhibit 1 (Schornak aff. ¶¶6-8; Johnson aff. ¶4).  Another challenger observed over-votes on ballots being "corrected" so that the ballots could be counted.  *Id.* (Zaplitny aff. ¶13).

51.     At least one challenger observed a box of provisional ballots being placed in a tabulation box at the TCF Center.  Exhibit 1 (Cizmar aff. ¶5).  At least one challenger observed poll workers adding marks to a ballot where there was no mark for any candidate. *Id.* (Tyson aff. ¶17).  Another challenger observed election officials making mistakes when duplicating ballots.  *Id.* (Piontek aff. ¶9).

52.     An election challenger at the Detroit Department of Elections office observed passengers in cars dropping off more ballots than there were people in the car. Exhibit 1 (Meyers aff. ¶3).  This challenger also observed election workers at the Detroit Department of Elections office handing t-shirts and food to voters in cars.  *Id.* ¶4.  This challenger also observed an election worker accepting a ballot after 8:00 p.m. on Election Day.  *Id.* ¶7.

53.     One Michigan voter stated that her deceased son has been recorded as voting twice since he passed away, most recently in the 2020 general election.  Exhibit 1 (Chase aff. ¶3).

### iii.     Absent voter ballots were pre-dated.

54.     Jessica Connarn is an attorney who was acting as a Republican challenger at the TCF Center in Wayne County.  **Exhibit 2**.  Jessica Connarn's affidavit describes how

an election poll worker told Jessica Connarn that the poll worker "was being told to change the date on ballots to reflect that the ballots were received on an earlier date."  *Id.* ¶1.  Jessica Connarn also provided a photograph of a note handed to her by the poll worker in which the poll worker indicated she (the poll worker) was instructed to change the date ballots were received.  *See id.*  Jessica Connarn's affidavit demonstrates that poll workers in Wayne County were pre-dating absent voter ballots, so that absent voter ballots received after 8:00 p.m. on Election Day could be counted.

55.    A lawsuit recently filed by the Great Lakes Justice Center raises similar allegations of vote fraud and irregularities that occurred in Wayne County.  *See* **Exhibit 3** (copy of complaint filed in the Circuit Court of Wayne County in *Costantino, et al. v. City of Detroit, et al.*).  The lawsuit alleges the Detroit Election Commission "systematically processed and counted ballots from voters whose name failed to appear in either the Qualified Voter File (QVF) or in the supplemental sheets."  *Id.* at 3.  The complaint also alleges the Election Commission "instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity" and "instructed election workers to process ballots that appeared after the election deadline and to falsely report that those ballots had been received prior to November 3, 2020 deadline."  *Id.*  The complaint further alleges the Election Board "systematically used false information to process ballots, such as using incorrect or false birthdays," including inserting "new names into the QVF after the election and recorded these new voters as having a birthdate of 1/1/1900."  *Id.*  The complaint includes supporting affidavits of witnesses.

    iv. **Ballots were deposited in remote, unattended drop boxes without meaningful opportunity to observe or challenge the ballots.**

  56. Michigan's election code, MCL 168.24j, requires that ballot containers meet the following conditions:

  (1) A ballot container includes a ballot box, transfer case, or other container used to secure ballots, including optical scan ballots and electronic voting systems and data.

  (2) A manufacturer or distributor of ballot containers shall submit a nonmetal ballot container to the secretary of state for approval under the requirements of subsection (3) before the ballot container is sold to a county, city, township, village, or school district for use at an election.

  (3) A ballot container shall not be approved unless it meets both of the following requirements:

    (a) It is made of metal, plastic, fiberglass, or other material, that provides resistance to tampering.

    (b) It is capable of being sealed with a metal seal.

  (4) Before June 1 of 2002, and every fourth year after 2002, a county board of canvassers shall examine each ballot container to be used in any election conducted under this act. The board shall designate on the ballot container that the ballot container does or does not meet the requirements under subsection (3). A ballot container that has not been approved by the board shall not be used to store voted ballots.

  (5) A city, village, or township clerk may procure ballot containers as provided in section 669 and as approved under this section.

  (6) A clerk who uses or permits the use of a ballot container that has not been approved under this section is guilty of a misdemeanor.

  57. In October Michigan amended its election code to allow election authorities to establish remote unattended ballot drop-off boxes. *See* MCL 168.761d.  A remote, unattended ballot drop box is essentially equivalent to a polling place where a person can deposit a ballot.  But, unlike a polling place, there is no validation that the individual depositing a ballot in the box is an individual who is qualified to cast a vote or to lawfully

deliver a ballot cast by a lawful voter. *See*, for example, MCL 168.932(f), which prohibits "A person other than an absent voter," and certain others, such as an immediate family member, from possessing and returning an absent voter ballot. *See also Michigan Alliance for Retired Americans v. Secretary of State*, 2020 Mich. App. LEXIS 6931, *23-24 (Mich. Ct. App. Oct. 16, 2020) ("On balance, the ballot-handling restrictions pass constitutional muster given the State's strong interest in preventing fraud.").

