# EXHIBIT 14

## STATE OF MICHIGAN
## BOARD OF STATE CANVASSERS

2016 DEC -1 PM 2: 35

| | |
|---|---|
| In re Petition for Recount for the Office of President of the United States of America | ) ) ) ) |

Gary P. Gordon (P26290)
Jason T. Hanselman (P61813)
Dykema Gossett, PLLC
Attorneys for Donald J. Trump
201 Townsend Street, Suite 900
Lansing, MI 48933
(517) 374-9100

Denise Barton (P41535)
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa Avenue
G. Mennen Williams Bldg.
Lansing, MI 48933
(517) 373-6434

Mark Brewer (P35661)
Goodman Acker PC
Attorneys for Jill Stein for President
17000 W 10 Mile Rd Fl 2
Southfield, MI 48075-2923

Donald F. McGahn II
Counsel
Donald J. Trump for President, Inc.
51 Louisiana Ave., N.W.
Washington, D.C. 200001-2113
(202) 879-3939

Chad A. Readler
Jones Day
Attorney for Donald J. Trump
325 John H. McConnell Blvd., Suite 600
Columbus, OH, 43221
(614) 469-3939
*Pro hac vice application pending*

Eric E. Doster (P41782)
Doster Law Offices, PLLC
Attorney for Donald J. Trump
2145 Commons Parkway
Okemos, MI 48864
(517) 483-2296

John D. Pirich (P23204)
Honigman Miller Schwartz and Cohn LLP
Attorneys for Donald J. Trump
222 North Washington Square, Suite 400
Lansing, Michigan 48933
(517) 377-0712

## DONALD J. TRUMP AND DONALD J. TRUMP FOR PRESIDENT, INC.'S OBJECTIONS TO DR. JILL STEIN'S RECOUNT PETITION

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN 48933

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................ 1

Background ......................................................................................................... 3

Argument ............................................................................................................ 4

    1.    As the fourth-place finisher, Dr. Jill Stein is not "aggrieved" by any alleged fraud or mistake, and is therefore not entitled to a recount. ................................... 4

    2.    A recount cannot be completed in time for Michigan to have its Electoral College votes counted. ....................................................................... 11

    3.    The petition must also be rejected because it is not properly signed and sworn to by the candidate. ........................................................................... 14

Conclusion ........................................................................................................ 15

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN 48933

## OBJECTIONS TO DR. JILL STEIN'S RECOUNT PETITION

NOW COMES Donald J. Trump and Donald J. Trump for President, Inc., by and through their attorneys, in support of these Objections to the Petition for Recount filed by Green Party presidential candidate Dr. Jill Stein, stating as follows:

### INTRODUCTION

Green Party presidential Candidate Dr. Jill Stein received barely 1 percent of the vote in the 2016 Michigan presidential election, finishing over 2.2 million votes behind the winner. Stein, in fact, finished no higher than fourth in any state where she appeared on the ballot. Yet despite being just a blip on the electoral radar, Stein has now commandeered Michigan's electoral process.

Minutes before the deadline, Stein filed a half-page, four paragraph petition challenging the outcome of Michigan's presidential election. Despite the substantial nature of her filing, Stein offered no specificity, examples, or even a clear articulation of her theoretical concerns. Indeed, on the basis of nothing more than speculation, Stein asks that Michigan residents endure an expensive, time-consuming recount, and the scrutiny and hardship that comes with it. And not simply a tedious recount of the totals of thousands of individual election machines, but instead a painstaking recount by hand of each of the nearly 5 million ballots cast for President in Michigan. Even with heroic efforts by state and local elections officials, that process will undoubtedly last weeks, likely months, and certainly past the December 13 deadline for certifying Michigan's presidential electors. See 3 USC § 5 (requiring disputes over electors to be resolved by December 13).

