# EXHIBIT 4

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., MATTHEW, SEELY, ALEXANDRA SEELY, PHILIP O'HALLORAN, ERIC OSTERGREN, MARIAN SHERIDAN, MERCEDES WIRSING, and CAMERON TARSA,<br><br>Plaintiffs,<br><br>v.<br><br>JOCELYN BENSON, in her official Capacity as Michigan Secretary of State, MICHIGAN BOARD OF STATE CANVASSERS, WAYNE COUNTY, MICHIGAN, and WAYNE COUNTY BOARD OF COUNTY CANVASSERS,<br><br>Defendants. | No. 1:20-cv-01083<br><br>Judge Janet T. Neff |

### CITY OF DETROIT'S PROPOSED ANSWER

Now comes the City of Detroit (the "City"), by and through counsel, and hereby states for its Answer and Affirmative Defenses to Plaintiffs' Complaint:

### SUMMARY OF THIS ANSWER[1]

This is one of the many lawsuits brought by the Trump campaign and its allies, seeking to interfere with the Michigan electoral process and to overturn the State's election results. This is at least the second suit filed by Donald J. Trump For President, Inc. The first was filed in the Michigan Court of Claims, where Judge Cynthia Diane Stephens issued an Opinion and Order finding, in part, that "the day-to-day operation of an absent voter counting board is controlled by the pertinent city or township clerk." *Donald J Trump for President Inc et al v Jocelyn Benson*,

---

[1] The Complaint includes a "summary," which "is not part of the Complaint but is provided for the convenience of the Court and parties." This proposed Answer includes a summary in response to same.

1

Opinion and Order of Michigan Court of Claims, issued Nov 6, 2020 (Case No 20-000225-MZ) Despite that admonition, this case raises some of the identical claims, and, once again, the Plaintiffs have failed to name the City of Detroit or any other local authority as a defendant. The Complaint repeatedly alleges that Wayne County conducted the election in Detroit, displaying a fundamental misunderstanding of how elections operate in Michigan. This mistake might be understandable from parties or attorneys with little familiarity with Michigan's election system, but, here, Judge Stephens has explained our State's statutes to the lead Plaintiff and its counsel. The Complaint repeatedly refers to "election officials in Wayne County," as though their geographical location establishes the County's responsibility for the activities of a City operating within its borders. That carelessness permeates the Complaint, with multiple allegations and legal theories which reveal the absence of any serious understanding of Michigan election law, asserting claims that simply lack legitimate legal grounds.

Two other Complaints, making most of the same allegations as here, have also been rejected by the Wayne County Circuit Court. See *Costantino et al v City of Detroit et al*, Opinion and Order of Wayne County Circuit Court, issued Nov 13, 2020 (Case No 20-014780-AW); *Stoddard et al v City Election Commission of the City of Detroit et al*, Opinion and Order of Wayne County Circuit Court, issued Nov, 6 2020 (Case No 20-014604-CZ).

As in the previous lawsuits, Plaintiffs here do not—and cannot—provide any legitimate evidence of voter fraud. They rely exclusively on debunked conspiracy theories. Most of the allegations in this lawsuit have already been rejected at least three times. The claims were rejected in two separate lawsuits by Chief Judge Timothy Kenny of the Wayne County Circuit Court and by Judge Stephens in the Michigan Court of Claims.

Unofficial results show that President-Elect Joe Biden carried this State by more than 145,000 votes. No lawsuit or recount can meaningfully change that result. The only realistic purpose of this litigation is to create delay to interfere with the timely appointment of Michigan's presidential electors or to validate the unfounded attacks on the integrity of our elections to undermine confidence in our democracy. Plaintiffs' attempts to derail this election based upon baseless allegations of fraud and unsupported conspiracy theories should be rejected by the Court; they represent a threat to the most fundamental of democratic rights – the right to vote.

1.      This Court has subject matter under 28 U.S.C. 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

**The City admits that this Court has jurisdiction under 28 U.S.C. § 1331, but denies that Plaintiffs state a claim upon which relief can be granted.**

2.      This Court also has subject matter jurisdiction under 28 U.S.C. 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

**The City admits that this Court has jurisdiction under 28 U.S.C. § 1343, but denies that Plaintiffs state a claim upon which relief can be granted.**

3.      The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

**The City admits that this Court has jurisdiction to issue a declaratory judgment pursuant 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57, but denies that Plaintiffs state a claim upon which relief can be granted**

4. This Court has jurisdiction over the related Michigan constitutional claims and state-law claims under 28 U.S.C. 1367.

**The City admits that this Court has jurisdiction under 28 U.S.C. § 1367, but denies that Plaintiffs state a claim upon which relief can be granted.**

5. Venue is proper because Secretary Benson and the board of state canvassers are located in Lansing, Michigan. The Office of the Secretary of State is in Lansing, Michigan. The board of state canvassers meets in Lansing, Michigan. 28 U.S.C. 1391(b) & (c).

**The City admits that venue is proper in this jurisdiction but denies that Plaintiffs state a claim upon which relief can be granted.**

## PARTIES

6. The entity, Donald J. Trump for President, Inc., is the campaign committee for the reelection of President Donald J. Trump and Vice President Michael R. Pence and have a substantial interest in assuring that Michigan election officials process and count Michigan citizens' ballots as required by the United States Constitution, the Michigan Constitution, and Michigan law so that every Michigan voter's lawfully-cast ballot is fairly and equally counted.

**The City neither admits nor denies the allegation for lack of sufficient information to form a belief as to the truth of the allegation, and, being without sufficient information, leaves Plaintiffs to their proofs. The City affirmatively states that Donald J. Trump for President, Inc does not have a substantial interest in this lawsuit, because the lawsuit is frivolous and**

**because the lawsuit could not change the reported results in Michigan with respect to the presidential election.**

7.      Matthew and Alexandra Seely, Philip O'Halloran, Eric Ostergren, Marian Sheridan, Mercedes Wirsing, and Cameron Tarsa are Michigan citizens and registered voters. Matthew and Alexandra Seely, Philip O'Halloran, Eric Ostergren, Marian Sheridan, and Mercedes Wirsing voted in the November 3, 2020 presidential election and served as credentialed election challengers in that election. Matthew and Alexandra Seely are residents and registered voters in Wayne County, Michigan. Philip O'Halloran is a resident and registered voter in Oakland County, Michigan. Eric Ostergren is a resident and registered voter in Roscommon County, Michigan. Marian Sheridan is a resident and registered voter in Oakland County, Michigan. Mercedes Wirsing is a resident and registered voter in Oakland County, Michigan. Cameron Tarsa is a resident and registered voter in Leelanau County, Michigan.

**The City neither admits nor denies the allegation for lack of sufficient information to form a belief as to the truth of the allegation, and, being without sufficient information, leaves Plaintiffs to their proofs.**

8.      Jocelyn Benson, Michigan's Secretary of State, is a defendant in her official capacity. Jocelyn Benson is the "chief elections officer" responsible for overseeing the conduct of Michigan elections MCL 168.21 ("The secretary of state shall be the chief election officer of the state and shall have supervisory control over local election officials in the performance of their duties under the provisions of this act."); MCL 168.31(1)(a) (the "Secretary of State shall … issue instructions and promulgate rules … for the conduct of elections and registrations in accordance with the laws of this state"). Local election officials must follow Secretary Benson's instructions regarding the conduct of elections. Michigan law provides that Secretary Benson "[a]dvise and

direct local election officials as to the proper methods of conducting elections."" MCL 168.31(1)(b). See also *Hare v. Berrien Co Bd. Of Election*, 129 N.W.2d 864 (Mich. 1964); *Davis v. Secretary of State*, 2020 Mich. App. LEXIS 6128, at *9 (Mich. Ct. App. Sep. 16, 2020). Secretary Benson is responsible for assuring Michigan's local election officials conduct elections in a fair, just and lawful manner. See MCL 168.21; 168.31; 168.32. See also *League of Women Voters of Michigan v. Secretary of State,* 2020 Mich. App. LEXIS 709, *3 (Mich. Ct. App. Jan. 27, 2020); *Citizens Protecting Michigan's Constitution v. Secretary of State*, 922 N.W.2d 404 (Mich. Ct. App. 2018) aff'd 921 N.W.2d 247 (Mich. 2018); *Fitzpatrick v. Secretary of State*, 440 N.W.2d 45 (Mich. Ct. App. 1989).

**The citations to statutes are admitted, and the conclusory legal statements are neither admitted nor denied, as they constitute out of context and over-simplified statements of law which do not require a response.**

9.     The Michigan board of state canvassers is "responsible for approv[ing] voting equipment for use in the state, certify[ing] the result of elections held statewide …." Michigan Election Officials' Manual, p. 4. *See also* MCL 168.841, *et seq*.

**The City Admits.**

10.     Wayne County is a political subdivision of the State of Michigan. Wayne County has an Elections Division that conducts elections taking place within Wayne County under and subject to Secretary of State Benson's supervision and direction.

