UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., MATTHEW SEELY, ALEXANDRA SEELY, PHILIP O'HALLORAN, ERIC OSTERGREN, MARIAN SHERIDAN, MERCEDES WIRSING, and CAMERON TARSA,<br><br>     Plaintiffs,<br> v.<br><br>JOCELYN BENSON, in her official capacity as Michigan Secretary of State, MICHIGAN BOARD OF STATE CANVASSERS, WAYNE COUNTY, MICHIGAN, and WAYNE COUNTY BOARD OF COUNTY CANVASSERS,<br><br>     Defendants. | CIVIL ACTION<br><br>Case No. 1:20-cv-01083-JTN-PJG<br><br>Hon. Janet T. Neff |

**PROPOSED INTERVENOR-DEFENDANTS DNC AND MICHIGAN DEMOCRATIC PARTY'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

CONCISE STATEMENT OF REASONS ................................................................................... ii

I.   INTRODUCTION ............................................................................................................... 1

II.  BACKGROUND ................................................................................................................. 2

   A.  Michigan's Election Laws ............................................................................................. 2

   B.  State Court Lawsuits ...................................................................................................... 4

   C.  Plaintiffs' Complaint ...................................................................................................... 6

III. LEGAL STANDARD .......................................................................................................... 7

IV. ARGUMENT ....................................................................................................................... 8

   A.  This Court should abstain in deference to ongoing state court proceedings....................... 8

   B.  The Eleventh Amendment bars this suit. ....................................................................... 13

   C.  Plaintiffs lack standing................................................................................................. 18

      1.   Plaintiffs do not allege harms sufficient to satisfy Article III standing. ....................... 19

      2.   Plaintiffs' lack prudential standing to bring Count II. ................................................ 21

   D.  Plaintiffs fail to state claims on which relief can be granted. ............................................ 22

      1.   Plaintiffs' claims are simply not plausible.................................................................. 22

      2.   Plaintiffs have not pleaded a cognizable equal protection claim.................................. 24

      3.   Plaintiffs' Election Code claim fails as a matter of law. .............................................. 27

      4.   Plaintiffs have not pleaded a viable claim under the Elections and Electors Clauses... 29

   E.  Plaintiffs are not entitled to the relief they seek. ............................................................. 29

V.  CONCLUSION................................................................................................................... 32

## CONCISE STATEMENT OF REASONS

1.      Under well-established abstention principles, this Court should defer to ongoing state court proceedings.

2.      The Eleventh Amendment bars Plaintiffs claims because this Court cannot require state officials to conform to state law.

3.      Plaintiffs' complaint should be dismissed because Plaintiffs lack both Article III and prudential standing to bring these claims.

4.      Plaintiffs' complaint should be dismissed because their constitutional and statutory claims fail as a matter of law.

## I.      INTRODUCTION

The people of Michigan have spoken. On November 3, 2020, more than 5.5 million Michiganders—a new record—cast their votes in races up and down the ballot. Their votes have since been received, processed, and canvassed by a dedicated team of election officials and volunteers, operating under intense scrutiny in the midst of a public health crisis. Every major news outlet has called Michigan for former vice president Joe Biden—unsurprisingly, as he leads by nearly 150,000 votes and a margin of 2.6 percent—and, based on national election results, designated him president-elect.

Dissatisfied with this result and unwilling to accept it, Plaintiffs, including Donald J. Trump for President, Inc. (the "Trump Campaign"), filed this suit in an apparent attempt to sow doubt about the results of the election. But their claims constitute mere intrigue and fantasy, divorced from reality and the successful—indeed, heroic—administration of this election by state and local officials. Supported only by flimsy evidence and rank generalizations, the Trump Campaign seeks extraordinary and unprecedented relief from this Court, including a halt to the certification of the entire state's duly counted votes.

The Trump Campaign and its allies are pursuing multiple avenues to obtain their requested relief, all of which have thus far failed. Although they currently have substantially similar actions pending in state court, they have simultaneously sought refuge in a federal forum, demanding that this Court disregard bedrock principles of federalism and comity *and* Article III's jurisdictional requirements. This Court should promptly dismiss Plaintiffs' complaint for lack of subject matter jurisdiction and failure to state a claim on which relief can be granted, and the certification of Michigan's returns should proceed.

As the Trump Campaign aptly put it four years ago, "there is no reason to rewrite Michigan

1

election law to accommodate the conspiracy-minded requests of an acknowledged loser." Donald J. Trump & Donald J. Trump for President, Inc.'s Objections to Dr. Jill Stein's Recount Pet., *In re Pet. for Recount for Office of President of U.S. of Am.* (Mich. Bd. of State Canvassers Dec. 1, 2016) (attached as Ex. 14).[1] This latest lawsuit is just one more distraction to disrupt the timely and orderly completion of the democratic process, the latest salvo in an increasingly desperate campaign to overturn the will of the people. Because Plaintiffs' claims are premised on noncognizable legal theories and implausible allegations of widespread electoral malfeasance, this Court should not grant the relief they seek, and their complaint should be dismissed.

## II.    BACKGROUND

### A.    Michigan's Election Laws

In Michigan, poll workers—known as "election inspectors"—are registered Michigan voters, each of whom has been deemed by the local clerk to have "a good reputation" and "sufficient education and clerical ability" to perform the necessary duties, Mich. Comp. Laws § 168.677, and has taken an oath of office both to support the federal and state constitutions and to "faithfully discharge the duties of the office of inspector of elections according to the best of [their] ability," *id.* § 168.680; *see also id.* § 168.674 (providing that election inspectors' qualifications are subject to challenge by county chairs of major political parties). Election inspectors shoulder the burden of ensuring polling places and counting boards run smoothly while also overseeing certain tasks, such as duplication of ballots, which might be necessary when a ballot cannot be read by a machine or a military or overseas ballot needs to be transcribed into a machine-readable ballot.

---

[1] Exhibit cites refer to the exhibits attached to Proposed Intervenor-Defendants DNC and Michigan Democratic Party's motion to intervene, filed concurrently.

Election "challengers," by contrast, are volunteers appointed by political parties or other organized groups who can challenge the validity of absent voter ballots at one of two locations: a precinct or an absent voter counting board ("AVCB"). *Id.* § 168.730(1). Challengers may: (1) observe the manner in which election inspectors perform their duties, (2) challenge the validity of ballots, (3) challenge election procedures not properly performed, or (4) bring various election code violations to the attention of election inspectors. *Id.* § 168.733(1). Challengers may only challenge a voter whom they have "good reason to believe is not a registered elector." *Id.* § 168.733(1)(c). Challengers are prohibited from engaging in "disorderly conduct" or voter intimidation. *Id.* §§ 168.733(3), 168.733(4). They may not "make a challenge indiscriminately," "handle the poll books . . . or the ballots," or "interfere with or unduly delay the work of the election inspectors." *Id.* § 168.727(3). They must also take an oath not to communicate any information about the "processing and tallying of votes . . . until after the polls are closed." *Id.* § 168.765a(9). Challengers' misbehavior may result in criminal penalties. *See id.* § 168.727(3).

Michigan law limits the number of challengers at precincts to "not more than 2" and at counting boards to "not more than 1" per entity, whether a political party or other certifying group. *Id.* § 168.730. Once challengers are duly appointed and accepted into the precinct or AVCB, election inspectors may not prevent their presence, *id.* § 168.734, and must provide them with a space where they may observe ballot counting, *id.* § 168.733(2). The Legislature further vested in Defendant Jocelyn Benson, the Michigan Secretary of State (the "Secretary"), the authority to issue "instructions . . . for the conduct of absent voter counting boards or combined absent voter counting boards." *Id.* § 168.765a(13). Pursuant to that authority, the Secretary allowed local

3

jurisdictions to determine, for the purposes of combined AVCBs,[2] "how and under what conditions challengers and other individuals permitted into the facility will be allowed in." *Absent Voter Ballot Election Day Processing*, Mich. Bureau of Elections 11 (Oct. 2020), https://www.michigan.gov/documents/sos/VIII_Absent_Voter_County_Boards_265998_7.pdf.[3] In every election, officials must balance challengers' right of access with election inspectors' need to do their work in limited available space. During this past election, Michigan's officials needed to grapple with not only how to conduct an orderly election, but also how best to safely allow individuals access to polling places in light of the COVID-19 pandemic and the social distancing required to prevent transmission of the virus.