58.     MCL 168.761d(4)(c) provides that "[t]he city or township clerk" who establishes a remote ballot drop box "must use video monitoring of that drop box to ensure effective monitoring of that drop box."

59.     An election challenger at the Detroit Department of Elections office observed ballots being deposited in a ballot drop box located at the Detroit Department of Elections after 8:00 p.m. on Election Day.  Exhibit 1 (Meyers aff. ¶6).

> **v.     Wayne County used ballot tabulators that were shown to miscount votes cast for President Trump and Vice President Pence and instead count them for the Biden-Harris ticket.**

60.     On the morning of November 4, unofficial results posted by the Antrim County Clerk showed that Joe Biden had over 7,700 votes — 3,000 more than Donald Trump.  Antrim County voted 62% in favor of President Trump in 2016.  The Dominion Voting Systems election management system and voting machines (tabulators), which were used in Antrim County, are also used in many other Michigan counties, including Wayne County, were at fault.

61.     Secretary of State Benson released a statement blaming the county clerk for not updating certain "media drives," but her statement failed to provide any coherent

explanation of how the Dominion Voting Systems software and vote tabulators produced such a massive miscount.[2]

62.     Secretary Benson continued: "After discovering the error in reporting the unofficial results, the clerk worked diligently to report correct unofficial results by reviewing the printed totals tape on each tabulator and hand-entering the results for each race, for each precinct in the county."  *Id.*

63.     What Secretary Benson fails to address is what would have happened if no one "discover[ed] the error," for instance, in Wayne County, where the number of registered voters is much greater than Antrim County, and where the tabulators were not individually tested.

64.     Wayne County used the same Dominion voting system tabulators as did Antrim County, and Wayne County tested only a single one of its vote tabulating machines before the election.  The Trump campaign asked Wayne County to have an observer physically present to witness the process.  *See* Exhibit 4.  Wayne County denied the Trump campaign the opportunity to be physically present.  Representatives of the Trump campaign did have opportunity to watch a portion of the test of a single machine by Zoom video.

65.     Tabulator issues occurred elsewhere in Michigan.  In Oakland County, Democrat Melanie Hartman was wrongly declared the winner of the commissioner's race by a 104-vote margin.  A computer issue at the Rochester Hills clerk's office caused them

---

[2] https://www.michigan.gov/documents/sos/Antrim_Fact_Check_707197_7.pdf
(emphasis in original).

to double-count some votes.  After elections officials caught the error, Republican Adam Kochenderfer was declared the winner with 1,127 more votes than Hartman.[3]

66.    These vote tabulator failures are a mechanical malfunction that, under MCL 168.831-168.839, requires a "special election" in the precincts affected.

67.    Michigan's Election Code, MCL 168.831-168.839, provides the board of canvassers shall order a special election as governed by those precincts affected by the defect or mechanical malfunction.  The board of county canvassers "is responsible for resolving any claims that malfunctioning voting equipment or defective ballots may have affected the outcome of a vote on an office appearing on the ballot."  Michigan Manual for Boards of County Canvassers.

## II.    The canvassing process in Michigan.

68.    Michigan has entrusted the conduct of elections to three categories of individuals, a "board of inspectors," a "board of county canvassers," and the "board of state canvassers."

69.    The board of inspectors, among its other duties, canvasses the ballots and compares the ballots to the poll books.  *See* MCL 168.801.  "Such canvass shall be public and the doors to the polling places and at least 1 door in the building housing the polling places and giving ready access to them shall not be locked during such canvas."  *Id.*  The members of the board of inspectors (one from each party) are required to seal the ballots and election equipment and certify the statement of returns and tally sheets and deliver the statement of returns and tally sheet to the township or city clerk, who shall deliver it to the

_____

[3] https://www.freep.com/story/news/politics/elections/2020/11/08/election-misinformation-michigan-vote-antrim-county/6209693002/

probate court judge, who will than deliver the statement of returns and tally sheet to the "board of county canvassers."  MCL 168.809.  "All election returns, including poll lists, statements, tally sheets, *absent voters' return envelopes bearing the statement required [to cast an absentee ballot] ... must be carefully preserved*."  MCL.810a and 168.811 (emphasis added).

70.     After the board of inspectors completes its duties, the board of county canvassers is to meet at the county clerk's office "no later than 9 a.m. on the Thursday after" the election.  November 5, 2020 is the date for the meeting.  MCL 168.821.  The board of county canvassers has power to summon and open ballot boxes, correct errors, and summon election inspectors to appear.  Among other duties and responsibilities, the board of county canvassers shall do the following provided in MCL 168.823(3).