Stein's request no doubt comes as shock to most Michiganders. Michigan voters—having endured a lengthy, expensive, hard-fought presidential election—surely expected their votes would matter when the Electoral College meets this December. Yet the election's fourth-

1

place finisher seeks to jeopardize the participation of *every voter in Michigan* with a lengthy recount. And she asks Michigan to spend $4 million of its own money to fund the recount that creates this risk. See Livengood, *Mich. Recount to start Friday barring Trump challenge*, THE DETROIT NEWS (Dec. 1, 2016), archived at https://perma.cc/LN4N-2SEE ("Secretary of State Ruth Johnson said Wednesday the recount cost could total $5 million," and that "state and county governments on the hook for … $4 million.")

On what basis does Stein seek to disenfranchise Michigan citizens? None really, save for speculation. All available evidence suggests that the 2016 general election was *not* tainted by fraud or mistake. Governor Snyder has said so. See Governor Rick Snyder on Twitter, TWITTER (Nov. 28, 2016) *archived at* https://perma.cc/Q5X3-ACZV. So too has the White House. See Geller, *White House insists hackers didn't sway election, even as recount begins*, POLITICO (Nov. 26, 2016), *archived at* https://perma.cc/5Z5C-Z59S. Even the chief counsel to second-place finisher Hillary Clinton concedes there is no evidence of any tampering that would warrant a recount or lawsuit. See Elias, *Listening and Responding To Calls for an Audit and Recount*, MEDIUM, archived at https://perma.cc/S45U-MWZ4.

Nonetheless, Stein insists that her accusation alone compels a statewide recount. That herculean effort is necessary, she says, because Michigan must "ensure the accuracy and integrity of the election." In Stein's mind, apparently, election results are deemed unreliable, and election officials are deemed corrupt or incompetent, until proven otherwise. Nonsense. Simply put, Michigan should not grant this lawless, insulting request, and its voters should not risk having the Electoral College door knocked off its hinges, all because a 1-percent candidate is dissatisfied with the election's outcome.

Regrettably, Michigan is not the only victim of Stein's electoral farce. Rather, it is the

2

nation as a whole. By "contesting" the clear choice of millions of voters in Michigan, Pennsyl-

vania, and Wisconsin, Stein aims to sow doubts regarding the legitimacy of the presidential elec-

tion while denying millions of people in three separate states a seat at the Electoral College table.

And in bringing mayhem to the otherwise orderly, time-honored Electoral College process, Stein

is meddling with confirmation of the election's outcome when Congress meets in January 2017.

Ultimately, Stein cannot change the outcome of the presidential election. But she apparently has

no qualms over creating constitutional chaos in her effort to do so. All of this, moreover, while

she continues to pluck money from others to support her frivolous requests and other frolics.

The law does not require the State to support this ruse, and it should not do so.

## BACKGROUND

On November 9, 2016, Hillary Clinton conceded the presidential election to Donald J.

Trump. Over the next several weeks, President-elect Trump worked to fill his Cabinet. In Mich-

igan, the Boards of County Canvassers in each county canvassed the votes cast in their precincts,

verifying provisional ballots and ensuring that every valid vote cast was included in the election

totals. Stein, who never finished so high as third in any state Presidential election, nonetheless

began raising funds to conduct recounts in various states.

On November 28, upon completion of the canvass, the Michigan Board of State Canvass-

ers (the "Board") certified the results of the election. The final vote tallies included 2,279,543

votes for President-elect Trump, 2,268,839 votes for Hillary Clinton, 172,136 votes for Libertar-

ian candidate Gary Johnson, and 51,463 votes for Stein. See *2016 Presidential Election Results*,

MICHIGAN SECRETARY OF STATE (last visited Nov. 30, 2016), http://www.michigan.gov/sos/

0,4670,7-127-1633_8722_76444-397762--,00.html. That same day, despite the absence of a

formal recount petition filed by Stein, the Board of State Canvassers indicated that the anticipat-

ed statewide recount would be conducted by hand. Two days later—at almost the last possible

3

moment—Stein filed a recount petition with the Board (the "Recount Petition").   She has filed similar requests in Pennsylvania and Wisconsin.