**The City denies, because the allegation is false. Plaintiffs misstate this fundamental element of their claims. In Michigan, counties do not conduct elections taking place within their borders. That is a function reserved to the municipalities within the counties. The**

**counties print ballots, accumulate vote totals from municipalities in their borders and canvass the election.**

11.     The Wayne County board of county canvassers is "responsible for canvassing the votes cast within the county [it] serve[s]. The Board members certify elections for local, countywide and district offices which are contained entirely within the county they serve. The Board members are also responsible for inspecting the county's ballot containers every four years." Michigan Election Officials' Manual, p. 5. *See also* MCL 168.821, *et seq*.

**The City Admits.**

12.     The Fourteenth Amendment to the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

**The City Admits.**

13.     Article I, Section 4 of the United States Constitution provides that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof."

**The City Admits.**

14.     Article II, Section 1 of the United States Constitution provides the manner in which the President and Vice President are chosen:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress….

> The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

**The City admits that these words are quoted accurately from the United States Constitution and affirmatively state that this is only a partial citation to one section of the United States Constitution.**

15. The Twelfth Amendment to the United States Constitution provides:

The Electors shall meet in their respective states and vote by ballot for President and Vice-President … they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate….

**The City admits that these words are quoted accurately from the United States Constitution and affirmatively states that this is only a partial citation to one section of the United States Constitution.**

16. Michigan's Constitution declares that "[n]o person shall be denied the equal protection of the laws …." Mich. Const. 1963, art 1, §2.

**The City admits that this is an accurate partial citation to one section of the Constitution of the State of Michigan of 1963.**

17. The Michigan Constitution's "purity of elections" clause states that "the legislature shall enact laws to regulate the time, place and manner of all nominations and elections, to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting." Mich. Const. 1963, art 2, §4(2).

**The City admits that the words cited are found in the referenced article of the Constitution of the State of Michigan of 1963, but denies that the quotation is accurate, as it**

fails to denote the deletion of 22 words between "all nominations and elections" and "to preserve the purity of elections."

18. Challengers representing a political party, candidate, or organization interested in the outcome of the election provide a critical role in protecting the integrity of elections including the prevention of voter fraud and other conduct (whether maliciously undertaken or by incompetence) that could affect the conduct of the election. *See* MCL 168.730-738.

**The City admits that Michigan law allows challengers, but disagrees with the assertion that they play a "critical role" in the electoral process. Some states do not allow challengers, and challengers are generally present at only a small percentage of precincts in the City and statewide.**

19. Michigan requires Secretary of State Benson, local election authorities, and state and county canvassing boards to provide challengers the opportunity to meaningfully participate in, and oversee, the conduct of Michigan elections and the counting of ballots.

**The City admits that Michigan law requires election authorities to permit challengers to oversee the counting of ballots. The City further states that, in the City of Detroit, Democratic and Republican challengers were allowed to meaningfully participate in the process in accordance with Michigan law.**

20. Michigan's election code provides that challengers shall have the following rights and responsibilities:

a. An election challenger shall be provided a space within a polling place where they can observe the election procedure and each person applying to vote. MCL 168.733(1).

b. An election challenger must be allowed opportunity to inspect poll books as ballots are issued to electors and witness the electors' names being entered in the poll book. MCL 168.733(1)(a).

c. An election challenger must be allowed to observe the manner in which the duties of the election inspectors are being performed. MCL 168.733(1)(b).

d. An election challenger is authorized to challenge the voting rights of a person who the challenger has good reason to believe is not a registered elector. MCL 168.733(1)(c).

e. An election challenger is authorized to challenge an election procedure that is not being properly performed. MCL 168.733(1)(d).

f. An election challenger may bring to an election inspector's attention any of the following: (1) improper handling of a ballot by an elector or election inspector; (2) a violation of a regulation made by the board of election inspectors with regard to the time in which an elector may remain in the polling place; (3) campaigning and fundraising being performed by an election inspector or other person covered by MCL 168.744; and/or (4) any other violation of election law or other prescribed election procedure. MCL 168.733(1)(e).

g. An election challenger may remain present during the canvass of votes and until the statement of returns is duly signed and made. MCL 168.733(1)(f).

h. An election challenger may examine each ballot as it is being counted. MCL 168.733(1)(g).

i. An election challenger may keep records of votes cast and other election procedures as the challenger desires. MCL 168.733(1)(h).

j. An election challenger may observe the recording of absent voter ballots on voting machines. MCL 168.733(1)(i).

**The City admits that these are generally accurate paraphrases of sections of Michigan Compiled Laws, and neither admits nor denies each of these conclusory, paraphrased statements, as they constitute out of context and over-simplified statements of law which do not require a response.**

21. The Michigan Legislature adopted these provisions to prevent and deter vote fraud, require the conduct of Michigan elections to be transparent, and to assure public confidence in the outcome of the election no matter how close the final ballot tally may be.

**The City neither admits nor denies the allegation for lack of sufficient information to form a belief as to the truth of the allegation, and states affirmatively that the Michigan Legislature speaks through its enacted laws.**

22. Michigan values the important role challengers perform in assuring the transparency and integrity of elections. For example, Michigan law provides it is a felony punishable by up to two years in state prison for any person to threaten or intimidate a challenger who is performing any activity described in Michigan law. MCL 168.734(4).  It is a felony punishable by up to two years in state prison for any person to prevent the presence of a challenger exercising their rights or to fail to provide a challenger with "conveniences for the performance of the[ir] duties." MCL 168.734.

**The City admits that the allegation accurately quotes applicable penalties for the violation of Michigan election law. The City neither admits nor denies the remainder of allegation for lack of sufficient information to form a belief as to the truth of the allegation, and, being without sufficient information, leaves Plaintiffs to their proofs.**

23. The responsibilities of challengers are established by Michigan statute. MCL 168.730 states:

> (1) At an election, a political party or [an organization] interested in preserving the purity of elections and in guarding against the abuse of the elective franchise, may designate challengers as provided in this act. Except as otherwise provided in this act, a political party [or interested organization] may designate not more than 2 challengers to serve in a precinct at any 1 time. A political party [or interested organization] may designate not more than 1 challenger to serve at each counting board.
>
> (2) A challenger shall be a registered elector of this state. . . . A candidate for the office of delegate to a county convention may serve as a challenger in a precinct other than the 1 in which he or she is a candidate. . . .
>
> (3) A challenger may be designated to serve in more than 1 precinct. The political party [or interested organization] shall indicate which precincts the challenger will serve when designating challengers under subsection (1). If more than 1 challenger of a political party [or interested organization] is serving in a

precinct at any 1 time, only 1 of the challengers has the authority to initiate a challenge at any given time. The challengers shall indicate to the board of election inspectors which of the 2 will have this authority. The challengers may change this authority and shall indicate the change to the board of election inspectors.

**The City admits that these words are found in Michigan Compiled Laws and states affirmatively that not all words deleted are designated with ellipses.**

24. Secretary Benson and Wayne County violated these provisions of Michigan law and violated the constitutional rights of Michigan citizens and voters when they did not conduct this general election in conformity with Michigan law and the United States Constitution.

**While the City cannot speak to the entirety of the State, the City does have knowledge as to allegations relating to the electoral process in the City and therefore denies that Secretary Benson or Wayne County violated these provisions of Michigan law or the constitutional rights of Michigan citizens and voters and denies that the election was not conducted in conformity with Michigan law and the United States Constitution.**

25. More than one hundred credentialed election challengers provided sworn affidavits. These affidavits stated, among other matters, that these credentialed challengers were denied a meaningful opportunity to review election officials in Wayne County handling ballots, processing absent voter ballots, validating the legitimacy of absent voter ballots, and the general conduct of the election and ballot counting. *See* Exhibit 1(affidavits of election challengers).

**The City denies that the affidavits demonstrate that "challengers were denied a meaningful opportunity to review election officials in Wayne County handling ballots, processing absent voter ballots, validating the legitimacy of absent voter ballots, and the general conduct of the election and ballot counting" because such allegations are not true.**

26. Wayne County excluded certified challengers from meaningfully observing the conduct of the election. This allowed a substantial number of ineligible ballots to be counted. The

following affidavits describe the specifics that were observed. This conduct was pervasive in Wayne County as attested to in the affidavits attached at Exhibit 1.