**B.     State Court Lawsuits**

In the eleven days following election day, various challenges to Michigan's election procedures and results have been filed in state court, including a previous lawsuit filed by two Plaintiffs in this action: the Trump Campaign and Eric Ostergren. In that case, which featured many of the same claims now raised here, the Trump Campaign sought an immediate cessation of the counting of absentee ballots based on allegations of insufficient oversight. *See* Verified Compl.

---

[2] "[C]ity or townships may enter into agreements with each other or with the county to operate a combined absent voter counting board. In general, the same rules and procedures apply to combined absent voter counting boards that apply to other absent voter counting boards." *Absent Voter Ballot Election Day Processing*, Mich. Bureau of Elections 10 (Oct. 2020), https://www.michigan.gov/documents/sos/VIII_Absent_Voter_County_Boards_265998_7.pdf.

[3] "When considering whether to grant a Rule . . . 12(b)(6) motion," the Court may consider "matters of public record (e.g. pleadings, orders and other papers on file in another action pending in the court; records or reports of administrative bodies; or the legislative history of laws, rules or ordinances) as long as the facts noticed are not subject to reasonable dispute." *Lozar v. Birds Eye Foods, Inc.*, 678 F. Supp. 2d 589, 599 (W.D. Mich. 2009) (quoting *Pakootas v. Teck Cominco Metals, Ltd.*, 632 F. Supp. 2d 1029, 1032 (E.D. Wash. 2009)); *see also United States ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1381 (C.D. Cal. 2014) (courts may take judicial notice of "'government documents available from reliable sources on the Internet,' such as websites run by governmental agencies" (quoting *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG (POR), 2009 WL 6597891, at *2 (S.D. Cal. Dec. 23, 2009))).

for Immediate Declaratory & Injunctive Relief, *Donald J. Trump for President, Inc. v. Benson*, No. 20-000225-MZ (Mich. Ct. Cl. Nov. 4, 2020) (attached as Ex. 7). The Michigan Court of Claims denied the Trump Campaign's emergency motion for declaratory relief, concluding that it was unlikely to succeed on the merits and that, even "overlooking the problems with the factual and evidentiary record," the matter had become moot because "the complaint and emergency motion were not filed until approximately 4:00 p.m. on November 4, 2020—despite being announced to various media outlets much earlier in the day." *Donald J. Trump for President, Inc. v. Benson*, No. 20-000225-MZ, slip op. at 5 (Mich. Ct. Cl. Nov. 6, 2020) (attached as Ex. 8). The Trump Campaign has since sought an appeal. *See* Mot. for Immediate Consideration of Appeal Under MCR 7.211(C)(6), *Donald J. Trump for President, Inc. v. Benson*, No. 20-000225-MZ (Mich. Ct. App. Nov. 6, 2020) (attached as Ex. 9).

Other election-related challenges have been similarly rejected as having no legal or factual merit. On election day, the Michigan Court of Claims denied an emergency motion to increase, at the eleventh hour and without any legal justification, the number of challengers allowed at the Oakland County vote center. *See Polasek-Savage v. Benson*, No. 20-000217-MM, slip op. at 3 (Mich. Ct. Cl. Nov. 3, 2020) (attached as Ex. 10). On November 6, the Third Judicial Circuit Court for Wayne County rejected an effort to delay certification of that County's ballots:

> This Court finds that it is mere speculation by plaintiffs that hundreds or thousands of ballots have, in fact, been changed and presumably falsified. . . .
>
> A delay in counting and finalizing the votes from the City of Detroit without any evidentiary basis for doing so, engenders a lack of confidence in the City of Detroit to conduct full and fair elections. The City of Detroit should not be harmed when there is no evidence to support accusations of voter fraud.

*Stoddard v. City Election Comm'n*, No. 20-014604-CZ, slip op. at 4 (Mich. Cir. Ct. Nov. 6, 2020) (attached as Ex. 11).

And on November 13, the Third Judicial Circuit Court denied the plaintiffs' motion for preliminary injunction in another challenge to Wayne County's returns. *See Costantino v. City of Detroit*, No. 20-014780-AW, slip op. at 13 (Mich. Cir. Ct. Nov. 13, 2020) (attached as Ex. 13). After discounting affidavits reporting vague allegations of suspicious conduct at TCF Center and concluding that the "[p]laintiffs' interpretation of events is incorrect and not credible," the court observed that

> [i]t would be an unprecedented exercise of judicial activism for this Court to stop the certification process of the Wayne County Board of Canvassers. . . .
>
> Waiting for the Court to locate and appoint an independent, nonpartisan auditor to examine the votes, reach a conclusion and then finally report to the Court would involve untold delay. It would cause delay in establishing the Presidential vote tabulation, as well as all other County and State races. It would also undermine faith in the Electoral System.

*Id.* at 11–13.

These cases remain ongoing.

**C.    Plaintiffs' Complaint**

More than a week after election day—and well after the tabulation of ballots in Wayne County and elsewhere in Michigan concluded—Plaintiffs filed this suit. Most of their complaint, like the 200-plus pages of exhibits accompanying it, consists of declarations and testimonials from individuals who observed alleged irregularities in Wayne County's processing of ballots. From this hodgepodge of allegations, Plaintiffs derive three claims: Count I, which alleges that the "failure to allow challengers and [the] counting of ineligible and illegal ballots . . . diluted the lawful ballots of these plaintiffs and of other Michigan voters" in violation of the Equal Protection Clauses of the U.S. and Michigan Constitutions, Compl. ¶¶ 76–80; Count II, which claims that Defendants violated the U.S. Constitution's Elections and Electors Clauses by departing from Michigan's Election Code and "preventing Republican challengers from meaningfully observing

and participating in the ballot processing and counting process," *id.* ¶¶ 81–84; and Count III, which similarly alleges violations of Michigan's Election Code provisions relating to election challengers, *id.* ¶¶ 85–88.

## III.    LEGAL STANDARD

Whether a party has Article III standing is properly addressed as a question of a court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). Unlike a motion to dismiss for failure to state a claim under Rule 12(b)(6), "where subject matter jurisdiction is challenged under Rule 12(b)(1)[,] . . . the plaintiff has the burden of proving jurisdiction in order to survive the motion." *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (emphasis omitted) (quoting *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)).

When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court presumes that all well-pleaded material allegations in the complaint are true, *see Total Benefits Plan. Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008), but "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Fed. R. Civ. P. 8(a)). Courts need not accept as true legal conclusions or unwarranted factual inferences. *See Total Benefits Plan.*, 552 F.3d at 434.

7

# IV.    ARGUMENT

## A.    This Court should abstain in deference to ongoing state court proceedings.

At the outset, the Court need not reach the merits of Plaintiffs' claims to dismiss this lawsuit. Under well-established abstention principles, Plaintiffs' challenge to Michigan's administration of its election under state law should proceed in pending state court proceedings.

In bringing this suit, Plaintiffs seek to bypass both state law remedies—which are designed specifically to address the types of grievances over the tabulation of votes and certification of results that Plaintiffs have raised here—*and* unfavorable rulings in ongoing state court proceedings. The relief Plaintiffs seek calls for an extraordinary intrusion on state sovereignty by a federal court, and principles of federalism and comity counsel strongly in favor of, and indeed may well require, adjudication of these claims through the well-established state law procedures for election contests. *See González-Cancel v. Partido Nuevo Progresista*, 696 F.3d 115, 120 (1st Cir. 2012) ("Where, as here, a plaintiff is aware of, yet fails to fully use, an adequate state administrative or judicial process to address a local election dispute, a claim that the election process created fundamental unfairness to warrant federal intervention cannot survive."); *see also Costantino*, slip op. at 10–12 (describing remedies under Michigan law for election challenges) (attached as Ex. 13).