> The board of county canvassers shall correct obvious mathematical errors in the tallies and returns. *The board of county canvassers may, if necessary for a proper determination, summon the election inspectors before them*, and require them to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns.  In the alternative to summoning the election inspectors before them, the board of county canvassers may designate staff members from the county clerk's office to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns.  When the examination of the papers is completed, or the ballots have been counted, they shall be returned to the ballot boxes or delivered to the persons entitled by law to their custody, and the boxes shall be locked and sealed and delivered to the legal custodians.[4]

---

[4] Emphasis added.

71.     The county board of canvassers shall "conclude the canvass at the earliest possible time and in every case no later than the fourteenth day after the election," which is November 17.  MCL 168.822(1).  But, "[i]f the board of county canvassers fails to certify the results of any election for any officer or proposition by the fourteenth day after the election as provided, the board of county canvassers shall immediately deliver to the secretary of the board of state canvassers all records and other information pertaining to the election.  The board of state canvassers shall meet immediately and make the necessary determinations and certify the results within the 10 days immediately following the receipt of the records from the board of county canvassers."  MCL 168.822(2).

72.     The Michigan board of state canvassers then meets at the Secretary of State's office the twentieth day after the election and announce its determination of the canvass "not later than the fortieth day after the election."  For this general election that is November 23 and December 3.  MCL 168.842.  There is provision for the Secretary of State to direct an expedited canvass of the returns for the election of electors for President and Vice President.

73.     The federal provisions governing the appointment of electors to the Electoral College, 3 U.S.C. 1-18, require Michigan Governor Whitmer to prepare a Certificate of Ascertainment by December 14, the date the Electoral College meets.

74.     The United States Code (3 U.S.C. 5) provides that if election results are contested in any state, and if the state, prior to election day, has enacted procedures to settle controversies or contests over electors and electoral votes, and if these procedures have been applied, and the results have been determined six days before the electors' meetings, then these results are considered to be conclusive and will apply in the counting of the

electoral votes. This date (the "Safe Harbor" deadline) falls on December 8, 2020. The governor of any state where there was a contest, and in which the contest was decided according to established state procedures, is required (by 3 U.S.C. 6) to send a certificate describing the form and manner by which the determination was made to the Archivist as soon as practicable.

75. The members of the board of state canvassers are Democrat Jeannette Bradshaw, Republican Aaron Van Langeveide, Republican Norman Shinkle, and Democrat Julie Matuzak. Jeanette Bradshaw is the Board Chairperson. The members of the Wayne County board of county canvassers are Republican Monica Palmer, Democrat Jonathan Kinloch, Republican William Hartmann, and Democrat Allen Wilson. Monica Palmer is the Board Chairperson.

## COUNT I

### Secretary of State Benson and Wayne County violated the Equal Protection Clause of the United States Constitution and the corollary clause of Michigan's Constitution.

76. The Fourteenth Amendment to the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665, (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

77.     Wayne County's failure to allow challengers and its counting of ineligible and illegal ballots that did not comply with the Michigan Election Code diluted the lawful ballots of these plaintiffs and of other Michigan voters and electors in violation of the United States Constitution and the Michigan Constitution guarantee of equal protection.

78.     President Trump's campaign committee and these Michigan voters and challengers seek declaratory and injunctive relief requiring Secretary Benson to direct that Wayne County allow a reasonable number of challengers to meaningfully observe the conduct of the Wayne County board of county canvassers and the board of state canvassers and that these canvassing boards exercise their duty and authority under Michigan law, which forbids certifying a tally that includes any ballots that were not legally cast.

79.     In addition, President Trump's campaign committee and these Michigan voters and challengers ask this Court to order that no ballot processed by a counting board in Wayne County can be included in the final vote tally unless a challenger was allowed to meaningfully observe the process and the handling and counting of the ballot.

80.     Secretary Benson violated these Michigan voters' right to equal protection by allowing Wayne County to process and count ballots in a manner that allowed ineligible ballots to be counted and by not requiring Wayne County to conduct the general election in a uniform manner as required by Michigan's Election Code as was done in other jurisdictions.

**COUNT II**

**Secretary of State Benson and Wayne County violated the rights of these Michigan voters under the federal Elections and Electors Clauses.**

81.     The Electors Clause states that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of Electors" for President.  U.S. Const. art. II, §1, cl. 2 (emphasis added).

82.     Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof."  U.S. Const. art. I, §4, cl. 1 (emphasis added).

83.     Michigan statutes enacted by the legislature protect the purity and integrity of elections by allowing ballot challengers to monitor the counting and processing of absentee ballots.  Wayne County and Secretary Benson violated this statutory guarantee by preventing Republican challengers from meaningfully observing and participating in the ballot processing and counting process as is provided by MCL 168.730-736.