### ARGUMENT

MCL 168.879(1) permits candidates "voted for at a primary or election for an office" to "petition for a recount," if and only if they can meet certain requirements.  (Although Stein filed affidavits of "electors," only candidates have standing to request a recount.)   Among other things, the petition must allege "that the candidate is *aggrieved* on account of fraud or mistake in the canvass of the votes by the inspectors of election or the returns made by the inspectors, or by a board of county canvassers or the board of state canvassers."  MCL 168.879(1)(b) (emphasis added).

Stein's recount petition fails this standard.  She does not allege (let alone explain) how a fourth-place finisher could be "aggrieved" by the election canvas.  And even if that could be overlooked, Stein's request would have to be denied because no recount can be reliably completed in the time required by state and federal law.  Finally, in addition to all that, Stein's petition is not properly notarized as required by Michigan law.

**1.    As the fourth-place finisher, Dr. Jill Stein is not "aggrieved" by any alleged fraud or mistake, and is therefore not entitled to a recount.**

Because Stein has not alleged an actual injury relating to the canvass of the votes in the Michigan presidential election, her petition does not allege that she is aggrieved.

**1.1.**   Michigan law requires candidates seeking recounts to allege that they have been "*aggrieved* on account of fraud or mistake in the canvass of the votes by the inspectors of election or the returns made by the inspectors, or by … the board of state canvassers."  MCL 168.879(1)(b) (emphasis added).  If a "statute's language is clear and unambiguous," the government must "assume that the Legislature intended its plain meaning and … enforce the statute

4

as written." *People v Gardner*, 482 Mich 41, 50; 753 NW2d 78 (2008) (internal quotation marks omitted).

MCL 168.879 is unambiguous with respect to its use of the term "aggrieved." That word, in this context, connotes the violation of a legal right that *causes harm* to the right's holder. See *Maxwell v Dep't of Environmental Quality*, 264 Mich App 567, 571; 692 NW2d 68, (2004) ("Black's Law Dictionary (6th ed.) defines 'aggrieved' to mean 'Having suffered loss or injury; damnified; injured.'"); see also *Black's Law Dictionary* (10th ed) ("[H]aving legal rights that are adversely affected; *having been harmed by* an infringement of legal rights") (emphasis added). In the election context, a candidate is harmed—and thus "aggrieved"—by losing an election she should have won.

Michigan officials have long understood "aggrieved" to bear its natural meaning. See That much is confirmed by the statements Chris Thomas, Michigan's Director of Elections, made before a hearing of the Board of State Canvassers ten years ago. See Board of State Canvassers Hearing Transcript, November 27, 2006, pp. 1-2. attached as Exhibit 1. There, he reported that the Board "rejected" a recount petition "from a candidate for Secretary of State," who challenged the results in "a number of precincts from Washtenaw County." *Id*. Mr. Thomas explained that Michigan recount law "talks about an *aggrieved* candidate," and added that the petitioning Secretary-of-State candidate did not qualify. *Id*. (emphasis added). Why? Because she did not challenge the vote in "enough precincts to actually affect the outcome of the election." *Id*.

That natural understanding of "aggrieved" is consistent with the idea that legal redress is typically available only to those able to show that they have been harmed. Most torts, for example, require proof of injury. See, e.g., *Henry v Dow Chem Co*, 473 Mich 63, 72; 701 NW2d 684

5

(2005) ("Michigan law requires an actual injury to person or property as a precondition to recovery under a negligence theory."). So too do most statutory rights of action. See, e.g., *Epps v 4 Quarters Restoration LLC*, 498 Mich 518, 534; 872 NW2d 412 (2015) (explaining that Michigan courts will infer a private right of action to exist only where necessary to, among other things, protect against "the kind of harm which has resulted") (internal citations omitted).