**The City denies, because the allegations are false for at least two reasons: Wayne County did not conduct the election, and the allegations would be false if they were alleged against the City of Detroit, which did conduct the election.**

27. Many individuals designated as challengers to observe the conduct of the election were denied meaningful opportunity to observe the conduct of the election. For example, challengers designated by the Republican Party or Republican candidates were denied access to the TCF Center (formerly called Cobo Hall) ballot counting location in Detroit while Democratic challengers were allowed access. Exhibit 1 (Deluca aff. ¶¶7-9, 16-18; Langer aff. ¶3; Papsdorf aff. ¶3; Frego aff. ¶9; Downing aff. ¶¶2-9, 11, 15, 22; Sankey aff. ¶¶5-8; Ostin aff. ¶¶5-7; Cavaliere aff. ¶3; Cassin aff. ¶4; Rose aff. ¶18; Zimmerman aff. ¶8; Langer aff. ¶3; Poplawski aff. ¶3; Henderson aff. ¶7; Fuqua-Frey aff. ¶5; Ungar aff. ¶4; Eilf aff. ¶¶9, 17; Jeup aff. ¶¶6-7; Tietz aff. ¶¶9-18; McCall aff. ¶¶5-6; Arnoldy aff. ¶¶5, 8-9 (unlimited members of the media were also allowed inside regardless of COVID restrictions while Republican challengers were excluded)).

**The City denies, because the allegation is false. In the City of Detroit, Democratic and Republican challengers were allowed to meaningfully participate in the process in accordance with Michigan law.**

28. Many challengers stated that Republican challengers who had been admitted to the TCF Center but who left were not allowed to return. Exhibit 1 (Bomer aff. ¶16; Paschke aff. ¶4; Schneider aff., p. 2; Arnoldy aff. ¶6; Boller aff. ¶¶13-15 (removed  and not allowed to serve as challenger); Kilunen aff. ¶7; Gorman aff. ¶¶6-8; Wirsing aff., p. 1; Rose aff. ¶19; Krause aff. ¶¶9, 11; Roush aff. ¶16; M. Seely aff. ¶6; Fracassi aff. ¶6; Whitmore aff. ¶5). Furthermore, Republican

challengers who left the TCF Center were not allowed to be replaced by other Republican challengers while Democratic challengers were replaced. *See id.*

**The City admits that affiants have made such statements, but denies that Republican challengers who left the TCF Center were not allowed to be replaced by other Republican challengers while Democratic challengers were replaced. At all times, in the City of Detroit, Democratic and Republican challengers were allowed to meaningfully participate in the process in accordance with Michigan law.**

29. As a result of Republican challengers not being admitted or re-admitted, while Democratic challengers were freely admitted, there were many more Democratic challengers allowed to observe the processing and counting of absent voter ballots than Republican challengers. Exhibit 1 (Helminen aff. ¶12 (Democratic challengers outnumbered Republican challengers by at least a two-to-one ratio); Daavettila aff., p. 2 (ten times as many Democratic challengers as Republican); A. Seely aff. ¶19; Schneider aff., p. 2; Wirsing aff., p. 1; Rauf aff. ¶21; Roush aff. ¶¶16-17; Topini aff. ¶4).

**The City denies, because the allegation is false. At no time were Democratic challengers freely admitted while Republican challengers were not. In the City of Detroit, Democratic and Republican challengers were allowed to meaningfully participate in the process in accordance with Michigan law. The City also states affirmatively that there were also challengers from Election Integrity Fund and other Republican-affiliated organizations participating at all times.**

30. Many challengers testified that election officials strictly and exactingly enforced a six-foot distancing rule for Republican challengers but not for Democratic challengers. Exhibit 1 (Paschke aff. ¶4; Wirsing aff., p. 1; Montie aff. ¶4; Harris aff. ¶3; Krause aff. ¶7; Vaupel aff. ¶5;

Russel aff. ¶7; Duus aff. ¶9; Topini aff. ¶6). As a result, Republican challengers were not allowed to meaningfully observe the ballot counting process. *Id.*

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph, but denies the accuracy of the claims. The City states affirmatively that some Republican challengers refused to abide by the distancing rules or to wear masks in such a manner as to reduce the risk of spreading the COVID-19 virus. The City further states that, in the City of Detroit, Democratic and Republican challengers were allowed to meaningfully participate in the process in accordance with Michigan law. Furthermore, this allegation is impertinent and immaterial to this lawsuit.**

31. Many challengers testified that their ability to view the handling, processing, and counting of ballots was physically and intentionally blocked by election officials. Exhibit 1 (A. Seely aff. ¶15; Miller aff. ¶¶13-14; Pennala aff. ¶4; Tyson aff. ¶¶12-13, 16; Ballew aff. ¶8; Schornak aff. ¶4; Williamson aff. ¶¶3, 6; Steffans aff. ¶¶15-16, 23-24; Zaplitny aff. ¶15; Sawyer aff. ¶5; Cassin aff. ¶9; Atkins aff. ¶3; Krause aff. ¶5; Sherer aff. ¶¶15, 24; Basler aff. ¶¶7-8; Early aff. ¶7; Posch aff. ¶7; Chopjian aff. ¶11; Shock aff. ¶7; Schmidt aff. ¶¶7-8; M. Seely aff. ¶4; Topini aff. ¶8).

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph. The City denies the accuracy of these affidavits and further states affirmatively that, in the City of Detroit, Democratic and Republican challengers were allowed to meaningfully participate in the process in accordance with Michigan law.**

32. At least three challengers said they were physically pushed away from counting tables by election officials to a distance that was too far to observe the counting. Exhibit 1 (Helminen aff. ¶4; Modlin aff. ¶¶4, 6; Sitek aff. ¶4). Challenger Glen Sitek reported that he was pushed twice

by an election worker, the second time in the presence of police officers. *Id.* (Sitek aff. ¶4). Sitek filed a police complaint. *Id.*

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph. The City denies the accuracy of these affidavits, because election officials did everything within their power to ensure that challengers from both the Democratic and Republican parties were able to meaningfully participate in the process in accordance with Michigan law.**

33. Challenger Pauline Montie stated that she was prevented from viewing the computer monitor because election workers kept pushing it further away and made her stand back away from the table. Exhibit 1 (Montie aff. ¶¶4-7). When Pauline Montie told an election worker that she was not able to see the monitor because they pushed it farther away from her, the election worker responded, "too bad." *Id.* ¶8.

**The City admits that an affidavit attached to the Complaint contains the allegation in this paragraph. The City denies the accuracy of this affidavit and states affirmatively that election officials did everything within their power to ensure that, in the City of Detroit, Democratic and Republican challengers were allowed to meaningfully participate in the process in accordance with Michigan law. This included adding monitors that could be viewed freely by all challengers. Furthermore, this allegation is impertinent and immaterial to this lawsuit.**

34. Many challengers witnessed Wayne County election officials covering the windows of the TCF Center ballot counting center so that observers could not observe the ballot counting process. Exhibit 1 (A. Seely aff. ¶¶9, 18; Helminen aff. ¶¶9, 12; Deluca aff. ¶13; Steffans aff. ¶22; Frego aff. ¶11; Downing aff. ¶21; Sankey aff. ¶14; Daavettila aff., p. 4; Zimmerman aff. ¶10;

Krause aff. ¶12; Sherer aff. ¶22; Johnson aff. ¶7; Posch aff. ¶10; Rauf aff. ¶23; Luke aff., p. 1; M. Seely aff. ¶8; Zelasko aff. ¶8; Ungar aff. ¶12; Storm aff. ¶7; Fracassi aff. ¶8; Eilf aff. ¶25; McCall aff. ¶9).

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph. The City denies the accuracy of these affidavits, because Wayne County election officials were not involved. The City further states affirmatively that Michigan law does not envision or permit groups of people banging on the windows of an absent voter counting place and taking videos and photographs of the vote counting process, nor is there any legal requirement that windows be provided for observation of an Absent Voter Counting Board from outside the room. In the City of Detroit, Democratic and Republican challengers were allowed to meaningfully participate in the process in accordance with Michigan law.**

35. Many challengers testified that they were intimidated, threatened, and harassed by election officials during the ballot processing and counting process. Exhibit 1 (Ballew aff. ¶¶7, 9; Gaicobazzi aff. ¶¶12-14 (threatened repeatedly and removed); Schneider aff., p. 1; Piontek aff. ¶11; Steffans aff. ¶26 (intimidation made her feel too afraid to make challenges); Cizmar aff. ¶8(G); Antonie aff. ¶3; Zaplitny aff. ¶20; Moss aff. ¶4; Daavettila aff., pp. 2-3; Tocco aff. ¶¶1-2; Cavaliere ¶3; Kerstein aff. ¶3; Rose aff. ¶16; Zimmerman aff. ¶5; Langer aff. ¶3; Krause aff. ¶4; Sherer aff. ¶24; Vaupel aff. ¶4; Basler aff. ¶8; Russell aff. ¶5; Burton aff. ¶5; Early aff. ¶7; Pannebecker aff. ¶10; Sitek aff. ¶4; Klamer aff. ¶4; Leonard aff. ¶¶6, 15; Posch aff. ¶¶7, 14; Rauf aff. ¶24; Chopjian aff. ¶10; Cooper aff. ¶12; Shock aff. ¶9; Schmidt aff. ¶¶9-10; Duus aff. ¶10; M. Seely aff. ¶4; Storm aff. ¶¶5, 7; DePerno aff. ¶¶5-6; McCall aff. ¶¶5, 13). Articia Bomer was called a "racist name" by an election worker and also harassed by other election workers. *Id.* (Bomer aff.