Under the abstention doctrine set forth in *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), federal courts should "avoid exercising jurisdiction in cases involving an ambiguous state statute that may be interpreted by state courts so as to eliminate, or at least alter materially, the constitutional question raised in federal court." *Lawrence v. Pelton*, 413 F. Supp. 3d 701, 709 (W.D. Mich. 2019) (quoting *Fowler v. Benson*, 924 F.3d 247, 255 (6th Cir. 2019)). This doctrine "acknowledges that federal courts should avoid the unnecessary resolution of federal constitutional

issues and that state courts provide the authoritative adjudication of questions of state law." *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 508 (1985)). Abstention thus reflects the federal judiciary's "scrupulous regard for the rightful independence of the state governments." *Pullman*, 312 U.S. at 501. Abstention is appropriate if the Court finds that (1) "state law is unclear," and (2) "a clarification of that law would preclude the need to adjudicate the federal question." *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011). Both requirements are easily met here.

*First*, Plaintiffs' federal constitutional claims center on unresolved questions of state law. The complaint expressly alleges that Plaintiffs' claims hinge on violations of Michigan's Election Code, *see* Compl. ¶¶ 77–78, 80, 83–84, and Plaintiffs devote a substantial portion of the complaint to describing various provisions of the Michigan Compiled Laws, *see id.* ¶¶ 20–23, 56–58, 67. Plaintiffs contend that certain Republican Party election challengers could not enter the ballot counting location, were not allowed sufficiently close to counting tables, and could not view the processing or counting of ballots when election officials blocked their view. Plaintiffs further claim that, accordingly, the challengers could not "meaningfully" observe ballot processing and counting and that this "violated [a] statutory guarantee." *Id.* ¶ 83; *see also id.* ¶ 80 (alleging that Secretary failed to require Wayne County "to conduct the general election in a uniform manner as required by Michigan's Election Code"). This is purely a question of state law that should be addressed and adjudicated by a state court.

Plaintiffs' objections to the eligibility of particular ballots and their claims about video monitoring of unattended ballot drop boxes likewise turn on questions of state law. As noted above, there are multiple suits ongoing in state court on *these very same issues*, one of which involves substantially the same parties, *see* Exs. 7–9, and another of which Plaintiffs themselves cite to

support their federal court claims. *See* Compl. ¶ 55 (noting that *Costantino* "raises similar allegations of voter fraud and irregularities"). However, rather than properly appealing in the Michigan courts, Plaintiffs improperly seek a second opinion in federal court. Under these circumstances, abstention is the correct course.

*Second*, clarification of these state law issues would preclude the need to adjudicate the federal questions in this case. If reviewing state courts in the (similarly captioned) state case *Donald J. Trump for President, Inc. v. Benson* or in *Costantino* were to definitively interpret Michigan law and enforce state law procedures for adjudicating challenges to election results, then there would be nothing left for this Court to decide. Indeed, in the absence of a higher court decision, the trial court decisions in both state cases are dispositive and suggest that it is highly likely that the state law questions will be resolved in Defendants' favor. *See West v. AT&T Co.*, 311 U.S. 223, 236–37 (1940) (noting that "a federal court is not free to reject" rules of decision issued by state courts "merely because it has not received the sanction of the highest state court"). Any analysis of Plaintiffs' claims in this Court would begin with an interpretation of the Michigan statutory provisions that were allegedly violated; if Plaintiffs are incorrect that the conduct alleged violates Michigan law—*as state trial courts have already concluded*—then they cannot succeed on their equal protection claim or their claim under the Elections and Electors Clauses. *See* Compl. ¶¶ 77–78, 80, 83–84 (alleging that Defendants committed constitutional violations when they failed to conduct election as required by Michigan's Election Code).

In short, allowing Michigan courts to interpret these state law questions "may obviate the federal claims" and "eliminate the need to reach the federal question," and this Court should therefore abstain. *GTE N., Inc. v. Strand*, 209 F.3d 909, 921 (6th Cir. 2000); *see also Georgevich v. Strauss*, 772 F.2d 1078, 1094–95 (3d Cir. 1985) (abstaining where "state law appears to resolve

10

the sole issue in the case" and thus it "may be more appropriately resolved in state court," and

noting that "[i]f we do not need to intrude, we should not").[4]

Moreover, *Colorado River Water Conservation District v. United States*, 424 U.S. 800

(1976), also counsels in favor of abstention. This doctrine encourages "abstention in favor of

ongoing, parallel state proceedings in cases where 'considerations of wise judicial administration,

giving regard to conservation of judicial resources and comprehensive disposition of litigation'

clearly favor abstention." *Ackerman v. ExxonMobil Corp*., 734 F.3d 237, 248 (4th Cir. 2013)

(quoting *Colo. River*, 424 U.S. at 817). "The threshold question in a *Colorado River* inquiry is

whether the pending state and federal suits are parallel," *id.*, and that requirement is satisfied here

because the Trump Campaign and Plaintiff Ostergren are currently involved in a state court action

that implicates the same issues of Michigan law. *See* Exs. 7–9.[5] The other relevant factors under

this doctrine—including avoiding piecemeal litigation, the order and relative progress of the cases,

the critical issues of state law at stake, and the adequacy of the state court to continue addressing

these issues—also weigh heavily in favor of abstention. *See Preferred Care of Del., Inc. v.

VanArsdale*, 676 F. App'x 388, 395 (6th Cir. 2017).

---

[4] Another federal court facing similar claims related to this election concluded that abstention was proper, rejecting the plaintiffs' request "to find that state officials have wrongly interpreted state law" where "an alternative appropriately exists with the . . . state courts." *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 4920952, at *17 (W.D. Pa. Aug. 23, 2020) (quoting *Fuente v. Cortes*, 207 F. Supp. 3d 441, 452 (M.D. Pa. 2016)).

[5] Parallelism in this case is not defeated simply because the state court litigation does not raise identical claims; it is sufficient that the claims in this case are "predicated on the same allegations as to the same material facts." *Romine v. Compuserve Corp.*, 160 F.3d 337, 340 (6th Cir. 1998). Nor does it matter that this case contains additional Plaintiffs; the Sixth Circuit has "never held that identity of parties is required for parallelism. In fact, [it has] held the opposite." *Healthcare Co. v. Upward Mobility, Inc.*, 784 F. App'x 390, 395 (6th Cir. 2019); *cf. Lumen Constr., Inc. v. Brant Constr. Co*, 780 F.2d 691, 695 (7th Cir. 1985) ("If the rule were otherwise, the *Colorado River* doctrine could be entirely avoided by the simple expedient of naming additional parties.").

Finally, Plaintiffs' claims are precluded under *Burford* abstention, which is appropriate, as here, "where timely and adequate state-court review is available and (1) a case presents 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the case at bar,' or (2) the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Caudill v. Eubanks Farms, Inc.*, 301 F.3d 658, 660 (6th Cir. 2002) (quoting *New Orleans Pub. Serv., Inc. v. Council*, 491 U.S. 350, 361 (1989)); *see also Burford v. Sun Oil Co.*, 319 U.S. 315, 334 (1943). There is simply no dispute that the conduct of federal elections implicates a vital area of state policy. The U.S. Constitution explicitly delegates *to the states* the responsibility for determining the "Times, Places, and Manner of holding Elections," U.S. Const. art. II, § 1, cl. 2, and the "Manner" in which it appoints presidential electors, U.S. Const. art. I, § 4, cl. 1. Michigan therefore has a compelling interest in the orderly administration and certification of its elections. Indeed, as Plaintiffs point out throughout their complaint, Michigan has enacted an extensive Election Code that provides for an orderly canvass and protects the integrity of the electoral process. Accordingly, because the State has "primary authority over the administration of elections," *Hunter*, 635 F.3d at 232, abstention is proper—this case implicates an area where "the State's interests are paramount" and thus "would best be adjudicated in a state forum." *Caudill*, 301 F.3d at 660 (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996)).