84.     It is a violation of the rights of President Trump's campaign committee to have federal elections for presidential electors governed under rules prescribed by the state legislature for Secretary Benson and Wayne County to count ballots that are not lawfully cast, and it is a violation of Michigan law for the Wayne County board of county canvassers and the Michigan board of state canvassers to certify an election tally that includes ineligible or unlawfully cast ballots.

## COUNT III

**Secretary of State Benson and Wayne County violated Michigan's Election Code.**

85.    MCL 168.730 provides:

(1) At an election, a political party or [an organization] interested in preserving the purity of elections and in guarding against the abuse of the elective franchise, may designate challengers as provided in this act.  Except as otherwise provided in this act, a political party [or interested organization] may designate not more than 2 challengers to serve in a precinct at any 1 time.  A political party [or interested organization] may designate not more than 1 challenger to serve at each counting board.

(2) A challenger shall be a registered elector of this state. . . . A candidate for the office of delegate to a county convention may serve as a challenger in a precinct other than the 1 in which he or she is a candidate. . . .

(3) A challenger may be designated to serve in more than 1 precinct.  The political party [or interested organization] shall indicate which precincts the challenger will serve when designating challengers under subsection (1).  If more than 1 challenger of a political party [or interested organization] is serving in a precinct at any 1 time, only 1 of the challengers has the authority to initiate a challenge at any given time.  The challengers shall indicate to the board of election inspectors which of the 2 will have this authority.  The challengers may change this authority and shall indicate the change to the board of election inspectors.

86.    Secretary of State Benson and the election officials in Wayne County violated MCL 168.730-168.734 by denying Republican challengers' rights to meaningfully observe and participate in the ballot processing and counting process..

87.    Michigan Election Code, MCL 168.734 provides:

Any officer or election board who shall prevent the presence of any such challenger as above provided, or shall refuse or fail to provide such challenger with conveniences for the performance of the duties expected of him, shall, upon conviction, be punished by a fine not exceeding $1,000.00, or by imprisonment in the state prison not exceeding 2 years, or by both such fine and imprisonment in the discretion of the court.

88.    Wayne County's and Secretary Benson's denial of Republican challengers' right to participate and observe the processing of ballots violates Michigan's Election Code

and resulting in the casting and counting of ballots that were ineligible to be counted and diluted or canceled out the lawfully cast ballots of other Michigan voters.

## PRAYER FOR RELIEF

President Trump's and Vice President Pence's campaign committee and these Michigan citizens and voters ask this Court to enter a declaratory judgment in their favor as set forth in the foregoing counts and to grant the following injunctive relief:

A.  An order directing Secretary Benson and the Michigan Board of State Canvassers to not certify the election results until they have verified and confirmed that all ballots that were tabulated and included in the final reported election results were cast in compliance with the provisions of the Michigan Election Code as set forth herein.

B.  An order prohibiting the Wayne County board of county canvassers and the board of state canvassers from certifying any vote tally that includes:

(1) fraudulently or unlawfully cast ballots;

(2) ballots tabulated using the Dominion tabulating equipment or software without the accuracy of individual tabulators having first been determined;

(3) any ballots that were received after Election Day (November 3, 2020) where the postmark or date of receipt was altered to be an earlier date before Election Day; and

(4) any ballots that were verified or counted when challengers were excluded from the room or denied a meaningful opportunity to observe the handling of the ballot and poll book as provided in MCL 168.733.

C.  An order directing the Wayne County board of county canvassers to summon and open the ballot boxes and other election material, as provided in MCL 168.823, and, in the presence of challengers who can meaningfully monitor the process, to review the poll lists, absent voter ballot envelopes bearing the statement required by MCL 168.761, and other material provided in MCL 168.811.

D.  An order directing that challengers be allowed to be physically present with a meaningful opportunity to observe when the accuracy of each piece of tabulating equipment is determined, and if the accuracy of each piece of tabulation equipment used by Wayne County is not confirmed to be

accurate, an order directing a special election be held in the affected precincts as provided by MCL 168.831-168.839.

E.     An order directing the board of county canvassers and the board of state canvassers, with challengers present and meaningfully able to observe, to obtain and review the video of unattended remote ballot drop boxes.

Plaintiffs further pray the Court to grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Respectfully submitted,

TRUE NORTH LAW, LLC

*/s/ Mark F. (Thor) Hearne, II*
Mark F. (Thor) Hearne, II (P40231)
Stephen S. Davis (*pro hac* forthcoming)
TRUE NORTH LAW, LLC
112 S. Hanley Road, Suite 200
St. Louis, MO 63105
(314) 296-4000
thor@truenorthlawgroup.com

*Counsel for Plaintiffs*