Interpreting "aggrieved" to connote some degree of actual injury also comports with the way that word is used throughout Michigan law. Take, for example, the standing context, where the Michigan Supreme Court has held that "[a]n aggrieved party is not one who is merely disappointed over a certain result," but rather a party who has "suffered a concrete and particularized injury." *Federated Ins Co v Oakland County Rd Comm'n*, 475 Mich 286, 291; 715 NW2d 846 (2006). This statement reflects the longstanding rule that "[t]o be aggrieved, one must have some interest … in the outcome of the case, and not a mere possibility arising from some unknown and future contingency." *In re Miller's Estate*, 274 Mich 190, 339-340; 264 NW 338 (1936). This harm-requiring reading of "aggrieved" finds more support in *Herman Brodsky Enterprises, Inc v State Tax Commission*, 204 Mich App 376, 383; 522 NW2d 126 (1994), which held that petitioners did not qualify as a "part[ies] aggrieved," for purposes of MCL 207.570, where "no substantial rights of the petitioners were prejudiced." *Herman*, 204 Mich App at 383. See also *Emerick v Saginaw Township*, 104 Mich App 243, 247; 304 NW2d 536 (1981) (explaining that an "aggrieved party" in a fraud case must "allege a causal link between the inequitable conduct and the resulting harm").

In other words, Michigan courts have consistently read "aggrieved" to require actual injury. Michigan's legislature must be assumed to have been aware of that settled meaning when it amended MCL 168.879 in 1999. And when "administrative and judicial interpretations have set-

6

tled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well." *Bragdon v Abbott*, 524 US 624, 645; 118 S Ct 2196; 141 L Ed 2d 540 (1998).

For this reason, Michigan cases involving recounts unsurprisingly involve margins close enough to permit an inference that the alleged fraud or mistake caused the petitioning candidate to lose an election; harm that would render the losing candidate "aggrieved." See, e.g., *Kennedy v Bd of State Canvassers*, 127 Mich App 493, 495; 339 NW2d 477 (1983) (difference of 17 votes between winning and losing candidate); *State v Bd of City Canvassers*, 70 Mich 147, 148-149; 38 NW 11 (1888) ("aggrieved" party, who claimed he would have won but for error in counting votes, was entitled to a recount). MCL 168.879 has never been understood to permit challenges by bottom-dwelling (and thus not aggrieved) candidates like Stein.

**1.2** Cases from Michigan's sister states confirm that parties claiming to have been "aggrieved" by vote-counting errors must allege that the errors made a difference. One court, interpreting another recount statute, explained that "the 'person aggrieved' must have sustained a direct injury that somehow differentiates him or her from other members of the community." *Babiarz v Town of Grafton*, 155 NH 757, 761; 930 A2d 395 (2007). Another held that a candidate is not "aggrieved" by a recount unless "the ultimate consequence of the recount" goes against him. *Carville v Allen*, 13 AD2d 866, 867; 214 NYS2d 985 (1961). Likewise, when the candidate "does not claim or demonstrate entitlement to th[at] nomination or contend that he would have received it were it not for alleged irregularities in the [election process]," he is not an "aggrieved candidate." *Nicolai v Kelleher*, 45 AD3d 960, 962; 844 NYS2d 504 (2007).

Similarly, the Wisconsin Court of Appeals held that a candidate was not "aggrieved" where she was "not directly injured by [a] recount because the result was in her favor." *Roth v*

7

*La Farge Sch Dist Bd of Canvassers*, 247 Wis 2d 708, 719; 634 NW2d 882 (2001). And the same court has held "that a person running for office could not be aggrieved by any election ir-regularities if he or she was not eligible to run for or hold that office in the first place." *Willan v. Brereton*, 238 Wis 2d 446 at *5; 617 NW2d 907 (2000) (per curiam) (unpublished table disposi-tion). Each of these cases illustrates that one cannot be aggrieved, in the relevant sense, without having suffered an injury. And each is in addition to the cases from other states holding that, without regard to any statutory requirement of aggrievement, recounts are unavailable unless the alleged "irregularities" are "such that they would change the result." *Wood v. Lydick*, 1974 OK 75, 523 P.2d 1082, 1084 (1974). There is no good reason for Michigan to do things differently.