¶7). Zachary Vaupel reported that an election supervisor called him an "obscene name" and told him not to ask questions about ballot processing and counting. *Id.* (Vaupel aff. ¶4). Kim Tocco was personally intimidated and insulted by election workers. *Id.* (Tocco aff. ¶¶1-2). Qian Schmidt was the target of racist comments and asked, "what gives you the right to be here since you are not American?" *Id.* (Schmidt aff. ¶9). Other challengers were threatened with removal from the counting area if they continued to ask questions about the ballot counting process. *Id.* (A. Seely aff. ¶¶6, 13, 15; Pennala aff. ¶5).

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph, but denies the accuracy of these affidavits. Furthermore, such allegations are impertinent and immaterial to this lawsuit.**

36. Challenger Kathleen Daavettila observed that Democratic challengers distributed a packet of information among themselves entitled, "Tactics to Distract GOP Challengers." *Id.* (Daavettila aff., p. 2). An election official told challenger Ulrike Sherer that the election authority had a police SWAT team waiting outside if Republican challengers argued too much. *Id.* (Sherer aff. ¶24). An election worker told challenger Jazmine Early that since "English was not [her] first language…[she] should not be taking part in this process." *Id.* (Early aff. ¶11).

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph, but denies the accuracy of these affidavits. Furthermore, such allegations are impertinent and immaterial to this lawsuit.**

37. Election officials at the TCF Center in Detroit participated in the intimidation experienced by Republican challengers when election officials would applaud, cheer, and yell whenever a Republican challenger was ejected from the counting area. Exhibit 1 (Helminen aff. ¶9; Pennala aff. ¶5; Ballew aff. ¶9; Piontek aff. ¶11; Papsdorf aff. ¶3; Steffans aff. ¶25; Cizmar

aff. ¶8(D); Kilunen aff. ¶5; Daavettila aff., p. 4; Cavaliere aff. ¶3; Cassin aff. ¶10; Langer aff. ¶3; Johnson aff. ¶5; Early aff. ¶13; Klamer aff. ¶8; Posch aff. ¶12; Rauf aff. ¶22; Chopjian aff. ¶13; Shock aff. ¶10).

**The City denies, because the allegation is false.**

38. There is a difference between a ballot and a vote. A ballot is a piece of paper. A vote is a ballot that has been completed by a citizen registered to vote who has the right to cast a vote and has done so in compliance with Michigan election law by, among other things, verifying their identity and casting the ballot on or before Election Day. It is the task of Secretary Benson and Michigan election officials to assure that only ballots cast by individuals entitled to cast a vote in the election are counted and to make sure that all ballots cast by lawful voters are counted and the election is conducted in accord with Michigan's Election Code uniformly throughout Michigan.

**The City admits that it is the duty of Michigan election officials to ensure that only lawfully cast ballots are counted.**

39. Challengers provide the transparency and accountability to assure ballots are lawfully cast and counted as provided in Michigan's Election Code and voters can be confident the outcome of the election was honestly and fairly determined by eligible voters.

**The City admits that Michigan allows challengers. The City further states affirmatively that in the City of Detroit, Democratic and Republican challengers were allowed to meaningfully participate in the process in accordance with Michigan law. Challengers play a positive role in the process when they are fully trained, are aware how the election process works, and understand the difference between a valid objection and a frivolous objection. In contrast, challengers can be detrimental to the conduct of an election**

**and can undermine the confidence in the electoral process when they level false allegations based on material misunderstandings of how elections are conducted.**

40. Unfortunately, this did not happen in Wayne County. Many challengers testified that their challenges to ballots were ignored and disregarded. Exhibit 1 (A. Seely aff. ¶4; Helminen aff. ¶5; Miller aff. ¶¶10-11; Schornak aff. ¶¶9, 15; Piontek aff. ¶6; Daavettila aff., p. 3; Valice aff. ¶2; Sawyer aff. ¶7; Kerstein aff. ¶3; Modlin aff. ¶4; Cassin aff. ¶6; Brigmon aff. ¶5; Sherer aff. ¶11; Early aff. ¶18; Pannebecker aff. ¶9; Vanker aff. ¶5; M. Seely aff. ¶11; Ungar aff. ¶¶16-17; Fracassi aff. ¶4).

**The City denies, because the allegation is false with respect to the legitimate challenges made in the City of Detroit. Legitimate challenges were not ignored or disregarded. Furthermore, this allegation is impertinent and immaterial to this lawsuit.**

41. As an example of challenges being disregarded and ignored, challenger Alexandra Seely stated that at least ten challenges she made were not recorded. *Id.* (A. Seely aff. ¶4). Articia Bomer observed that ballots with votes for Trump were separated from other ballots. *Id.* (Bomer aff. ¶5). Articia Bomer stated, "I witnessed election workers open ballots with Donald Trump votes and respond by rolling their eyes and showing it to other poll workers. I believe some of these ballots may not have been properly counted." *Id.* ¶8. Braden Gaicobazzi challenged thirty-five ballots for whom the voter records did not exist in the poll book, but his challenge was ignored and disregarded. Exhibit 1 (Giacobazzi aff. ¶10). When Christopher Schornak attempted to challenge the counting of ballots, an election official told him, "We are not talking to you, you cannot challenge this." *Id.* (Schornak aff. ¶15). When Stephanie Krause attempted to challenge ballots, an election worker told her that challenges were no longer being accepted because the "rules 'no longer applied.'" *Id.* (Krause aff. ¶13).

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph. Regarding the specific details of each of these allegations, the City neither admits nor denies those allegations for lack of sufficient information to form a belief as to the truth of those allegations, and, being without sufficient information, leaves Plaintiffs to their proofs. The City states affirmatively that it denies that legitimate challenges were disregarded. Furthermore, these allegations are impertinent and immaterial to this lawsuit.**

42. If a ballot is rejected by a ballot-tabulator machine and cannot be read by the machine, the ballot must be duplicated onto a new ballot. The Michigan Secretary of State has instructed, "If the rejection is due to a false read the ballot must be duplicated by *two election inspectors who have expressed a preference for different political parties*." Michigan Election Officials' Manual, ch. 8, p. 6 (emphasis added). Thus, the ballot duplicating process must be performed by bipartisan teams of election officials. It must also be performed where it can be observed by challengers.

**The City admits the portion of this allegations that quotes the Michigan Election Officials manual. The remainder of the allegation is denied because it is false. The ballots in "false read" situations are not duplicated onto a new ballot. They are reviewed at an adjudication station on a screen by a Republican and a Democratic inspector. If a determination is made that an overvote is a "false read" it is altered on the screen, not on a duplicated ballot. This replaces traditional duplication. The statement "Thus, the ballot duplicating process must be performed by bipartisan teams of election officials" is not a correct inference from the Manual citation, which refers only to "false read" situations and not to duplication situations.**

43. But Wayne County prevented many challengers from observing the ballot duplicating process. Exhibit 1 (Miller aff. ¶¶6-8; Steffans aff. ¶¶15-16, 23-24; Mandelbaum aff. ¶6; Sherer aff.

¶¶16-17; Burton aff. ¶7; Drzewiecki aff. ¶7; Klamer aff. ¶9; Chopjian aff. ¶10; Schmidt aff. ¶7; Champagne aff. ¶12; Shinkle aff., p. 1). Challenger John Miller said he was not allowed to observe election workers duplicating a ballot because the "duplication process was personal like voting." *Id.* (Miller aff. ¶8). Challenger Mary Shinkle stated that she was told by an election worker that she was not allowed to observe a ballot duplication because "if we make a mistake then you would be all over us." *Id.* (Shinkle aff., p. 1).

**The City denies that Wayne County controlled the ballot duplicating process and denies that the City "prevented many challengers from observing the ballot duplicating process," because the allegations are false. As to the remaining allegations, the City neither admits nor denies those allegations for lack of sufficient information to form a belief as to the truth of those allegations, and, being without sufficient information, leaves Plaintiffs to their proofs. The City further states affirmatively that, in the City of Detroit, Democratic and Republican challengers were allowed to meaningfully participate in the process in accordance with Michigan law.**

44. Many challengers testified that ballot duplication was performed only by Democratic election workers, not bipartisan teams. Exhibit 1 (Pettibone aff. ¶3; Kinney aff., p. 1; Wasilewski aff., p. 1; Schornak aff. ¶¶18-19; Dixon aff., p. 1; Kolanagireddy aff., p. 1; Kordenbrock aff. ¶¶3-4; Seidl aff., p. 1; Kerstein aff. ¶4; Harris aff. ¶3; Sitek aff. ¶4).

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph. The City denies the accuracy of these affidavits, because they are untrue or are based on a misunderstanding of Michigan law. The City further affirmatively states that bipartisan teams of Election Inspectors are not required in every ballot duplication situation. The City also affirmatively states that in the City of Detroit, Democratic and Republican**

challengers were allowed to meaningfully participate in the process in accordance with Michigan law.