In short, the Trump Campaign should not be permitted to employ the federal courts in a transparent effort to relitigate the *same* claims that continue to fail in state court. This blatant "attempt to . . . avoid adverse rulings by the state court . . . weighs strongly in favor of abstention." *Nakash v. Marciano*, 882 F.2d 1411, 1417 (9th Cir. 1989). Indeed, if any case demands

abstention—whether under *Pullman*, *Colorado River*, or *Burford*, each of which is applicable here—it is this one.

**B.      The Eleventh Amendment bars this suit.**

The Eleventh Amendment bars this Court's exercise of judicial power to issue Plaintiffs' requested relief because a federal court cannot order state officials to conform to state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

Plaintiffs' complaint is replete with references to what *Michigan* law requires, what the *Michigan* Legislature intended, and how the allegedly unlawful actions of election workers in Detroit and elsewhere violate both.[6] Count III is premised *exclusively* on officials' alleged violations of state statutes. *See* Compl. ¶¶ 85–88 (claim premised solely on allegations that "Secretary of State Benson and the election officials in Wayne County violated MCL 168.730-168.734"). Even Counts I and II, though superficially couched in the language of federal constitutional claims, at bottom allege only violations of Michigan law. *See id.* ¶ 77 (Count I: alleging equal protection violation premised solely on "Wayne County's failure to allow challengers and its counting of ineligible and illegal ballots that *did not comply with the Michigan Election Code*" (emphasis added)); *id.* ¶ 83 (Count II: Elections Clause and Electors Clause claim premised solely on alleged "violat[ions]" of "*Michigan statutes enacted by the legislature*" (emphasis added)). Accordingly, each of these claims requires this Court to (1) adjudicate whether Defendants violated state law, and (2) issue a preliminary injunction requiring state officials to comply with state law. *See, e.g.*, *id.* at 30 (asking Court for "[a]n order directing Secretary Benson

---

[6] *See, e.g.*, Compl. 2 ("Unfortunately, Wayne County did not conduct (and is not conducting) this election as required by Michigan law, and Secretary of State Benson did not require Wayne County to follow Michigan's election code."); *id.* ¶¶ 18–25 (describing Michigan law, alleging that "[t]he Michigan Legislature adopted these provisions to prevent and deter vote fraud," and claiming that "Secretary Benson and Wayne County violated these provisions of Michigan law").

and the Michigan Board of State Canvassers to not certify the election results until they have verified and confirmed that all ballots that were tabulated and included in the final reported election results were cast *in compliance with the provisions of the Michigan Election Code* as set forth herein." (emphasis added)).

This Court cannot undertake such an adjudication. As the U.S. Supreme Court explained decades ago in *Pennhurst*, "the principles of federalism that underlie the Eleventh Amendment" prohibit a federal court from granting "relief against state officials on the basis of state law, whether prospective or retroactive." 465 U.S. at 106; *see also id.* at 117 ("[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when . . . the relief sought and ordered has an impact directly on the state itself."); *In re Ohio Execution Protocol Litig.*, 709 F. App'x 779, 787 (6th Cir. 2017) ("If the plaintiff sues a state official under state law in federal court for actions taken within the scope of his authority, sovereign immunity bars the lawsuit regardless of whether the action seeks monetary or injunctive relief."). This is true even where, as here, state law claims are cloaked in federal causes of action. *See, e.g.*, *Balsam v. Sec'y of State*, 607 F. App'x 177, 183–84 (3d Cir. 2015) (holding that Eleventh Amendment bars state law claims even when "premised on violations of the federal Constitution"); *Massey v. Coon*, No. 87-3768, 1989 WL 884, at *2 (9th Cir. Jan. 3, 1989) (affirming dismissal of suit where "on its face the complaint states a claim under the due process and equal protection clauses of the Constitution, [but] these constitutional claims are entirely based on the failure of defendants to conform to state law"); *Six v. Newsom*, 462 F. Supp. 3d 1060, 1073 (C.D. Cal. 2020) (denying temporary restraining order in part because Fifth and Fourteenth Amendment claims were predicated on violations of state law); *Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 626 (E.D. Pa. 2018) ("Even when voters attempt to 'tie their state law claims into their federal claims,' the Eleventh

14

Amendment bars the state law claims." (quoting *Balsam*, 607 F. App'x at 183)); *Thompson v. Alabama*, No. 2:16-CV-783-WKW, 2017 WL 3223915, at *8 (M.D. Ala. July 28, 2017) (denying injunction where plaintiffs' federal constitutional claims rested on premise that state officials were violating state law).[7]

Plaintiffs ask this Court to adjudicate whether state and local officials violated state law— and that's it. As state officials, the Secretary and Michigan Board of State Canvassers (the "State Board") are indisputably shielded by the Eleventh Amendment, as are, in this case, Wayne County and its Board of County Canvassers. Although counties are not ordinarily considered arms of the state for Eleventh Amendment purposes, the remedies Plaintiffs seek can *only* be enforced by state officials. *See* Mich. Comp. Laws § 168.842 (explaining that Secretary and State Board shall meet for purposes of "ascertaining and determining the result" of election); *Id.* § 168.46 (explaining that "governor shall certify" the results of the election after State Board has ascertained result); *see also Beiersdorfer v. LaRose*, 397 F. Supp. 3d 1037, 1053 (N.D. Ohio 2019) ("The county boards of elections and their members are also arms of the state."); *Porter v. Gore*, 354 F. Supp. 3d 1162, 1180 (S.D. Cal. 2018) (finding that *Pennhurst* extends to claims against local officials where effect would be to invalidate state law). The Eleventh Amendment bar thus extends to each Defendant in this case.

---

[7] The Third Circuit's decision in *Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310 (3d Cir. 2002), is instructive. There, the plaintiffs sued the Secretary of Pennsylvania's Department of Environmental Protection, among others, for declaratory and injunctive relief under the federal Surface Mining Control and Reclamation Act of 1977 ("SMCRA"). Even though the plaintiffs' allegations nominally alleged violations of the SMCRA, the court found that once the state's regulatory system was approved, "jurisdiction for its administration and enforcement devolved on the state," and accordingly, "prospective relief vis-à-vis that program . . . is barred in federal court by the Eleventh Amendment." *Id.* at 325.

All three of Plaintiffs' claims, including those nominally styled as federal claims, are barred under *Pennhurst* because they depend on an adjudication of Michigan law and state officials' interpretation of it. In Count III, Plaintiffs allege that Defendants violated Michigan Compiled Laws sections 168.730 and 168.734 by failing to provide election observers with adequate opportunities to participate in and observe the processing of ballots. *See* Compl. ¶¶ 85–88. But "[a] federal court may not enjoin a state official to follow state law." *Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 479 (6th Cir. 2008). *Pennhurst* made clear that there is no "greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." 465 U.S. at 106. Because Count III is based entirely on violations of state law, and seeks to enjoin state officials, it is plainly barred by the Eleventh Amendment.