**1.3** It is true that "[p]ublic policy requires that statutes controlling the manner in which elections are conducted be construed as far as possible in a way which prevents the disenfran-chisement of voters through the fraud or mistake of others." *Kennedy*, 127 Mich App at 496. But there is also "a strong public policy favoring stability and finality of election results." *Buo-nanno v DiStefano*, 430 A2d 765, 770 (1981); see also *Sumner v New Hampshire Sec'y of State*, 168 NH 667, 670; 136 A3d 101 (2016) (same); *Donaghey v Attorney Gen*, 120 Ariz 93, 95; 584 P2d 557 (1978) ("The rationale for requiring strict compliance with the time provisions for initi-ating a contest is the strong public policy favoring stability and finality of election results."). And the interest in finality outweighs the competing interest where the party seeking a recount cannot allege even a slim possibility that voter "disenfranchisement" cost her the election. Such is the case here. Further, the principle of liberal construction comes into play only when the statute is otherwise ambiguous. Here, the text and context are *un*ambiguous, and so that princi-ple has no role to play.

No doubt, the Michigan Legislature could have passed a recount law permitting *all* losing

candidates to demand a recount. Some states do exactly that. See, e.g., § 102.168(1), Fla Stat (allowing a challenge "by any unsuccessful candidate for [the particular] office"). But Michigan's legislature authorized only those "aggrieved" by the outcome to seek a recount, and so that word cannot be read as mere "surplusage." *Robertson v DaimlerChrysler Corp,* 465 Mich 732, 748; 641 NW2d 567 (2002). To avoid giving "aggrieved" no meaning—to avoid treating it as surplusage—it should be read to require allegations of actual injury. See *Babiarz*, 155 NH at 759 (applying identical logic to a New Hampshire statute's use of "aggrieved").

To be sure, the legislature may create legal rights enforceable without any showing of harm. See *Lansing Sch Educ Ass'n v Lansing Bd of Educ*, 7487 Mich 349; 92 NW2d 686 (2010) (explaining Michigan's standing doctrine). But it would be stunning if the legislature did so here: What could justify giving candidates the right to force an expensive, time-consuming recount when they are "aggrieved" only in the sense of being "troubled or distressed in spirit"? See *Webster's Ninth New Collegiate Dictionary* (1987). Nothing at all, which bolsters the conclusion that MCL 168.879 was not intended, and has never been understood, to permit recounts at the request of a candidate who does not even purport to be the potential winner.

We are aware of just one case that supports the contrary meaning—an unpublished Report and Recommendation from a magistrate judge that addressed the issue in dicta. See *Bormuth v. Johnson*, 16-cv-13166, Dk. No. 13, slip op. 13–15 (E.D. Mich. Oct. 24, 2016). Its analysis is not binding, both because it occurs in dicta, *Auto-Owners Ins. Co. v. All Star Lawn Specialists Plus, Inc.*, 497 Mich. 13, 21, 857 N.W.2d 520, 523 (2014), and because Michigan courts and agencies are "not bound to follow a federal court's interpretation of state law," *Doe v. Young Marines of The Marine Corps League*, 277 Mich. App. 391, 399, 745 N.W.2d 168, 172 (Mich. 2007). Neither is it persuasive. *Borsuch* relied primarily on the principle of liberal construction

9

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN 48933

addressed above, which it believed militated for reading "aggrieved" to mean "having legal rights that are adversely affected." *Borsuch*, slip op. at 14 & n.8. And, it concluded, a candidate's legal rights are adversely affected whenever the vote total is not "accurately tabulated." *Id.*