45. Challengers reported that batches of ballots were repeatedly run through the vote tabulation machines. Exhibit 1 (Helminen aff. ¶4; Waskilewski aff., p. 1; Mandelbaum aff. ¶5; Rose aff. ¶¶4-14; Sitek aff. ¶3; Posch aff. ¶8; Champagne aff. ¶8). Challenger Patricia Rose stated she observed a stack of about fifty ballots being fed multiple times into a ballot scanner counting machine. *Id.* (Rose aff. ¶¶4-14). Challenger Articia Bomer stated, "I observed a station where election workers were working on scanned ballots that had issues that needed to be manually corrected. I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates." *Id.* (Bomer aff. ¶9). Articia Bomer further stated that she witnessed the same group of ballots being rescanned into the counting machine "at least five times." *Id.* ¶12.

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph. The City denies the accuracy of these affidavits, because they are false or based on a misunderstanding of the process. The electoral process includes numerous safeguards that protect against any of the actions alleged. For instance, it appears that Plaintiffs are implying that Ms. Rose's assertion that she saw "a stack of about fifty ballots" being "fed multiple times into a ballot scanner counting machine" means that the ballots were counted multiple times. However, if what she said were true, hundreds of extra votes would be reported for an absent voter counting board, making the absent voter counting board reported vote totals substantially out of balance with the ballots and number of voters on the poll list. That would be easily discovered and corrected, if not at the TCF Center by**

the Detroit Department of Elections then by the Wayne County Canvassing Board. Similarly, Ms. Bomer's "belief" is irrelevant; there is no evidence to support her assertions.

46. Many challengers stated that the ballot number on the ballot did not match the number on the ballot envelope, but when they raised a challenge, those challenges were disregarded and ignored by election officials, not recorded, and the ballots were processed and counted. Exhibit 1 (A. Seely aff. ¶15; Wasilewski aff., p. 1; Schornak aff. ¶13; Brunell aff. ¶¶17, 19; Papsdorf aff. ¶3; Spalding aff. ¶¶8, 11; Antonie aff. ¶3; Daavettila aff., p. 3; Atkins aff. ¶3; Harris aff. ¶3; Sherer aff. ¶21; Drzewiecki aff. ¶¶5-6; Klamer aff. ¶4; Rauf aff. ¶¶9-14; Roush aff. ¶¶5-7; Kinney aff. ¶5). For example, when challenger Abbie Helminen raised a challenge that the name on the ballot envelope did not match the name on the voter list, she was told by an election official to "get away" and that the counting table she was observing had "a different process than other tables." *Id.* (Helminen aff. ¶5).

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph. Regarding the specific details of each of these allegations, the City neither admits nor denies those allegations for lack of sufficient information to form a belief as to the truth of those allegations, and, being without sufficient information, leaves Plaintiffs to their proofs. The City denies the accuracy of the claims to the extent they suggest there was any impropriety with respect to the process. The City also affirmatively states that legitimate challenges are to be recorded, while illegitimate challenges need not be. Ballots with a number that does not match the number recorded are processed as a challenged ballot.**

47. Many challengers reported that when a voter was not in the poll book, the election officials would enter a new record for that voter with a birth date of January 1, 1900. Exhibit 1 (Gaicobazzi aff. ¶10; Piontek aff. ¶10; Cizmer aff. ¶8(F); Wirsing aff., p. 1; Cassin aff. ¶9; Langer

aff. ¶3; Harris aff. ¶3; Brigmon aff. ¶5; Sherer aff. ¶¶10-11; Henderson aff. ¶9; Early ¶16; Klamer aff. ¶13; Shock aff. ¶8; M. Seely aff. ¶9). *See also id.* (Gorman aff. ¶¶23-26; Chopjian aff. ¶12; Ungar aff. ¶15; Valden aff. ¶17). Braden Gaicobazzi reported that a stack of thirty-five ballots was counted even though there was no voter record. *Id.* (Giacobazzi aff. ¶10).

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph. The City admits that officials entered January 1, 1900 into the electronic-pollbook (the "EPB"). The EPB has an "Unlisted Tab" that allows inspectors to add the names of voters not listed. The EPB is designed primarily for use in election day polling places and reserves the Unlisted Tab to enter voters casting provisional ballots. In polling places, voters are verified by providing their date of birth. Consequently, the EPB is designed with a birthdate field that must be completed to move to the next step. When using this software at an absent voter counting board, a birthdate is not necessary to verify voters, as these voters are verified by signature comparisons (a process which was completed before the ballots were delivered to the TCF Center). Inspectors at the TCF Center did not have access to voters' birthdates. Therefore, because the software (but not the law or the Secretary of State) requires the field be completed to move to the next step, 1/1/1900 was used as a placeholder. This is standard operating procedure and a standard date used by the State Bureau of Elections, and election officials across the state to flag records requiring attention. The date of 1/1/1900 (a birthdate which could not possibly be accurate for any voter in the year 2020) is recommended by the Michigan Secretary of State for instances in which a placeholder date is needed. When Republican challengers questioned the use of the 1/1/1900 date on several occasions, election officials explained the process to them. The challengers**

**understood the explanation and, realizing that what they observed was actually a best practice, chose not to raise any challenges.**

48. At least two challengers observed ballots being counted where there was no signature or postmark on the ballot envelope. Exhibit 1 (Brunell aff. ¶¶17, 19; Spalding aff. ¶13; Sherer aff. ¶13). Challenger Anne Vanker observed that "60% or more of [ballot] envelopes [in a batch] bore the same signature on the opened outer envelope." *Id.* (Vanker aff. ¶5).

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph. The City affirmatively states that it appears the affiants are referencing signatures of City Clerk employees who performed the verification of the voter's signatures. Thus, what these affiants saw is actually part of the process to ensure the ballot was verified before the vote is counted.**

49. Challenger William Henderson observed that a counting table of election workers lost eight ballot envelopes. Exhibit 1 (Henderson aff. ¶8).

**The City admits that an affidavit attached to the Complaint contain the allegations in this paragraph, and the City neither admits nor denies those allegations for lack of sufficient information to form a belief as to the truth of those allegations, and, being without sufficient information, leaves Plaintiffs to their proofs.**

50. At least two challengers observed spoiled ballots being counted. Exhibit 1 (Schornak aff. ¶¶6-8; Johnson aff. ¶4). Another challenger observed over-votes on ballots being "corrected" so that the ballots could be counted. *Id.* (Zaplitny aff. ¶13).

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph. Regarding the specific details of each of these allegations, the City neither admits nor denies those allegations for lack of sufficient information to form a belief as to**

**the truth of those allegations, and, being without sufficient information, leaves Plaintiffs to their proofs. The City states affirmatively that Michigan law has specific provisions with respect to "spoiled ballots" or "over-votes," which were complied with at all times.**

51. At least one challenger observed a box of provisional ballots being placed in a tabulation box at the TCF Center. Exhibit 1 (Cizmar aff. ¶5). At least one challenger observed poll workers adding marks to a ballot where there was no mark for any candidate. *Id.* (Tyson aff. ¶17). Another challenger observed election officials making mistakes when duplicating ballots. *Id.* (Piontek aff. ¶9).

**The City admits that affidavits attached to the Complaint contain the allegations in this paragraph. The City denies the accuracy of these affidavits; indeed, provisional ballots are not part of the absentee ballot process, they are issued at polling stations. Further, although the Complaint excises the relevant language from Mr. Piontek's affidavit, the affiant admits that the two human error mistakes he witnessed were corrected in his presence.**

52. An election challenger at the Detroit Department of Elections office observed passengers in cars dropping off more ballots than there were people in the car. Exhibit 1 (Meyers aff. ¶3). This challenger also observed election workers at the Detroit Department of Elections office handing t-shirts and food to voters in cars. *Id.* ¶4. This challenger also observed an election worker accepting a ballot after 8:00 p.m. on Election Day. *Id.* ¶7.

**The City admits that an affidavit attached to the Complaint contains the allegations in this paragraph. The City denies the accuracy of these allegations with respect to any implication of improper conduct. Michigan law allows household members or relatives to return ballots, so the affiant's claim of observing passengers in cars dropping off more ballots**

than the number of people in the car is irrelevant. Further, whether an affiant claims he saw

an election worker accept a ballot after 8:00 p.m. is irrelevant, because there is no indication

that, even if the observation was correct, that the one ballot was counted.

53. One Michigan voter stated that her deceased son has been recorded as voting twice

since he passed away, most recently in the 2020 general election. Exhibit 1 (Chase aff. ¶3).