Counts I and II, in turn, are only *ostensibly* premised on violations of federal law; in actuality, resolution of these claims depends wholly on whether state officials followed state law, and thus they suffer from the same defect as Count III. As discussed above, when a pure issue of state law is simply pleaded as a federal cause of action, *Pennhurst* bars the claim. Count I, nominally pleaded in part as a federal equal protection claim, is based solely on perceived violations of state law. Although Plaintiffs have styled this claim as a federal cause of action, the substance of their allegations focuses entirely on state officials' purported failure to "comply with the Michigan Election Code" by allegedly counting ineligible and illegal ballots, Compl. ¶ 77, and by failing to "conduct the general election in a uniform manner as required by Michigan's Election Code," *id.* ¶ 80. Count I's lack of federal character is further revealed by the fact that Plaintiffs' theory of vote dilution cannot give rise to a federal cause of action under the Equal Protection Clause. *See, e.g.*, *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at *43 (W.D. Pa. Oct. 10, 2020) (vote dilution "is not an equal-protection issue"); *see*

*also infra* Part IV.D.2. Because Plaintiffs have not advanced a legitimate equal protection claim under federal law, and the actual substance of their claim is predicated on violations of state law, it is barred under *Pennhurst*.[8]

Count II, Plaintiffs' claim under the Elections and Electors Clauses, is barred for the same reason. Plaintiffs' sole allegation is that Defendants violated these clauses by "preventing Republican challengers from meaningfully observing and participating in the ballot processing and counting process" in violation of Michigan's Election Code. Compl. ¶¶ 81–84. To support this claim, Plaintiffs spend a large portion of the Complaint discussing state election law, *see id.* ¶¶ 18–23, 56, 67, 69–72, and the complaint repeatedly alleges that state and county officials violated state law, *see id.* ¶¶ 24, 57–59, 66. Thus, Count II is also barred by the Eleventh Amendment.

The distinction between *actual* federal claims under the Elections and Electors Clauses and, as here, state law claims merely masquerading as federal claims becomes apparent when looking at other cases brought under these constitutional provisions. In *Cook v. Gralike*, for example, the U.S. Supreme Court struck down a Missouri law that mandated a ballot designation for any congressional candidate who refused to commit to term limits after concluding that such a rule constituted a "'regulation' of congressional elections" under the Elections Clause. 531 U.S. 510, 525–26 (2001) (quoting U.S. Const. art. I, § 4, cl. 1). And in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, the Supreme Court upheld a law that delegated the redistricting process to an independent commission after reaffirming that "the Legislature" as used in the Elections Clause includes "the State's lawmaking processes." 576 U.S. 787, 824 (2015). In these cases, the task of federal courts was to measure state laws against *federal* mandates

---

[8] Plaintiffs also bring Count I under the Equal Protection Clause of the *Michigan* Constitution, *see* Compl. ¶ 77; *see also* Mich. Const. art. I, § 2, which is indisputably barred by *Pennhurst*.

set out under the Elections Clause—in the former, what is a "regulation"; in the latter, who is "the Legislature." No such federal question is posed here. Instead, the only issue presented in Plaintiffs' complaint is whether officials conformed to Michigan's Election Code. No amount of hand-waving or ex post rationalization can change the simple fact that Count II, like Plaintiffs' other claims, is premised solely on violations of state law. All of their claims are therefore barred by the Eleventh Amendment.[9]

## C.    Plaintiffs lack standing.

Even if this Court does not abstain, this action should be dismissed because Plaintiffs lack both Article III and prudential standing to bring their claims.

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). To avoid dismissal on Article III grounds, a plaintiff must show (1) an injury in fact, meaning "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the defendant's conduct, and (3) a likelihood that the injury will be redressed by a favorable decision from the court. *Spokeo, Inc. v. Robins*, 136 S. Ct.

---

[9] Notably, federal courts regularly reject state law claims against state officials in litigation involving election administration. *See, e.g.*, *Ohio Republican Party v. Brunner*, 543 F.3d 357, 360–61 (6th Cir. 2008) (*Pennhurst* bars claim that Secretary of State violated state election law); *Acosta*, 288 F. Supp. 3d at 628 (Eleventh Amendment bars Pennsylvania Election Code claims); *Veasey v. Perry*, 29 F. Supp. 3d 896, 922 (S.D. Tex. 2014) (Eleventh Amendment bars claim that state officials violated state constitution); *Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1358–59 (N.D. Ga. 2005) (same). This is unsurprising; federal and presidential elections in particular are *entirely* administered by the states, under rules proscribed by state law. *See Chiafalo v. Washington*, 140 S. Ct. 2316, 2324 (2020) (U.S. Constitution "gives the States far-reaching authority over presidential electors, absent some other constitutional constraint").

1540, 1547–48 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Additionally, prudential considerations require that "a plaintiff generally must assert his own legal

rights and interests, and cannot rest his claim to relief on the legal rights or interests of third

parties." *Int'l Union v. Dana Corp.*, 278 F.3d 548, 559 (6th Cir. 2002) (quoting *Warth*, 422 U.S.

at 499).

### 1. Plaintiffs do not allege harms sufficient to satisfy Article III standing.

Plaintiffs lack Article III standing because they fail to allege any "concrete and

particularized" injuries-in-fact. *Lujan*, 504 U.S. at 560–61. They do not allege that they were

deprived of the right to vote, nor that they or *any* voter submitted an absentee ballot that was

improperly rejected. *See Bognet v. Sec'y of Commonwealth*, No. 20-3214, slip op. at 36 (3d Cir.

Nov. 13, 2020) (attached as Ex. 15).

Instead, Plaintiffs assert a generalized entitlement to have Defendants follow certain

procedures in canvassing *other* voters' lawfully cast ballots—an injury premised on "group

political interests, not individual legal rights" that is therefore noncognizable under Article III. *Gill

v. Whitford*, 138 S. Ct. 1916, 1933 (2018). Plaintiffs have not suffered an injury-in-fact from what

they apparently feel was an improper application of Michigan's challenger laws and other election

procedures. That "injury is precisely the kind of undifferentiated, generalized grievance about the

conduct of government that [the U.S. Supreme Court has] refused to countenance in the past."

*Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam). And "[i]t is quite different from the

sorts of injuries alleged by plaintiffs in voting rights cases where" the Supreme Court has found

standing. *Id.* (citing *Baker v. Carr*, 369 U.S. 186, 207–08 (1962)); *see also Bognet*, slip op. at 21

(attached as Ex. 15). Plaintiffs' dissatisfaction with the administration of the election does not

constitute a concrete, particularized injury-in-fact under Article III.

Plaintiffs also advance the theory that their votes have been "diluted" by the counting of other, supposedly unlawful votes. *See, e.g.*, Compl. ¶ 77. But this purported injury of vote-dilution-through-unlawful balloting has been repeatedly rejected by federal courts across the country as a viable basis for standing, and for good reason: any purported vote dilution somehow caused by the counting of allegedly improper votes would affect *all* Michigan voters, not only Plaintiffs, and therefore constitutes a generalized grievance that cannot support standing. *See, e.g.*, *Bognet*, slip op. at 36–44 (rejecting similar vote-dilution injury as "paradigmatic generalized grievance that cannot support standing" (quoting *Bognet v. Boockvar*, No. 3:20-cv-215, 2020 WL 6323121, at *4 (W.D. Pa. Oct. 28, 2020))) (attached as Ex. 15); *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445 JCM (VCF), 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020); *Martel v. Condos*, No. 5:20-cv-131, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020); *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813, at *5 (D. Nev. Apr. 30, 2020); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015).

The Trump Campaign also lacks standing to bring these claims. Whatever injury it might claim on behalf of its members as to vote dilution would be just as generalized as the other Plaintiffs', as would its grievances regarding the alleged misapplication of Michigan's Election Code and its derivative claims under the Elections and Electors Clauses. *See Bognet*, slip op. at 21, 26–27 (finding candidate lacked standing to bring challenges under Elections and Electors Clauses) (attached as Ex. 15). And—conspicuously—at no point does the Trump Campaign suggest, let alone demonstrate, that the allegedly fraudulent votes cast and counted in this election cost Donald Trump the election. All Plaintiffs lack standing, and this Court cannot adjudicate their claims.