This analysis is flawed. For one thing, the liberal principle of interpretation has no application here, for the reasons discussed above. Even if it did, the definition of "aggrieved" on which *Borsuch* relies does not support its conclusion. It is true that "aggrieved" may refer to "having legal rights that are adversely affected." But that is only because people are usually injured when their rights are affected, and so that sense of the word *assumes* actual harm. Indeed, the very definition *Borsuch* cites makes this clear: "having legal rights that are adversely affected; *having been harmed by an infringement of legal rights*." Black's Law Dictionary 80 (10th ed.) (quoted in part by *Borsuch*, slip op. at 14 n.8) (emphasis added). *Borsuch* reached its conclusion by simply ignoring, and by *failing to quote*, the second half of that definition. Far from justifying a harm-free reading of "aggrieved," this definition underscores the obviousness of the link between injury and aggrievement.

One final flaw plagues the *Borsuch* decision: it made no attempt to grapple with its interpretation's problems. It did not explain, for example, why its reading of "aggrieved" did not treat the word as surplusage. Nor could it have: If a candidate is "aggrieved" whenever votes are not "accurately tabulated," then a candidate would allege aggrievement simply by alleging mistake or fraud. Why, then, did Michigan's legislature require allegations of *both* (1) aggrievement, and (2) mistake or fraud? *Borsuch* has no answer.

**1.4** In light of all this, the recount cannot go forward. On November 28, 2016, the Board certified the results of this year's general election. Trump won the state, with 2,279,543 votes.

10

Stein came in fourth, with just 51,463 votes. For perspective, third-place finisher Gary Johnson more than tripled Stein's performance, receiving 172,136 votes. See 2016 Michigan Election Results, http://miboecfr.nictusa.com/election/results/2016GEN_CENR.html (last visited Nov. 29, 2016). Given her tiny vote total, Stein does not, and could not possibly, allege a good-faith belief that she may have won the state of Michigan. Assuming for the sake of argument that there were errors in counting the votes, it is ludicrous to suggest that her votes were undercount-ed by over 2 million. That is especially so because Stein's support in Michigan is roughly con-sistent with the support she earned around the country; she won just over 1 percent of the votes in Michigan, and between .4 and 3 percent in other states where she appeared on the ballot. America's Election Headquarters, http://www.foxnews.com/politics/elections/2016/presidential-election-headquarters (last visited Nov. 29, 2016).

In sum, Stein fails to allege that any improprieties harmed her, and thus fails to allege that she is "aggrieved" for purposes of MCL 168.879. She therefore fails to satisfy the requirements for a recount, and her petition should be denied.

**2.     A recount cannot be completed in time for Michigan to have its Electoral College votes counted.**

Even if Stein satisfied the requirements of MCL 168.879, her request would have to be denied, as it interferes with Michigan and federal law governing the certification of electors.

Federal law's safe-harbor statute requires that a state's determination of electors be "made at least six days before the time fixed for the meeting of the electors." 3 USC § 5. Mich-igan, by requiring its electors to convene and vote within the time-frame required by that statute, see MCL 168.47, has evinced its intent to come within its safe harbor. This year, the "meeting of the electors" will occur on December 19, 2016. 3 USC § 5. Therefore, because Michigan has indicated its intent to participate in the electoral process described by 3 USC § 5, "any controver-

11

sy or contest that is designed to lead to a conclusive selection of electors [must] be completed

by" December 13. *Bush v. Gore*, 531 US 98, 110; 121 S Ct 525; 148 L Ed 2d 388 (2000).

That is no longer possible, particularly if the recount is to occur by hand. Stein waited

until the last possible hour to file her recount petition—this despite having all she needed to seek

a recount long beforehand. While Michigan law mandates that recount petitions be filed no later

than "48 hours following the competition of the canvass of votes," MCL 168.879(c), it puts no

limitations on filing earlier, including *before* the canvass of votes, *Santia v Bd of State Canvass-

ers*, 152 Mich App 1; 391 NW2d 504 (1986).