**The City admits that an affidavit attached to the Complaint contains the allegations**

**in this paragraph. The City denies the accuracy of the allegation, because the claim has been**

**debunked by the Michigan Secretary of State. As reported by the media, Ms. Chase's**

**confusion stems from the fact that her deceased son shares a name with other Michiganders.**

**According to the statement from the Secretary of State and investigative reporting on the**

**issue, the voter registration for Mark D. Chase, who was listed as living at the same address**

**as his mother, was cancelled in 2016. Two other people named Mark D. Chase are listed in**

**Michigan's Qualified Voter File.**

54. Jessica Connarn is an attorney who was acting as a Republican challenger at the TCF

Center in Wayne County. Exhibit 2. Jessica Connarn's affidavit describes how an election poll

worker told Jessica Connarn that the poll worker "was being told to change the date on ballots to

reflect that the ballots were received on an earlier date." *Id.* ¶1. Jessica Connarn also provided a

photograph of a note handed to her by the poll worker in which the poll worker indicated she (the

poll worker) was instructed to change the date ballots were received. *See id.* Jessica Connarn's

affidavit demonstrates that poll workers in Wayne County were pre-dating absent voter ballots, so

that absent voter ballots received after 8:00 p.m. on Election Day could be counted.

**The City admits that an affidavit attached to the Complaint contains the allegations**

**in this paragraph. The City further notes that Ms. Connarn's claims are hearsay within**

**hearsay which have already been declared as such and rejected by the Michigan Court of Claims. Further, all absentee ballots at the TCF Center had been received by 8:00 p.m. on November 3, 2020. None received after that time were delivered. Election Inspectors did not "pre-date" anything; they noted in the system the date-stamp on the ballot envelope, again, all of which were received before the deadline. If the ballot was received after the deadline, it was not accepted and brought to the TCF Center.**

55. A lawsuit recently filed by the Great Lakes Justice Center raises similar allegations of vote fraud and irregularities that occurred in Wayne County. *See* Exhibit 3 (copy of complaint filed in the Circuit Court of Wayne County in *Costantino, et al. v. City of Detroit, et al.*). The lawsuit alleges the Detroit Election Commission "systematically processed and counted ballots from voters whose name failed to appear in either the Qualified Voter File (QVF) or in the supplemental sheets." *Id.* at 3. The complaint also alleges the Election Commission "instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity" and "instructed election workers to process ballots that appeared after the election deadline and to falsely report that those ballots had been received prior to November 3, 2020 deadline." *Id.* The complaint further alleges the Election Board "systematically used false information to process ballots, such as using incorrect or false birthdays," including inserting "new names into the QVF after the election and recorded these new voters as having a birthdate of 1/1/1900." *Id.* The complaint includes supporting affidavits of witnesses.

**The City admits the existence of the lawsuit referenced in this paragraph, but denies that the allegations in that lawsuit are meritorious. That lawsuit, like this one, is devoid of merit. Indeed, the Circuit Court soundly rejected the allegations in its Opinion and Order**

**Denying Plaintiffs' request for a temporary restraining order or preliminary injunctive relief.**

56. Michigan's election code, MCL 168.24j, requires that ballot containers meet the following conditions:

(1) A ballot container includes a ballot box, transfer case, or other container used to secure ballots, including optical scan ballots and electronic voting systems and data.

(2) A manufacturer or distributor of ballot containers shall submit a nonmetal ballot container to the secretary of state for approval under the requirements of subsection (3) before the ballot container is sold to a county, city, township, village, or school district for use at an election.

(3) A ballot container shall not be approved unless it meets both of the following requirements:

    (a) It is made of metal, plastic, fiberglass, or other material, that provides resistance to tampering.

    (b) It is capable of being sealed with a metal seal.

(4) Before June 1 of 2002, and every fourth year after 2002, a county board of canvassers shall examine each ballot container to be used in any election conducted under this act. The board shall designate on the ballot container that the ballot container does or does not meet the requirements under subsection (3). A ballot container that has not been approved by the board shall not be used to store voted ballots.

(5) A city, village, or township clerk may procure ballot containers as provided in section 669 and as approved under this section.

(6) A clerk who uses or permits the use of a ballot container that has not been approved under this section is guilty of a misdemeanor.

**The statute speaks for itself and therefore no Answer is necessary.**

57. In October Michigan amended its election code to allow election authorities to establish remote unattended ballot drop-off boxes. *See* MCL 168.761d. A remote, unattended ballot drop box is essentially equivalent to a polling place where a person can deposit a ballot. But, unlike a polling place, there is no validation that the individual depositing a ballot in the box is an individual who is qualified to cast a vote or to lawfully deliver a ballot cast by a lawful voter. *See*, for example, MCL 168.932(f), which prohibits "A person other than an absent voter," and certain others, such as an immediate family member, from possessing and returning an absent voter ballot. *See also*

*Michigan Alliance for Retired Americans v. Secretary of State*, 2020 Mich. App. LEXIS 6931, *23-24 (Mich. Ct. App. Oct. 16, 2020) ("On balance, the ballot-handling restrictions pass constitutional muster given the State's strong interest in preventing fraud.").

**The City admits that the Michigan legislature amended M.C.L. § 168.761d in October 2020. The City admits that these are generally accurate paraphrases of sections of Michigan Compiled Laws, and neither admits nor denies each of these conclusory, paraphrased statements, as they constitute out of context and over-simplified statements of law which do not require a response. The City affirmatively states it is unclear why Plaintiffs identify the statute, because they do not appear to allege it was not followed.**

58. MCL 168.761d(4)(c) provides that "[t]he city or township clerk" who establishes a remote ballot drop box "must use video monitoring of that drop box to ensure effective monitoring of that drop box."

**The City admits that the provision applies to remote ballot drop boxes installed after October 6, 2020. See M.C.L. § 168.761d(2). The City affirmatively states it is unclear why Plaintiffs identify the statute, because they do not appear to allege it was not followed.**

59. An election challenger at the Detroit Department of Elections office observed ballots being deposited in a ballot drop box located at the Detroit Department of Elections after 8:00 p.m. on Election Day. Exhibit 1 (Meyers aff. ¶6).

**The City admits that an affidavit attached to the Complaint contains the allegations in this paragraph. Regarding the specific details of each of these allegations, the City neither admits nor denies those allegations for lack of sufficient information to form a belief as to the truth of those allegations, and, being without sufficient information, leaves Plaintiffs to**

their proofs. **The City states affirmatively that election workers were instructed to lock the ballot drop boxes at the Detroit Department of Elections at 8:00 p.m. on Election Day.**

60. On the morning of November 4, unofficial results posted by the Antrim County Clerk showed that Joe Biden had over 7,700 votes — 3,000 more than Donald Trump. Antrim County voted 62% in favor of President Trump in 2016. The Dominion Voting Systems election management system and voting machines (tabulators), which were used in Antrim County, are also used in many other Michigan counties, including Wayne County, were at fault.

**Upon information and belief, the error in Antrim County was a human-caused tabulation error. The fact that the error was caught demonstrates the strength of the electoral process in the United States, where decentralization and layer-upon-layer of checks prevent electoral error and fraud.**

61. Secretary of State Benson released a statement blaming the county clerk for not updating certain "media drives," but her statement failed to provide any coherent explanation of how the Dominion Voting Systems software and vote tabulators produced such a massive miscount.2

**The City admits that the Michigan Department of State released a statement titled "Isolated User Error in Antrim County Does Not Affect Election Results, Has no Impact on Other Counties or States," but denies Plaintiffs' characterization of the statement. The statement speaks for itself and explains what happened in Antrim County.**

62. Secretary Benson continued: "After discovering the error in reporting the unofficial results, the clerk worked diligently to report correct unofficial results by reviewing the printed totals tape on each tabulator and hand-entering the results for each race, for each precinct in the county." *Id.*

32

**The City admits that Plaintiffs accurately quote from a statement released by the Department of State.**

63. What Secretary Benson fails to address is what would have happened if no one "discover[ed] the error," for instance, in Wayne County, where the number of registered voters is much greater than Antrim County, and where the tabulators were not individually tested.

**The City affirmatively states that the statement from the Department of State explains the issue in Antrim County, but does not appear to have been intended to be a treatise on election law. The City affirmatively states there are numerous checks on the electoral process to ensure that any such errors are caught and rectified, including numerous checks at the precinct level, at polling places, at absent voter counting boards, at county and state canvassing boards and through the recount process. The City also states that logic and accuracy tests were run on each tabulator used by the City of Detroit before the election.**

64. Wayne County used the same Dominion voting system tabulators as did Antrim County, and Wayne County tested only a single one of its vote tabulating machines before the election. The Trump campaign asked Wayne County to have an observer physically present to witness the process. *See* Exhibit 4. Wayne County denied the Trump campaign the opportunity to be physically present. Representatives of the Trump campaign did have opportunity to watch a portion of the test of a single machine by Zoom video.

**The City denies the allegation as untrue. The County of Wayne does not tabulate ballots, making it impossible for the County to test its non-existent tabulators. Moreover, the logic and accuracy test of tabulators are public events that are scheduled in advance, with public notice. The Trump campaign had the same right as all members of the public to view**

the testing, which as stated above, was done on every vote tabulating machine used by the City of Detroit.