2.      **Plaintiffs' lack prudential standing to bring Count II.**

Plaintiffs also lack prudential standing to bring Count II. "Even if an injury in fact is demonstrated, the usual rule is that a party may assert only a violation of its own rights." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988). Plaintiffs' Count II, by contrast, "rest[s] . . . on the legal rights or interests of third parties.'" *Kowalski*, 543 U.S. at 129 (quoting *Warth*, 422 U.S. at 499). Specifically, Count II is predicated solely on *the Michigan Legislature's* purported rights under the Elections and Electors Clauses. Plaintiffs have no standing to assert the Michigan Legislature's rights, nor is there a need for them to do so.

Plaintiffs assert that the Secretary and Wayne County contravened "Michigan statutes enacted by the legislature . . . by preventing Republican challengers from meaningfully observing and participating in the ballot processing and counting process," and therefore violated the Elections and Electors Clauses, which vest authority over federal elections to "*the Legislature.*" Compl. ¶¶ 81–83 (quoting U.S. Const art. I, § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2). Plaintiffs, however, have no authority or standing to assert the rights of the Michigan Legislature. *See Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) (per curiam) ("[T]he Elections Clause claims asserted in the verified complaint belong, if they belong to anyone, only to the Pennsylvania General Assembly."); *Bognet*, slip op. at 22 (similar) (attached as Ex. 15); *cf. Lance*, 549 U.S. at 442 (observing that U.S. Supreme Court's "decisions construing the term 'Legislature' in the Elections Clause [were] filed by a relator on behalf of the State rather than private citizens acting on their own behalf").[10] Plaintiffs are not the Michigan Legislature, and they have identified no

---

[10] Although *Corman* and *Lance* specifically concerned the Elections Clause only, the Elections and Electors Clauses play functionally identical roles, with the former setting the terms for congressional elections and the latter implicating presidential elections. *See Ariz. State Legislature*, 576 U.S. at 839 (Roberts, C.J., dissenting) (noting that Electors Clause is "a constitutional

"'hindrance' to the [Legislature's] ability to protect [its] own interests." *Kowalski*, 543 U.S. at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). "Absent a 'hindrance' to the third-party's ability to defend its own rights, this prudential limitation on standing cannot be excused." *Corman*, 287 F. Supp. 3d at 572 (quoting *Kowalski*, 543 U.S. at 130). Count II should therefore be dismissed.[11]

**D.**     **Plaintiffs fail to state claims on which relief can be granted.**

Even if this Court had jurisdiction to consider Plaintiffs' claims, their complaint should be dismissed pursuant to Rule 12(b)(6). Plaintiffs' constitutional and statutory claims fail as a matter of law, and they have failed to create a plausible inference of widespread fraud and malfeasance that justifies the extraordinary relief they seek from this Court.

**1.**     **Plaintiffs' claims are simply not plausible.**

Even before delving into their causes of action, Plaintiffs' complaint fails as a matter of first principles. Plaintiffs in federal court must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Although Rule 12(b)(6) requires that allegations be viewed in the light most favorable to the nonmovant, this posture does not dispense with Rule 8's mandate of basic plausibility.

---

provision with considerable similarity to the Elections Clause"); *Foster v. Love*, 522 U.S. 67, 69 (1997) (referring to Electors Clause as Elections Clause's "counterpart for the Executive Branch"); *Millsaps v. Thompson*, 259 F.3d 535, 538 (6th Cir. 2001) (same). Cases interpreting "the Legislature" in the context of the Elections Clause thus inform application of the Electors Clause. *See Bognet*, slip op. at 22 (applying same standing analysis to Elections Clause and Electors Clause claims) (attached as Ex. 15).

[11] The Third Circuit's recent opinion in *Bognet* is instructive. There, the plaintiffs—"four individual voters and a candidate for federal office"—brought similar challenges to Pennsylvania's election rules that the court denied because "they lack standing to sue over the alleged usurpation of the General Assembly's rights under the Elections and Electors Clauses." *Bognet*, slip op. at 22–23 (attached as Ex. 15).

Plaintiffs have utterly failed in this regard. At heart, their complaint suggests a massive, coordinated effort among election officials and volunteers to perpetrate electoral fraud, disenfranchise Republicans, and swing a presidential election—all under the gaze of dozens of election challengers whose presence and oversight at counting facilities is confirmed *by the hundreds of pages of affidavits* from election challengers that Plaintiffs include with their complaint. And yet despite this intense scrutiny, all Plaintiffs can produce to support their narrative of widespread malefaction are isolated allegations of apparent misconduct and allegedly suspicious activities, couched in vague terms without any specific details—such as how many allegedly invalid ballots were counted, how many ballots were allegedly altered, and how many ballots were supposedly duplicated incorrectly.[12]

The U.S. Supreme Court has instructed that "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). It challenges both experience and common sense to accept Plaintiffs' overarching theory of widespread fraud, and under applicable pleading standards, this Court need not credit their

---

[12] Indeed, fundamental pleading standards require "[a]t a minimum" that allegations of fraud "specify the 'who, what, when, where, and how' of the alleged fraud." *Sanderson v. HCA-Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997)); *see also id.* (concluding that plaintiffs failed to satisfy pleading standard where they included nothing "to alert the defendants 'to the precise misconduct with which they are charged and [to] protect[] defendants against spurious charges of immoral and fraudulent behavior'" (alterations in original) (quoting *United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002))); *Costantino*, slip op. at 2 (noting that "[i]n cases of alleged fraud, the Plaintiff must state with particularity the circumstances constituting the fraud" and denying challenge to Wayne County's returns where, as here, plaintiffs provided affidavits containing vague and unspecific allegations of misconduct) (attached as Ex. 13).

unwarranted factual inferences. Plaintiffs' claims just don't add up. That is not merely a practical reality—it is a fatal substantive shortcoming.

> ## 2.     Plaintiffs have not pleaded a cognizable equal protection claim.

Even if Plaintiffs' allegations were plausible, Count I would not state a viable equal protection claim. This claim is premised on Plaintiffs' assertion that "Wayne County's failure to allow challengers and its counting of ineligible and illegal ballots that did not comply with the Michigan Election Code diluted the lawful ballots of these plaintiffs and of other Michigan voters and electors in violation of the United States Constitution and the Michigan Constitution guarantee of equal protection." Compl. ¶ 77. But vote dilution is a viable basis for federal claims only in certain contexts, such as when laws are crafted that structurally devalue one community's votes over another's. *See, e.g.*, *Bognet*, slip op. at 34–35 ("[V]ote dilution under the Equal Protection Clause is concerned with votes being weighed differently.") (attached as Ex. 15); *Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396, 406–07 (E.D. Pa. 2016); *see also Reynolds v. Sims*, 377 U.S. 533, 568 (1964) ("Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State."). In these cases, which are grounded in the Equal Protection Clause,[13] plaintiffs allege that their votes are devalued as compared to similarly situated voters in other parts of the state. *See Reynolds*, 377 U.S. at 567–68.

Here, by contrast, Plaintiffs' equal protection claim is premised on the theory that if some unlawful absentee ballots evade detection, then the lawful ballots of *all* other voters are diluted.

---

[13] While Plaintiffs bring Count I under the Equal Protection Clauses of both the U.S. *and* Michigan Constitutions, *see* Compl. ¶ 77; *see also* Mich. Const. art. I, § 2, "the equal protection guaranty of the Michigan Constitution is applied under the same standards as the corresponding provision of the federal constitution." *People v. Walker*, 354 N.W.2d 312, 317 (Mich. Ct. App. 1984) (citing *Fox v. Mich. Emp. Sec. Comm'n*, 153 N.W.2d 644, 647 (Mich. 1967)).

But "[t]his conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment." *Bognet*, slip op. at 33 (attached as Ex. 15). Indeed, Plaintiffs cannot identify a single precedent adopting their theory.[14] This is unsurprising: the claim of vote dilution based on fears of potential fraud is fundamentally speculative and applies to all voters equally, making it an ill-fit for an equal protection challenge. *Cf. Mays v. LaRose*, 951 F.3d 775, 785 (6th Cir. 2020) ("All binding authority to consider the burdensome effects of disparate treatment on the right to vote has done so from the perspective of only affected electors—not the perspective of the electorate as a whole.").