It may well be possible to finish a recount in short order in a local race. But anyone seek-

ing a recount in a statewide race, in particular the presidential election, must be conscious of time

constraints, and must file in a manner that will enable election officials to comply with the re-

quest. Yet Stein waited until minutes before the deadline, making a recount impossible under

state and federal deadlines. Given Stein's 11th-hour recount request, the State could not start a

recount before Friday, December 2, 2016, giving vote counters just eleven days to recount nearly

5 million votes. The result is a "logistical hell," says one election official, no doubt aware of the

frenzy caused by a late-stage recount. See Livengood, *Ingham Co. clerk calls recount $45k 'lo-

gistical hell'*, DETROIT NEWS (Nov. 30, 2016), archived at https://perma.cc/44JE-H3LK. Anoth-

er explained that Oakland County has "never had a recount of this magnitude," and described the

task as a "monumental undertaking." See Wisely, Guillen, & Hall, *Here's What Michigan Will

need for 'monumental' presidential recount*, Detroit Free Press (Nov. 29, 2016), archived at

https://perma.cc/HM3F-DY8R. And lest there be any doubt about the deadline, note that the

Wisconsin Elections Commission ordered another Stein-led recount to be completed by Decem-

ber 12. See *In re: A Recount of the General Election for President of the United States held on*

12

*November 8, 2016*, Recount EL 16-03 (Nov. 29, 2016). Attached as Exhibit 2.

To count that many votes by hand is not feasible. See Affidavits of John Pirich and Jason Hanselman attached as Exhibits 3 and 4, respectively. And any attempt to finish the process in time will no doubt lead to errors; poll workers will need to work with tremendous speed for long hours, and mistakes are inevitable. Indeed, one election-law expert has opined that "it is doubtful that *any* state could fairly complete its procedures on" the current federal safe harbor timetable. Tokaji, *An Unsafe Harbor*, 106 Mich L Rev 84, 86 (2008). And this is so even though many of these states would typically be able to begin recounting ballots much earlier than Michigan would be able to here. Reading MCL 168.879 to permit a recount in the present circumstances thus contradicts the principle that "statutes controlling the manner in which elections are conducted be construed as far as possible in a way which prevents the disenfranchisement of voters through the fraud *or mistake* of others." 152 Mich App at 6 (emphasis added). Here, holding a frantic, around-the-clock recount all but assures mistakes.

Reading MCL 168.879 to allow a recount would also contradict the principle that laws governing related subject matter should, "so far as reasonably possible, be construed in harmony with each other, so as to give force and effect to each." *Int'l Bus Machines Corp v Dep't of Treasury*, 496 Mich 642, 652; 852 NW2d 865 (2014). That principle matters here because, again, Michigan has opted to avail itself of 3 USC § 5's safe-harbor provision. See MCL 168.47. Reading Michigan recount law to require recounts that cannot be completed during the safe-harbor period would thus bring it into conflict with MCL 168.47. That conflict is easily avoided, however, by reading Michigan's recount provisions as implicitly prohibiting recounts initiated so late in the process that they cannot be reliably completed before the 3 USC § 5 deadline expires. That harmonizes all the relevant provisions. See *Int'l Bus. Machines*, 496 Mich at 651-652.

13

It is also consistent with the rule that "[c]ourts should be reluctant to apply the literal terms of a statute to mandate pointless expenditures of effort." *Alabama Power Co v Costle*, 204 US App DC 51, 62; 636 F.2d 323 (1979).  That rule suggests that Michigan's recount provisions should be read as implicitly disallowing recounts that cannot be finished in time to have any effect.  And the rule has particular force where, as here, the party demanding the pointless expenditure suffered no harm from the wrongs that expenditure is supposed to right.