65. Tabulator issues occurred elsewhere in Michigan. In Oakland County, Democrat Melanie Hartman was wrongly declared the winner of the commissioner's race by a 104-vote margin. A computer issue at the Rochester Hills clerk's office caused them to double-count some votes. After elections officials caught the error, Republican Adam Kochenderfer was declared the winner with 1,127 more votes than Hartman.

**The City neither admits nor denies the allegation for lack of sufficient information to form a belief as to the truth of the allegation, and, being without sufficient information, leaves Plaintiffs to their proofs. The City affirmatively states, upon information and belief, that the system used in Rochester Hills is not a Dominion system. Further, the fact that the error was caught demonstrates the strength of the electoral process in the United States, where decentralization and layer-upon-layer of checks prevent electoral error and fraud.**

66. These vote tabulator failures are a mechanical malfunction that, under MCL 168.831-168.839, requires a "special election" in the precincts affected.

**The City denies, because the allegation is false. Plaintiffs misstate Michigan law. The referenced statute deals with situations in which an elector is prevented from voting because of an error in a voting machine. M.C.L. § 168.831. That is not what is alleged to have occurred in Antrim County or Rochester Hills. Furthermore, even if Plaintiffs were correct—and they are not—the remedy in the statute is for an aggrieved candidate to petition the secretary or clerk of the board of canvassers that canvasses the election no later than 10 days after the date of the election for a special election in those two jurisdictions. *See* M.C.L. §§ 168.831-168.839.**

67. Michigan's Election Code, MCL 168.831-168.839, provides the board of canvassers shall order a special election as governed by those precincts affected by the defect or mechanical malfunction. The board of county canvassers "is responsible for resolving any claims that malfunctioning voting equipment or defective ballots may have affected the outcome of a vote on an office appearing on the ballot." Michigan Manual for Boards of County Canvassers.

**The City denies because Plaintiffs misstate Michigan law. The referenced statute deals with situations in which an elector is prevented from voting because of an error in a voting machine. M.C.L. § 168.831. That is not what is alleged to have occurred in Antrim County or Rochester Hills. Furthermore, even if Plaintiffs were correct—and they are not— the remedy in the statute is for an aggrieved candidate to petition the secretary or clerk of the board of canvassers that canvasses the election no later than 10 days after the date of the election for a special election in the precincts in which the votes were not accepted.** *See* **M.C.L. §§ 168.831-168.839. The petition must "Allege the facts that made it impossible to cast a vote for the petitioning candidate or for or against the ballot question[;] Identify the precinct and city or township, and, if applicable, the number of the voting machine or device[; and] Be signed and certified by the candidate or elector." The law further specifies that if the county board of canvassers decides to order a special election upon receipt of a timely petition, they shall "order a special election for the office of the petitioning candidate or the ballot question only in each precinct affected by a defect or mechanical malfunction as described in section 831 if all of the following are true: (a) An elector could not cast a valid vote in the precinct for the petitioning candidate … because of the defect or mechanical malfunction [and] Based on the available canvass, the number of electors who could not cast valid votes for the office … in an election because of the defect or mechanical malfunction is**

35

greater than the number of votes separating the candidates getting the most and the second most number of votes …."

68. Michigan has entrusted the conduct of elections to three categories of individuals, a "board of inspectors," a "board of county canvassers," and the "board of state canvassers."

**The City admits that Michigan has entrusted the conduct of elections to the identified categories, but affirmatively states the conduct of elections is entrusted to numerous other entities and individuals as well.**

69. The board of inspectors, among its other duties, canvasses the ballots and compares the ballots to the poll books. *See* MCL 168.801. "Such canvass shall be public and the doors to the polling places and at least 1 door in the building housing the polling places and giving ready access to them shall not be locked during such canvas." *Id.* The members of the board of inspectors (one from each party) are required to seal the ballots and election equipment and certify the statement of returns and tally sheets and deliver the statement of returns and tally sheet to the township or city clerk, who shall deliver it to the probate court judge, who will than deliver the statement of returns and tally sheet to the "board of county canvassers." MCL 168.809. "All election returns, including poll lists, statements, tally sheets, *absent voters' return envelopes bearing the statement required [to cast an absentee ballot] … must be carefully preserved*." MCL.810a and 168.811 (emphasis added).

**The City states that M.C.L. § 168.801 speaks for itself and provides that a public "canvass shall commence by a comparison of the poll lists and a correction of any mistakes that may be found therein until they shall be found or made to agree." M.C.L. § 168.809 also speaks for itself and provides, among other things, for the sealing and delivery of the statement of returns and tally sheets. M.C.L. § 168.811 speaks for itself and states that,**

among other items, **"election returns, including poll lists, statements, tally sheets,[and] absent voters' return envelopes" must be "carefully preserved and may be destroyed after the expiration of 2 years following the primary or election at which the same were used."**

70. After the board of inspectors completes its duties, the board of county canvassers is to meet at the county clerk's office "no later than 9 a.m. on the Thursday after" the election. November 5, 2020 is the date for the meeting. MCL 168.821. The board of county canvassers has power to summon and open ballot, correct errors, and summon election inspectors to appear. Among other duties and responsibilities, the board of county canvassers shall do the following provided in MCL 168.823(3). The board of county canvassers shall correct obvious mathematical errors in the tallies and returns. *The board of county canvassers may, if necessary for a proper determination, summon the election inspectors before them*, and require them to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns. In the alternative to summoning the election inspectors before them, the board of county canvassers may designate staff members from the county clerk's office to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns. When the examination of the papers is completed, or the ballots have been counted, they shall be returned to the ballot boxes or delivered to the persons entitled by law to their custody, and the boxes shall be locked and sealed and delivered to the legal custodians.

**The City neither admits nor denies the allegation, because the statutes speak for themselves.**

71. The county board of canvassers shall "conclude the canvass at the earliest possible time and in every case no later than the fourteenth day after the election," which is November 17. MCL 168.822(1). But, "[i]f the board of county canvassers fails to certify the results of any election for any officer or proposition by the fourteenth day after the election as provided, the board of county canvassers shall immediately deliver to the secretary of the board of state canvassers all records and other information pertaining to the election. The board of state canvassers shall meet immediately and make the necessary determinations and certify the results within the 10 days immediately following the receipt of the records from the board of county canvassers." MCL 168.822(2).

**The City neither admits nor denies the allegation, because the statutes speak for themselves.**

72. The Michigan board of state canvassers then meets at the Secretary of State's office the twentieth day after the election and announce its determination of the canvass "not later than the fortieth day after the election." For this general election that is November 23 and December 3. MCL 168.842. There is provision for the Secretary of State to direct an expedited canvass of the returns for the election of electors for President and Vice President.

**The City neither admits nor denies the allegation, because the statutes speak for themselves. The City affirmatively states that the provision regarding an expedited canvass is inapplicable here, because that provision is only triggered "If the unofficial election returns show that the election of electors of President and Vice President of the United States is determined by a vote differential between the first place and second place candidates for**

President and Vice President of the United States of less than 25,000 votes." M.C.L. § 168.842(2).

73. The federal provisions governing the appointment of electors to the Electoral College, 3 U.S.C. 1-18, require Michigan Governor Whitmer to prepare a Certificate of Ascertainment by December 14, the date the Electoral College meets.

**The City Admits.**

74. The United States Code (3 U.S.C. 5) provides that if election results are contested in any state, and if the state, prior to election day, has enacted procedures to settle controversies or contests over electors and electoral votes, and if these procedures have been applied, and the results have been determined six days before the electors' meetings, then these results are considered to be conclusive and will apply in the counting of the electoral votes. This date (the "Safe Harbor" deadline) falls on December 8, 2020. The governor of any state where there was a contest, and in which the contest was decided according to established state procedures, is required (by 3 U.S.C. 6) to send a certificate describing the form and manner by which the determination was made to the Archivist as soon as practicable.

**The City Admits that 3 U.S.C. § 5 states that "if any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the**

counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned."

75. The members of the board of state canvassers are Democrat Jeannette Bradshaw, Republican Aaron Van Langeveide, Republican Norman Shinkle, and Democrat Julie Matuzak. Jeanette Bradshaw is the Board Chairperson. The members of the Wayne County board of county canvassers are Republican Monica Palmer, Democrat Jonathan Kinloch, Republican William Hartmann, and Democrat Allen Wilson. Monica Palmer is the Board Chairperson.

**The City Admits. But, the City notes that there is a typographical error in the spelling of the name Aaron Van Langeveide; upon information, his last name is spelled "Van Langevelde."**

## COUNT I
### Equal Protection Clause of the United States Constitution and the corollary clause of Michigan's Constitution.

76. The Fourteenth Amendment to the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665, (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

**The City admits the excerpt from the United States Constitution, but neither admits nor denies the relevance of the citations of law to the matters at issue in the instant matter.**

77. Wayne County's failure to allow challengers and its counting of ineligible and illegal ballots that did not comply with the Michigan Election Code diluted the lawful ballots of these plaintiffs and of other Michigan voters and electors in violation of the United States Constitution and the Michigan Constitution guarantee of equal protection.