Ultimately, "[t]he Constitution is not an election fraud statute." *Minn. Voters All. v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (quoting *Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986)), and it "d[oes] not authorize federal courts to be state election monitors." *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980). Even "a deliberate violation of state election laws by state election officials does not transgress against the Constitution." *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020). There is simply no authority for transmogrifying the vote dilution line of cases into a requirement that the federal judiciary micromanage election procedures and, in its zeal to enforce election statutes, disenfranchise lawful

---

[14] *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam), cited by Plaintiffs in their complaint, *see* Compl. ¶ 76, certainly does not support their claim. In *Bush*, the U.S. Supreme Court considered "whether the use of standardless manual recounts" by some, but not all, Florida counties in the aftermath of the 2000 presidential election violated the Equal Protection Clause. *Id.* at 103. In addition to being explicitly "limited to the present circumstances"—and thus not properly read as an expansion of the protections afforded by the Equal Protection Clause—the *Bush* Court addressed a situation where the counting of ballots lacked even "minimal procedural safeguards." *Id.* at 109. Here, by contrast, Michigan law provides those requisite safeguards, and so *Bush* is simply inapposite. And *Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966), also cited by Plaintiffs, *see* Compl. ¶ 77, was a case about poll taxes that had nothing to do with Plaintiffs' theory of vote dilution.

voters based on nothing more than speculative and unpersuasive allegations of voter fraud. "That is not how the Equal Protection Clause works." *Bognet*, slip op. at 35 (attached as Ex. 15); *cf. Short v. Brown*, 893 F.3d 671, 677–78 (9th Cir. 2018) ("Nor have the appellants cited any authority explaining how a law that makes it easier to vote would violate the Constitution.").[15] To the contrary, courts have routinely—and appropriately—rejected such efforts. *See Minn. Voters All.*, 720 F.3d at 1031–32 (affirming Rule 12(b)(6) dismissal of vote dilution claim); *see also Partido Nuevo Progresista v. Perez*, 639 F.2d 825, 827–28 (1st Cir. 1980) (per curiam) (rejecting challenge to purportedly invalid ballots because "case does not involve a state court order that *dis*enfranchises voters; rather it involves a [] decision that *en*franchises them—plaintiffs claim that votes were 'diluted' by the votes of others, not that they themselves were prevented from voting"); *Boockvar*, 2020 WL 5997680, at *67–68 (rejecting Trump Campaign's equal protection challenge to poll-watcher restrictions grounded in vote-dilution theory because restrictions did not burden fundamental right, including right to vote, or discriminate based on suspect classification); *Cook Cnty. Republican Party v. Pritzker*, No. 20-cv-4676, 2020 WL 5573059, at *4 (N.D. Ill. Sept. 17, 2020) (denying motion to enjoin law expanding deadline to cure votes because plaintiffs did not show how alleged voter fraud would dilute their votes); *Cortés*, 218 F. Supp. 3d at 406–07 (rejecting requested expansion of poll-watcher eligibility based on premise that voter fraud would dilute weight of plaintiffs' votes).

   Because Plaintiffs have failed to articulate a cognizable equal protection claim, Count I should be dismissed.

---

[15] Indeed, "if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots 'were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's "interest" in failing to do more to stop the illegal activity.'" *Bognet*, slip op. at 34 (quoting *Boockvar*, 2020 WL 5997680, at *46) (attached as Ex. 15).

### 3.      Plaintiffs' Election Code claim fails as a matter of law.

Count III of Plaintiffs' complaint alleges that Defendants violated Michigan laws relating to election challengers by "denying Republican challengers' rights to meaningfully observe and participate in the ballot processing and counting process." Compl. ¶¶ 85–88. But they identify no law or precedent that gives them a private right of action to vindicate these interests or otherwise use the judiciary to enact their preferred level of electoral scrutiny. *See Polasek-Savage*, slip op. at 3 ("[I]t is not apparent plaintiffs have a clear legal right to request that their chosen number of election challengers be permitted at an absent voter counting board.") (attached as Ex. 10); *Kraus v. Cegavske*, No. 20 OC 00142 1B, slip op. at 11 (Nev. Dist. Ct. Oct. 29, 2020) (denying mandamus because Trump Campaign and others "failed to cite any constitutional provision, statute, rule, or case that supports . . . request" for increased access to mail ballot processing and counting) (attached as Ex. 16), *stay denied*, No. 82018 (Nev. Nov. 3, 2020); *Cortés*, 218 F. Supp. 3d at 413–14 (similar). Even if they could bring this claim, Plaintiffs never allege that Republican or any other challengers were altogether deprived of the opportunity to fulfill their statutory roles, or that there were insufficient Republican challengers at TCF Center. *Cf.* Compl. ¶¶ 27–29 (alleging only that certain challengers were denied access, not that overall number of challengers was insufficient). Nor have Plaintiffs identified any statutory provisions or other authority that require the level of access to which they now claim they were entitled, let alone suggest that election officials' employment of basic social-distancing guidelines precluded meaningful observation.

Moreover, individuals have no legal right to serve as challengers, as recent court decisions—some involving the Trump Campaign itself—have underscored. *See, e.g.*, *Boockvar*, 2020 WL 5997680, at *67 ("[T]here is no individual constitutional right to serve as a poll watcher." (quoting *Pa. Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 WL 5554644, at *30 (Pa.

Sept. 17, 2020))); *Cortés*, 218 F. Supp. 3d at 408 (similar); *Cotz v. Mastroeni*, 476 F. Supp. 2d.

332, 364 (S.D.N.Y. 2007) (collecting cases and concluding that "poll watching . . . has no distinct

First Amendment protection").

Even if Plaintiffs could assert claims under the Michigan Election Code's challenger

provisions, they seek a remedy totally divorced from these laws. To remedy the procedural

violations Defendants allegedly facilitated—which, for the most part, consisted of the refusal to

allow observers to stand marginally closer to what they were observing—Plaintiffs seek to *restrain*

*certification of Wayne County's returns*, an astonishing request wholly unmoored from Michigan's

Election Code. Indeed, the consequences of violating the challenger provisions are clear,

unequivocal, and do not provide the relief Plaintiffs seek. Specifically,

> [a]ny officer or election board who shall prevent the presence of any such
> challenger as above provided, or shall refuse or fail to provide such challenger with
> conveniences for the performance of the duties expected of him, shall, upon
> conviction, be punished by a fine not exceeding $1,000.00, or by imprisonment in
> the state prison not exceeding 2 years, or by both such fine and imprisonment in the
> discretion of the court.

Mich. Comp. Laws § 168.734. Michigan law does *not* contemplate a complete cessation of

certification or the sort of judicial intervention Plaintiffs seek in their prayer for relief. *See* Compl.

30–31. And Plaintiffs identify no other authority permitting such a drastic remedy for perceived

violations of Michigan's Election Code.[16]

---

[16] Although not clearly tied to Count III, Plaintiffs ask this Court for "[a]n order directing the board of county canvassers and the board of state canvassers, with challengers present and meaningfully able to observe, to obtain and review the video of unattended remote ballot drop boxes." Compl. 31; *see also id.* ¶¶ 56–59 (describing drop box requirements). But Plaintiffs identify *no* authority, statutory or otherwise, conferring this privilege. Indeed, it is "*[t]he city or township clerk*" who "must use video monitoring of [any outdoor] drop box to ensure effective monitoring of that drop box," *not* election challengers or anyone else. Mich. Comp. Laws § 168.761d(4)(c) (emphasis added). Similarly, although the complaint includes allegations regarding the "Dominion Voting Systems election management system and voting machines," Compl. ¶¶ 60–67, it conspicuously lacks *any* authority entitling Plaintiffs "to observe when the accuracy of each piece of tabulating

4. **Plaintiffs have not pleaded a viable claim under the Elections and Electors Clauses.**

Finally, Count II—Plaintiffs' claim under the Elections and Electors Clauses, *see* Compl. ¶¶ 81–84—also fails as a matter of law. As discussed above, Plaintiffs lack Article III and prudential standing to assert a claim under these provisions. *See* Part IV.C.1–2 *supra*. And even if they had standing, Count II is predicated entirely on the alleged statutory violations contained in Count III. *See* Compl. ¶¶ 83–84. The claims therefore rise and fall together, and Count II must also be dismissed.