At the very least, there is no way of reliably counting the ballots by hand.  Nor is there any reason to, as machines are more reliable, and *less* likely to create opportunities for fraud than the use of human counters.  To be clear, there is no reason to believe that even a machine recount could be carried out by December 13.  But if the State is to have any chance at doing so, that is its only option.

**3.      The petition must also be rejected because it is not properly signed and sworn to by the candidate.**

There is yet another insurmountable problem for Stein.  Michigan law requires that all recount petitions be signed and sworn to by the candidate.  MCL 168.879(1)(e).  Stein's Recount Petition was notarized in Massachusetts, but was not validly notarized.  Under Massachusetts law, a jurat (the statement a notary public must affix to make the notarization valid) must take substantially the following form:

> On this _____ day of_____, 20_____, before me, the undersigned Notary Public, personally appeared _____(name of document signer),proved to me through satisfactory evidence of identification, which were_____, to be the person who signed the preceding or attached document in my presence, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of (his) (her) knowledge and belief.
>
> _____(official signature and seal of Notary).  See Apostilles and Certificates of Appointment, Exhibit 5.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN 48933

The jurat on Stein's petition leaves out critical requirements. For example, it does not say that Stein "personally appeared." Nor does the Recount Petition list the forms of identification she used. The notarization is therefore invalid and the Recount Petition must be rejected because Stein has failed to sign and swear to the Recount Petition as the candidate.

## CONCLUSION

The costs of going forward with this recount must not be underestimated. Most obvious, perhaps, are the expenditures of time and money that any recount will entail. Then there are the less-measurable but no-less-real costs that come with questioning the validity of the State's electoral processes. See *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197, 128 S. Ct. 181, 170 L.Ed.2d 574 (2008) (plurality) (explaining that states have an interest in ensuring "public confidence in the integrity and legitimacy of representative government.") (internal quotation marks omitted*).* Finally, the manner in which the recount is carried out is likely to provoke numerous legal challenges. For example, any inequity or inadequacy in the vote-counting will spur lawsuits alleging violations of the Michigan Constitution's Fair and Just Treatment Clause, Mich Const 1963, art I, § 17, or of the federal and state Due Process clauses, *id*. & U.S. Const., Am. 14. And if the Board's decision to conduct a hand recount is indeed a "rule," as Chris Thomas has said, then its informal promulgation likely violated Michigan's Administrative Procedure Act. MCL 24.207.

Many of these costs would be acceptable if Michigan law really did entitle Stein to a recount. But it does not. And there is no reason to rewrite Michigan election law to accommodate the conspiracy-minded requests of an acknowledged loser. The Board should therefore deny Stein's recount petition.

15

Respectfully submitted,

Dated: December 1, 2016

s/ Eric E Doster (with permission)
Eric E. Doster (P41782)
DOSTER LAW OFFICES, PLLC
Attorney for Donald J. Trump
2145 Commons Parkway
Okemos, MI 48864
Telephone: (517) 977-0147

Donald F. McGahn II
General Counsel
Donald J. Trump for President, Inc.
51 Louisiana Ave., N.W.
Washington, D.C. 200001-2113
(202) 879-3939
*Pro hac vice application pending*

Chad A. Readler
JONES DAY
Attorney for Donald J. Trump
325 John H. McConnell Blvd., Suite 600
Columbus, OH, 43221
(614) 469-3939
*Pro hac vice application pending*

John D. Pirich (P23204)
HONIGMAN MILLER SCHWARTZ COHN
Attorney for Donald J. Trump
222 North Washington Square Suite 400
Lansing, MI 48933
Telephone: (517) 377-0712

Gary P. Gordon (P26290)
Jason T. Hanselman (P61813)
DYKEMA GOSSETT PLLC
Attorneys for Donald J. Trump
201 Townsend Street, Suite 900
Lansing, MI 48933
Telephone: (517) 374-9133