**The City denies, because the allegation is false. The City affirmatively states that Plaintiffs allegations are false and misplaced and that the legal theory they put forth is not valid.**

78. President Trump's campaign committee and these Michigan voters and challengers seek declaratory and injunctive relief requiring Secretary Benson to direct that Wayne County allow a reasonable number of challengers to meaningfully observe the conduct of the Wayne County board of county canvassers and the board of state canvassers and that these canvassing boards exercise their duty and authority under Michigan law, which forbids certifying a tally that includes any ballots that were not legally cast.

**The City admits that this allegation identifies Plaintiffs' requested relief, but denies that Plaintiffs have stated a claim upon which relief can be granted.**

79. In addition, President Trump's campaign committee and these Michigan voters and challengers ask this Court to order that no ballot processed by a counting board in Wayne County can be included in the final vote tally unless a challenger was allowed to meaningfully observe the process and the handling and counting of the ballot.

**The City admits that this allegation identifies Plaintiffs' requested relief, but denies that Plaintiffs have stated a claim upon which relief can be granted.**

80. Secretary Benson violated these Michigan voters' right to equal protection by allowing Wayne County to process and count ballots in a manner that allowed ineligible ballots to be

counted and by not requiring Wayne County to conduct the general election in a uniform manner as required by Michigan's Election Code as was done in other jurisdictions.

**The City denies, because the allegation is false.**

**COUNT II**
**Federal Elections and Electors Clauses.**

81. The Electors Clause states that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of Electors" for President. U.S. Const. art. II, §1, cl. 2 (emphasis added).

**The City admits that these words are quoted accurately from the United States Constitution and affirmatively states that this is only a partial citation to one section of the United States Constitution.**

82. Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, §4, cl. 1 (emphasis added).

**The City admits that these words are quoted accurately from the United States Constitution and affirmatively states that this is only a partial citation to one section of the United States Constitution.**

83. Michigan statutes enacted by the legislature protect the purity and integrity of elections by allowing ballot challengers to monitor the counting and processing of absentee ballots. Wayne County and Secretary Benson violated this statutory guarantee by preventing Republican challengers from meaningfully observing and participating in the ballot processing and counting process as is provided by MCL 168.730-736.

**The City admits that Michigan law allows ballot challengers to monitor the counting and processing of absentee ballots. The remainder of the allegation is denied because it is false.**

84. It is a violation of the rights of President Trump's campaign committee to have federal elections for presidential electors governed under rules prescribed by the state legislature for Secretary Benson and Wayne County to count ballots that are not lawfully cast, and it is a violation of Michigan law for the Wayne County board of county canvassers and the Michigan board of state canvassers to certify an election tally that includes ineligible or unlawfully cast ballots.

**The City denies, because the allegation is false. The City states affirmatively that Plaintiffs' claim are false or misplaced and that Plaintiffs do not—and cannot—state a valid legal theory.**

### COUNT III
### Michigan's Election Code.

85. MCL 168.730 provides:

(1) At an election, a political party or [an organization] interested in preserving the purity of elections and in guarding against the abuse of the elective franchise, may designate challengers as provided in this act. Except as otherwise provided in this act, a political party [or interested organization] may designate not more than 2 challengers to serve in a precinct at any 1 time. A political party [or interested organization] may designate not more than 1 challenger to serve at each counting board.

(2) A challenger shall be a registered elector of this state. . . . A candidate for the office of delegate to a county convention may serve as a challenger in a precinct other than the 1 in which he or she is a candidate. . . .

(3) A challenger may be designated to serve in more than 1 precinct. The political party [or interested organization] shall indicate which precincts the challenger will serve when designating challengers under subsection (1). If more than 1 challenger of a political party [or interested organization] is serving in a precinct at any 1 time, only 1 of the challengers has the authority to initiate a challenge at any given time. The challengers shall indicate to the board of election

43

inspectors which of the 2 will have this authority. The challengers may change this authority and shall indicate the change to the board of election inspectors.

**The City admits that these words are found in Michigan Compiled Laws and state affirmatively that not all words deleted are designated with ellipses. The City denies any implication that the law was not followed or that Plaintiffs state a valid legal claim.**

86. Secretary of State Benson and the election officials in Wayne County violated MCL 168.730-168.734 by denying Republican challengers' rights to meaningfully observe and participate in the ballot processing and counting process…

**The City denies, because the allegation is false.**

87. Michigan Election Code, MCL 168.734 provides:

Any officer or election board who shall prevent the presence of any such challenger as above provided, or shall refuse or fail to provide such challenger with conveniences for the performance of the duties expected of him, shall, upon conviction, be punished by a fine not exceeding $1,000.00, or by imprisonment in the state prison not exceeding 2 years, or by both such fine and imprisonment in the discretion of the court.

**The City admits.**

88. Wayne County's and Secretary Benson's denial of Republican challengers' right to participate and observe the processing of ballots violates Michigan's Election Code and resulting in the casting and counting of ballots that were ineligible to be counted and diluted or canceled out the lawfully cast ballots of other Michigan voters.

**The City denies, because the allegation is false.**

November 16, 2020                                        Respectfully submitted,

                                                                    **FINK BRESSACK**

                                                                    By:      /s/ David H. Fink
                                                                    David H. Fink (P28235)
                                                                    Darryl Bressack (P67820)
                                                                    *Attorneys for City of Detroit*

38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel: (248) 971-2500
dfink@finkbressack.com
dbressack@finkbressack.com

**CITY OF DETROIT**
**LAW DEPARTMENT**
Lawrence T. Garcia (P54890)
Charles N. Raimi (P29746)
James D. Noseda (P52563)
*Attorneys for City of Detroit*
2 Woodward Ave., 5th Floor
Detroit, MI 48226
Tel: (313) 237-5037
garcial@detroitmi.gov
raimic@detroitmi.gov
nosej@detroitmi.gov

45

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., MATTHEW, SEELY, ALEXANDRA SEELY, PHILIP O'HALLORAN, ERIC OSTERGREN, MARIAN SHERIDAN, MERCEDES WIRSING, and CAMERON TARSA,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>JOCELYN BENSON, in her official Capacity as Michigan Secretary of State, MICHIGAN BOARD OF STATE CANVASSERS, WAYNE COUNTY, MICHIGAN, and WAYNE COUNTY BOARD OF COUNTY CANVASSERS,<br><br>　　　　　Defendants. | No. 1:20-cv-01083<br><br>Judge Janet T. Neff |

**CITY OF DETROIT'S PROPOSED AFFIRMATIVE DEFENSES**

For its Affirmative Defenses, the City of Detroit states as follows:

1.　　Plaintiffs' Complaint fails to state a claim upon which relief may be granted.

2.　　Plaintiffs' claims are barred in whole or in part by governmental immunity or other immunity granted by law.

3.　　Plaintiffs suffered no damages as a result of any conduct by the City of Detroit and Plaintiffs are not entitled to any relief.

4.　　Plaintiffs' claims are barred under abstention doctrines because the claims should be resolved in state court.

5.　　Plaintiffs' claims are barred under the Electoral Count Act of 1887.

6.　　Plaintiffs' claims are barred by res judicata.

7.　　Plaintiffs' claims are barred by collateral estoppel.

8.      Plaintiffs' claims are barred by estoppel.

9.      Plaintiffs' claims are barred by laches.

10.     Plaintiffs' claims are barred by the rule against splitting a cause of action.

11.     Plaintiffs' claims are barred because they are not ripe for adjudication.

12.     Plaintiffs' claims are barred because they are moot.

13.     Plaintiffs' claims are barred because Plaintiffs lack standing to bring their claims.

14.     Plaintiffs' claims should be dismissed because there are no genuine issues as to any material facts.

15.     The City of Detroit reserves the right to name additional affirmative defenses as they become known through the course of discovery.

WHEREFORE, the City of Detroit, having fully answered Plaintiffs' Complaint, requests that Plaintiffs' claims be dismissed with prejudice, and that the City of Detroit be permitted to recover all costs incurred.

November 16, 2020                                    Respectfully submitted,

                                                    **FINK BRESSACK**

                                                    By:      /s/ David H. Fink
                                                    David H. Fink (P28235)
                                                    Darryl Bressack (P67820)
                                                    *Attorneys for City of Detroit*
                                                    38500 Woodward Ave., Ste. 350
                                                    Bloomfield Hills, MI 48304
                                                    Tel: (248) 971-2500
                                                    dfink@finkbressack.com
                                                    dbressack@finkbressack.com

                                                    **CITY OF DETROIT**
                                                    **LAW DEPARTMENT**
                                                    Lawrence T. Garcia (P54890)
                                                    Charles N. Raimi (P29746)
                                                    James D. Noseda (P52563)
                                                    *Attorneys for City of Detroit*

2 Woodward Ave., 5th Floor
Detroit, MI 48226
Tel: (313) 237-5037
garcial@detroitmi.gov
raimic@detroitmi.gov
nosej@detroitmi.gov