In any event, even accepting Plaintiffs' allegations as true, not every violation of a state's election code triggers a constitutional claim. It simply cannot be the case, as Plaintiffs suggest, that any deviation from statutory election procedures, no matter how limited, automatically constitutes a violation of the Elections and Electors Clauses because the election was not held in the "Manner" prescribed by the Legislature. Plaintiffs do not claim a wholesale or systematic departure from the Election Code; instead, they allege at most only isolated deviations, many relating to protocols motivated by the exigencies of conducting an election during an unprecedented pandemic. *Cf. Wise v. Circosta*, Nos. 20-2104, 20-2107, 2020 WL 6156302, at *18 (4th Cir. Oct. 20, 2020) (en banc) (Wilkinson & Agee, JJ., dissenting) ("We do not question the ability of . . . state election boards[] to make minor ad hoc changes to election rules in response to sudden emergencies."). Plaintiffs' allegations, therefore, do not give rise to a violation of these constitutional provisions.

E. **Plaintiffs are not entitled to the relief they seek.**

Even if this Court had jurisdiction over this matter, and Plaintiffs had pleaded viable causes of action, they would not be entitled to the extraordinary relief they seek. Rather than *remedying*

---

equipment is determined," *id.* at 30, or even any suggestion that these machines experienced issues in Wayne County.

a constitutional violation, their requested relief would in fact *violate* Michiganders' constitutional rights. Accordingly, the Court should strike Plaintiffs' prayer for relief to the extent that it denies eligible Michigan voters their fundamental right to vote.

Plaintiffs ask this Court to enjoin Defendants from certifying Michigan's results "until they have verified and confirmed that all ballots that were tabulated and included in the final reported election results were cast in compliance with the provisions of the Michigan Election Code as set forth herein." Compl. 30. This Court could not grant such relief even if it found in Plaintiffs' favor. The ballots have been processed and removed from their envelopes (which are the only sources of identifying information), and thus there is no way to identify, let alone isolate, ballots that were "meaningfully" observed by the Trump Campaign's observers during the canvassing process. Plaintiffs are simply too late; the count has concluded, the votes have been tallied, and the genie cannot be put back in the bottle.

Nor is Plaintiffs' extraordinary request to enjoin Defendants from certifying the election a proper remedy. It is only in the rarest of circumstances that federal courts have taken such drastic measures to prevent the certification of results, and only where the evidence established that there was a fundamental failure of the electoral process. *See Stein v. Cortés*, 223 F. Supp. 3d 423, 438 (E.D. Pa. 2016) (collecting cases). Plaintiffs' allegations do not give rise to the type of systemic fraud or constitutional violations that might justify such drastic relief. Instead, to the extent the Trump Campaign "alleges that the candidate is aggrieved on account of fraud or mistake in the canvass of the votes," it is not without remedy and can instead pursue a recount under Michigan Compiled Laws section 168.872. *See Costantino*, slip op. at 10–12 (describing remedies under Michigan law for election challenges) (attached as Ex. 13). Accordingly, because Plaintiffs' gambit to circumvent the will of the Michigan electorate "has no essential or important relationship

30

to the claim for relief," their prayer for relief reflecting this inordinate request should be dismissed or, in the alternative, stricken under Rule 12(f) as immaterial. *Rees v. PNC Bank, N.A.*, 308 F.R.D. 266, 271 (N.D. Cal. 2015) (quoting *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993)); *see also, e.g.*, *Williamsburg Commons Condo. Ass'n v. State Farm Fire & Cas. Co.*, 907 F. Supp. 2d 673, 680 (E.D. Pa. 2012) (granting motion to dismiss requested relief).

Plaintiffs' requested relief would also violate the constitutional rights of Michigan voters. Reading their allegations and prayer for relief as a whole, what Plaintiffs truly seem to seek is the wholesale discarding of hundreds of thousands of Michigan ballots *in Wayne County alone*. Even if Plaintiffs' allegations were true (they are not) and there were isolated and sporadic incidents in which Michigan's election laws were violated—not by the *voters*, but by election workers—this could not possibly justify the widescale disenfranchisement of Michiganders. *See Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 595, 597–98 (6th Cir. 2012) (concluding that rejection of ballots invalidly cast due to poll worker error likely violates due process); *cf. Bognet*, slip op. at 8 (considering election challenge "with commitment to a proposition indisputable in our democratic process: that the lawfully cast vote of every citizen must count") (attached as Ex. 15). Throwing out ballots of lawful Michigan voters that were not tabulated pursuant to Plaintiffs' preferred procedures "would be both outrageous and completely unnecessary." *Stein*, 223 F. Supp. 3d at 442; *see also Gallagher v. N.Y. State Bd. of Elections*, No. 20-5504 (AT), 2020 WL 4496849, at *16 (S.D.N.Y. Aug. 3, 2020) (rejecting "grossly overinclusive" election scheme that would "not meaningfully advance the state interest at issue"). This remedy would violate Michiganders' fundamental voting rights, including the Michigan Constitution's self-executing right to vote absentee, Mich. Const. art. II, § 4(1)(g), which voters passed in 2018 by an overwhelming popular vote and took advantage of in unprecedented numbers during this past election.

Because it is both unjustifiably drastic and threatens the constitutional rights of Michigan voters, Plaintiffs' prayer for relief should be stricken or, in the alternative, dismissed. *See Rees*, 308 F.R.D. at 271.

## V.    CONCLUSION

For the foregoing reasons, Proposed Intervenor-Defendants DNC and Michigan Democratic Party respectfully request that the Court dismiss Plaintiffs' complaint.

Dated: November 14, 2020.                    Respectfully submitted,

                                             /s/ *Scott R. Eldridge*
                                             Scott R. Eldridge (P66452)
                                             Joe M. Infante (P68719)
                                             MILLER CANFIELD
                                             One Michigan Avenue, Suite 900
                                             Lansing, Michigan 48933
                                             Telephone: (517) 483-4918
                                             eldridge@millercanfield.com
                                             infante@millercanfield.com

                                             Mary Ellen Gurewitz (P25724)
                                             CUMMINGS & CUMMINGS
                                             423 North Main Street, Suite 200
                                             Royal Oak, Michigan 48067
                                             Telephone: (248) 733-3405
                                             maryellen@cummingslawpllc.com

                                             Marc E. Elias (DC #442007)
                                             John M. Devaney (DC #375465)*
                                             Jyoti Jasrasaria (DC #1671527)
                                             PERKINS COIE LLP
                                             700 Thirteenth Street NW, Suite 800
                                             Washington, DC 20005
                                             Telephone: (202) 654-6200
                                             melias@perkinscoie.com
                                             jdevaney@perkinscoie.com
                                             jjasrasaria@perkinscoie.com

                                             William B. Stafford (WA #39849)*
                                             Jonathan P. Hawley (WA #56297)*
                                             PERKINS COIE LLP
                                             1201 Third Avenue, Suite 4900
                                             Seattle, Washington 98101
                                             Telephone: (206) 359-8000
                                             wstafford@perkinscoie.com
                                             jhawley@perkinscoie.com

                                             *Counsel for Proposed Intervenor-Defendants
                                             DNC and Michigan Democratic Party*

                                             *Admission pending

33