## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., MATTHEW, SEELY, ALEXANDRA SEELY, PHILIP O'HALLORAN, ERIC OSTERGREN, MARIAN SHERIDAN, MERCEDES WIRSING, and CAMERON TARSA, <br><br> Plaintiffs, <br><br> v. <br><br> JOCELYN BENSON, in her official Capacity as Michigan Secretary of State, MICHIGAN BOARD OF STATE CANVASSERS, WAYNE COUNTY, MICHIGAN, and WAYNE COUNTY BOARD OF COUNTY CANVASSERS, <br><br> Defendants, <br><br> and <br><br> DEMOCRATIC NATIONAL COMMITTEE, MICHIGAN DEMOCRATIC PARTY, CITY OF DETROIT, THE MICHIGAN STATE CONFERENCE NAACP, WENDELL ANTHONY, YVONNE WHITE, and ANDRE WILKES, <br><br> Intervenor-Defendants. | No. 1:20-cv-01083 <br><br> Judge Janet T. Neff |

## CITY OF DETROIT'S CONCURRENCE WITH
## DNC AND MICHIGAN DEMOCRATIC PARTY'S MOTION
## TO DISMISS PLAINTIFFS' COMPLAINT FOR DECLARATORY,
## EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

The City of Detroit (the "City") respectfully submits this concurrence with the DNC and Michigan Democratic Party's Motion to Dismiss Plaintiffs' Complaint for Declaratory, Emergency, and Permanent Injunctive Relief (the "DNC Motion").

## <u>TABLE OF CONTENTS</u>

INDEX OF AUTHORITIES...................................................................................ii

ISSUES PRESENTED.........................................................................................iv

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 3

   I.    This Case Should be Dismissed Based on the Prohibition Against Claim-Splitting............3

   II.   This Case Should be Dismissed Pursuant to *Pullman* Abstention.......................................5

   III.  Plaintiffs Lack Standing to Bring a Voter Dilution Claim .................................................7

   IV.  Plaintiffs Have Failed to Plead a Voter Dilution Claim ....................................................9

   V.   Plaintiffs' Factual Assertions are Either False, Misplaced or Immaterial to the Relief
they Seek ......................................................................................................................10

      A.    Legal Standard for Allegations of Fraud ................................................................. 10

      B.    Overview .................................................................................................................. 11

      C.    Allegations Relating to Challengers at the TCF Center ........................................... 12

      D.    Allegations of "Pre-Dating" .................................................................................... 16

      E.    Allegations Regarding Ballot Duplication ................................................................ 18

      F.    Allegations Regarding Ballots Supposedly Counted More than Once ..................... 18

      G.    Allegations Regarding Tabulating Machines ........................................................... 20

CONCLUSION.................................................................................................. 22

# INDEX OF AUTHORITIES

**Cases**

*Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779 (W.D. Tex. 2015) ................... 8

*Blachy v. Butcher*, 221 F.3d 896 (6th Cir.2000) ........................................................... 7

*Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270 (7th Cir. 1986) ......................................... 10

*Carson v. Simon*, No. 20-CV-2030 (NEB/TNL), 2020 WL 6018957
  (D. Minn. Oct. 12, 2020), *rev'd and remanded*, No. 20-3139,
  2020 WL 6335967 (8th Cir. Oct. 29, 2020) ................................................................... 8

*Colorado River Water Conservation District v. United States*,
  424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) ......................................................... 4

*Courtney v. Smith*, 297 F.3d 455 (6th Cir. 2002) ........................................................... 7

*Frank v. Dana Corp.*, 547 F.3d 564 (6th Cir. 2008) ...................................................... 11

*Gottfried v. Med. Planning Servs., Inc.*, 142 F.3d 326 (6th Cir. 1998) ......................................... 5

*Gupta v. Terra Nitrogen Corp.*, 10 F. Supp. 2d 879 (N.D. Ohio 1998) ...................................... 11

*Harrison v. NAACP*, 360 U.S. 167 (1959) ........................................................... 5, 6, 7

*Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984) ......................................................... 5

*In re Alfes*, 709 F.3d 631 (6th Cir. 2013) ................................................................... 4

Katz v. Gerardi, 655 F.3d 1212 (10th Cir. 2011) ......................................................... 4

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................... 8

*Martel v. Condos*, No. 5:20-cv-131, —— F.Supp.3d ——,
  2020 WL 5755289 (D. Vt. Sept. 16, 2020) ................................................................... 8

*Minn. Voters All. v. Ritchie*, 720 F.3d 1029 (8th Cir. 2013) ........................................... 10

*Paher v. Cegavske*, 457 F. Supp. 3d 919 (D. Nev. 2020) ................................................... 8

*Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941) ......................................... 5

*Reynolds v. Sims*, 377 U.S. 533 (1964) ................................................................... 9

*Sanderson v. HCA-Healthcare Co.*, 447 F.3d 873 (6th Cir. 2006) ........................................... 10

*Talton v. BAC Home Loans Servicing LP*, 839 F. Supp. 2d 896 (E.D. Mich. 2012) ................... 11

*United States v. Hays*, 515 U.S. 737 (1995) ................................................................ 9

V*alley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982).................................................................. 7

*Waad v. Farmers Ins. Exch.*, 762 F. App'x 256 (6th Cir. 2019) .................................... 4

**Statutes**

Electoral Count Act of 1877 ........................................................................................... 6

M.C.L. § 168.727 ........................................................................................................... 15

M.C.L. § 168.831 ........................................................................................................... 21

**Other Authorities**

U.S. Const. art. III, § 2 ................................................................................................... 7

**Rules**

Fed. R. Civ. P. 9(b) ........................................................................................................ 10

## MOST CONTROLLING AUTHORITIES

*Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941)

*Waad v. Farmers Ins. Exch.*, 762 F. App'x 256 (6th Cir. 2019)

Fed. R. Civ. P. 9(b)


## ISSUES PRESENTED

Should Plaintiffs' Complaint be dismissed when their legal theories and factual assertions are frivolous?

The City answers "Yes"

**"There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."**

- Joint Statement from Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees ("CISA"), issued Nov 12, 2020 (bold emphasis in original statement). (Chris Krebs, director of CISA, was terminated by presidential tweet November 17, 2020) (Exhibit 1).

## INTRODUCTION

The Plaintiffs in this lawsuit do not expect to win. Having lost the State of Michigan by more than 146,000 votes, no recount, no audit, no judicial review could possibly change the outcome of the election. Instead, a judicial "victory" for the Trump campaign would lead to only two possible outcomes: (1) a delay so severe that Michigan loses its ability to appoint its electors in time to cast their votes; or (2) a process that gives credence to the conspiracy theories that call into question the integrity of our elections and undermine our democracy.

But this late-filed case now seems to have a different, more sinister purpose. The only logical purpose of this lawsuit is to give supporters of President Trump a talking point, something they can use to bolster their baseless claims of widespread voter fraud. Something to sow doubt about the integrity of the presidential election. This is revealed by Plaintiffs' actions. The Complaint purports to seek "emergency" and "permanent injunctive" relief, primarily relating to the Wayne County Board of Canvassers; the Complaint asks the Court to interfere in the certification process in several ways; and, the Complaint acknowledges that the deadline for the County Board's certification was November 17, 2020--yesterday. If Plaintiffs actually wanted relief from this Court or believed they were making legitimate claims, they would have filed an appropriate motion for emergency injunctive relief. Instead, they waited more than a week after the election, until November 11, 2020, to file this Complaint and then, when the case was not assigned to their requested judge*, they proceeded to do absolutely nothing*. They did not file a Motion for any sort of relief, emergency or otherwise. In fact, they did not even serve the

1

Complaint until the Court ordered them to do so on November 17 (at which time they asked if the Attorney General's office would accept service by email). The deadline for certification in Wayne County has now come and gone; ultimately, the Board, comprised of two Republicans and two Democrats, followed the letter of the law and certified the Wayne County election results.

If they thought their claims had merit, Plaintiffs in this case— Donald J Trump for President Inc. ("DJT") and Eric Ostergren—would have also pushed their claims in state court, where they still have an earlier-filed lawsuit raising the same issues. (*See* Ex. 7 to DNC and Michigan Democratic Party Brief). But, there too, Plaintiffs are not acting as though they can prove their claims. After the Court of Claims rejected their request for injunctive relief (See Ex. 8 to DNC/MDP Brief), Plaintiffs filed an Application for Leave to Appeal to the Court of Appeals, but did not include the required brief, and they have not sought immediate consideration or taken other steps to expedite that matter. *See* MCR 7.205(B); *see also* Ex. 9 to MDP/DNC Brief.

To date, every Court in Michigan which has addressed claims of widespread electoral fraud, has refused to endorse them.  In addition to the Court of Claims, the Wayne County Circuit Court and the Michigan Court of Appeals have rejected claims that are nearly identical to those in this lawsuit. *See Costantino et al v City of Detroit et al*, Opinion and Order of Wayne County Circuit Court, issued Nov. 13, 2020 (Case No 20-014780-AW) (Ex. 13 to DNC/MDP Brief). The Complaint in this lawsuit explicitly relies on the Complaint in the *Costantino* matter, apparently attempting to incorporate by reference, the allegations made in *Costantino*. *See* Compl. ¶ 55 and Ex. 3 to Compl. Plaintiffs in that lawsuit filed an emergency application for leave to appeal to the Michigan Court of Appeals, which was denied on November 16, 2020. *See* Exhibit 2 to this Brief.[1]

---

[1] The plaintiffs filed an application for leave to appeal to Michigan Supreme Court on Nov. 17, 2020. As of the time this concurrence is being submitted, the Michigan Supreme Court had not yet ruled on the application.

The claims were also rejected in *Stoddard et al v City Election Commission of the City of Detroit et al*. (*See* Ex. 11 to DNC/MDP Brief, Opinion and Order of Wayne County Circuit Court, issued Nov. 6, 2020 (Case No 20-014604-CZ)). Tellingly, the plaintiffs in *Stoddard* have not sought leave to appeal; instead, plaintiff Susan Stoddard seeks what she apparently hopes will be a more receptive forum by filing a "new" lawsuit in this court. *See Angelic Johnson and Sarah Stoddard v. Benson*, WDMI Case No. 1:20-cv-01098.

Plaintiffs' attempt to select a new forum by splitting their claims should be rejected by this Court. Abstention doctrines and the Electoral College Act of 1877 provide that this dispute should be resolved in State Court.

This lawsuit is not well grounded in law or in fact. This Court—like the Michigan courts— should not give credence to its baseless claims.

## ARGUMENT

### I.    This Case Should be Dismissed Based on the Prohibition Against Claim-Splitting

While Donald J. Trump for President, Inc. may be disappointed with its repeated losses, that does not provide an excuse to forum shop. That entity, and plaintiff Eric Ostergren, were the plaintiffs in the Court of Claims case, where Judge Cynthia Stephens rejected their requested preliminary relief and corrected their misconceptions about Michigan election law. (*See* Ex. 7 to DNC/MDP Brief). They then embarked on an undisguised forum shopping venture. First, they decided to bring these state law claims to federal court. Then, leaving no doubt about their intentions, they filed this case, not in the Eastern District of Michigan, where Wayne County and the Wayne County Board of Canvassers are located, but here, in the Western District of Michigan. And then, to make their intentions absolutely clear, Plaintiffs made the extraordinarily attenuated claim that this case is "related" to *Daunt v Benson*, W.D.MI Case No. 1:20-cv-00522, suggesting that the case should be assigned to the Judge to whom that case was assigned. *See* Civil Cover

Sheet, ECF No. 1, PageID 32. As Magistrate Judge Kent found, that case, which involved voter registration rolls, was not a related case. ECF No. 3. In fact, a review of that case shows that there is not a single issue in that case that overlaps the instant matter. This was a cynical effort to subvert the random assignment process and to direct this case to a particular judge who, for some reason, Plaintiffs preferred over Judge Cynthia Stephens and over other judges in the Western District of Michigan..

The gambit did not work. In fact, as a result of Plaintiffs' forum shopping and claim-splitting, the claims in this lawsuit are subject to dismissal under the *Colorado River* abstention doctrine. *See Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). "Claim-splitting and duplicative litigation are variations of res judicata." *Waad v. Farmers Ins. Exch.*, 762 F. App'x 256, 260 (6th Cir. 2019). Claim preclusion bars "subsequent litigation of causes of action where a court has already issued a final decision on the merits in an earlier case and the causes of action were, or should have been, litigated in the earlier case between the same parties." *Id.*, *citing In re Alfes*, 709 F.3d 631, 638 (6th Cir. 2013). However, the test for claim-splitting diverges from the test for res judicata, because with the former,  the test "is not whether there is finality of judgment, but whether the first suit, assuming it were final, would preclude the second suit." *Waad* at 260, *quoting Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011). "Essentially, claim splitting is the same as res judicata, but with a presumption of a final judgment instead of an actual final judgment." *Waad* at 260; *see also Katz* at 1219 ("The proper question is whether, assuming the first suit was already final, the second suit would be precluded under res judicata analysis.") As stated by the Sixth Circuit in *Waad,* "[t]he difference between claim splitting and duplicative litigation is in name only [and] [b]oth stem from the Supreme Court's instruction in *Colorado River* …." *Waad* at 260. These doctrines "do[ ] not

apply to claims that were not ripe at the time of the first suit." *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 530 (6th Cir. 2006) (citation omitted).

   This Court should not reward Plaintiffs' behavior. The "claims" in this suit were ripe—and remain "ripe"—for litigation in state court. A final judgment in state court would be dispositive of the claims. Therefore, the lawsuit must be dismissed.

## II.   This Case Should be Dismissed Pursuant to *Pullman* Abstention

   As discussed above, Plaintiffs split their cause of action by filing this lawsuit. Abstention doctrines guard against that conduct in this matter.[2] Functioning as an important aspect of our system of federalism, "*Pullman* abstention is built upon the traditional avoidance of unnecessary constitutional decisions and the sovereign respect due to state courts." *Gottfried v. Med. Planning Servs., Inc.*, 142 F.3d 326, 331 (6th Cir. 1998), *citing Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 500–01 (1941). In *Pullman*, the Supreme Court "held that federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984). This is particularly true "if a decision from the state court 'might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.'" *Gottfried*, 142 F.3d at 331, *quoting Harrison v. NAACP*, 360 U.S. 167, 177 (1959). Moreover, in *Harris Cty. Comm'rs Court v. Moore*, the Court provided additional guidance in determining whether abstention under the *Pullman* doctrine is appropriate, stating, "[w]here there is an action pending in state court that will likely resolve the state-law questions underlying the federal claim, we have regularly ordered abstention. Similarly, when the state-law

---

[2] Estoppel and preclusion doctrines also prevent forum shopping.

questions have concerned matters peculiarly within the province of the local courts, we have inclined toward abstention." 420 U.S. 77, 83–84 (1975).

In the present case, Plaintiffs have expressly tied their federal equal protection claim to violations of state law, alleging, that "Wayne County's" supposed "failure to allow challengers and its counting of ineligible and illegal ballots that *did not comply with the Michigan Election Code* diluted the lawful ballots of these plaintiffs and of other Michigan voters and electors in violation of the United States Constitution and the Michigan Constitution guarantee of equal protection." (Compl. ¶ 77) (emphasis added). Thus, a finding that no material state law violations had occurred with respect to poll watcher access and the vote counting process would "avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem" *Harrison*, 360 U.S. at 177. Litigation is currently pending in Michigan state court concerning these very same state law issues. *See Costantino v. Detroit*, No. 20-014780-AW (Mich. Cir. Ct.). Thus, because the state court will "likely resolve the state-law questions underlying the federal claim," abstention appropriate. *Moore*, 420 U.S. at 83–84.

Additionally, due to the autonomy federal courts provide state courts in resolving election disputes, abstention is particularly appropriate in the instant case. *Id.* The importance of allowing state courts the initial opportunity to settle disputes concerning the Presidential election is reflected in the Electoral Count Act of 1877. Section 5 of the Electoral Count Act applies if the state has provided, "by laws enacted prior to the day fixed for the appointment of the electors"—that is, through laws enacted before Election Day—for its "final determination" of any "controversy or contest" by "*judicial or other methods or procedures*," and such "determination" has been made "at least six days before the time fixed for the meeting of electors." 3 U.S.C. § 5 (emphasis added). This safe harbor provision states that if the determination is made "pursuant to such law" existing

before Election Day, then that determination "shall be conclusive, and shall govern in the counting

of the electoral votes . . . so far as the ascertainment of the electors appointed by such State is

concerned." *Id.* Thus, in recognizing the important role state courts play in the resolution of

election disputes under state law, this court should temporarily abstain from hearing this case. *See*

*Harrison*, 360 U.S. at 177 (stating the *Pullman* Doctrine does not "involve the abdication of federal

jurisdiction, but only the postponement of its exercise").

### III.    <u>Plaintiffs Lack Standing to Bring a Voter Dilution Claim</u>

Plaintiffs plainly lack standing to bring a "voter dilution" claim. Article III of the United

States Constitution restricts the jurisdiction of federal courts to actual "Cases" and

"Controversies." U.S. Const. art. III, § 2, cl. 1. "To satisfy this 'case-or-controversy' requirement,

'a plaintiff must establish three elements: (1) an injury in fact that is concrete and particularized;

(2) a connection between the injury and the conduct at issue—the injury must be fairly traceable

to the defendant's action; and (3) [a] likelihood that the injury would be redressed by a favorable

decision of the Court.'" *Courtney v. Smith*, 297 F.3d 455, 459 (6th Cir. 2002), *quoting Blachy v.*

*Butcher*, 221 F.3d 896, 909 (6th Cir.2000).

The first requirement—that plaintiffs establish an "injury in fact"—limits justiciability to

those cases involving a well-defined injury to the plaintiff, which allows the parties to develop the

necessary facts and seek responsive remedies. As the Supreme Court instructed in V*alley Forge*

*Christian Coll. v. Americans United for Separation of Church and State, Inc.*, "[t]he requirement

of 'actual injury redressable by the court' . . . tends to assure that the legal questions presented to

the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete

factual context conducive to a realistic appreciation of the consequences of judicial action." 454

U.S. 464, 472 (1982). To this end, the Supreme Court "repeatedly has rejected claims of standing

predicated on the right, possessed by every citizen, to require that the Government be administered

according to law." *Id.* at 482–83. Moreover, the Court has "consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992).

Here, Plaintiffs simply do not allege an actual, particularized injury in fact. Instead, they claim that alleged violations of the "Michigan Election Code diluted the lawful ballots of these plaintiffs and of other Michigan voters and electors in violation of the" voter's rights to equal protection. (Compl. ¶ 77). In doing so, Plaintiffs allege an injury identical to the injury supposedly incurred by every Michigan voter. Under Plaintiffs' theory, the "effect" of an erroneously counted vote will proportionally impact every Michigan voter to the same mathematical degree. Because the approximately 5.5 million Michigan voters in the Presidential election suffer the identical incremental dilution, the alleged injury constitutes a quintessential generalized injury incapable of conferring standing. Federal courts have addressed this "novel" voter dilution claim, with each court finding the claim fails to constitute an injury in fact. *See Paher v. Cegavske*, 457 F. Supp. 3d 919, 926–27 (D. Nev. 2020); *Martel v. Condos*, No. 5:20-cv-131, ─── F.Supp.3d ───, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015); *Carson v. Simon*, No. 20-CV-2030 (NEB/TNL), 2020 WL 6018957, at *8 (D. Minn. Oct. 12, 2020), *rev'd and remanded*, No. 20-3139, 2020 WL 6335967 (8th Cir. Oct. 29, 2020) (finding plaintiffs established standing as Electors, without ruling on the voter dilution theory rejected by the district court).

This is not to say that no claim under the label of "voter dilution" can be brought in federal court; but such claims can only survive with facts starkly different from the case at bar. First, voter

dilution claims may be appropriate in cases of racial gerrymandering, where the legislature impermissibly relied on race when drawing legislative districts. *See*, *e.g.*, *United States v. Hays*, 515 U.S. 737, 744–45 (1995). Second, voter dilution claims may proceed in apportionment cases, where un-updated legislative districts disfavor voters in specific districts merely due to the voter's geographic location. *See*, *e.g.*, *Reynolds v. Sims*, 377 U.S. 533 (1964). Though the latter cases are cited in Plaintiffs' Complaint, neither provides any support for Plaintiffs' theory. Notably, the injury in the permissible voter dilution claim may be shared by a group of individuals, but the injury is particularized to the specific group. In contrast to the specific class of minority voters in a racially gerrymandered district, or voters living in a growing but un-reapportioned district, the injury allegedly incurred in the present case is shared in proportion by *every* single Michigan voter. In alleging a generalized injury rather than an actual and particularized injury in fact, Plaintiffs lack standing to bring a voter dilution claim. Accordingly, Count I must be dismissed.

## IV.    Plaintiffs Have Failed to Plead a Voter Dilution Claim

Even if Plaintiffs could establish standing for their voter dilution claim, the Complaint would still fail as a matter of law. As noted above, equal protection voter dilution claims exist only in a narrow set of circumstances. *See, e.g., Reynolds*, 377 U.S. at 568 ("Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State."). In these unique cases, the plaintiffs allege disparate treatment from similarly situated voters. *See, e.g., id.* at 537 (Plaintiffs alleging devalued voting power when compared to similarly situated voters in other parts of the state).

In contrast, the gravamen of Plaintiffs' claim—that Michigan voters will have the value of their votes diluted by unlawfully counted ballots—falls far wide of the mark. Plaintiffs allege breaches of the Michigan Election Code due to a lack of access provided to poll watchers (*see*

Compl. ¶ 25), as well as a number of often hyper-localized violations of the Michigan Election Code (*see, e.g.,* Compl. ¶ 45). However, even if Plaintiffs successfully showed an impermissible lack of meaningful access for poll watchers, such a showing is plainly insufficient to prove fraudulent votes were *actually* counted. And with regard to the allegations of localized Election Code violations, the fundamental principle currently at play is that "[t]he Constitution is not an election fraud statute." *Minn. Voters All. v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013), *quoting Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986). No case supports the notion that the Equal Protection Clause of the U.S. Constitution can be utilized to police such allegations on a voter dilution theory. Plaintiffs here bring a novel claim ostensibly available to every Michigan voter in the event any voting error resulting in an erroneously counted vote is detected. Their supposed remedy—the rejection of hundreds of thousands, if not millions, of votes. No such legal theory exists, and Count I should be dismissed accordingly.

**V.    Plaintiffs' Factual Assertions are Either False, Misplaced or Immaterial to the Relief they Seek**

**A.  Legal Standard for Allegations of Fraud**

Rule 9(b) requires that, in alleging fraud, a party must state with particularity the "circumstances constituting fraud." Fed. R. Civ. P. 9(b). The complaint must "alert the defendants to the precise misconduct with which they are charged" to protect them "against spurious charges of immoral and fraudulent behavior." *Sanderson v. HCA-Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (internal quotations omitted). A complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements

were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (internal quotations omitted).[3]

### B.  Overview

Plaintiffs do not come close to satisfying Rule 9(b). In their zeal to advance unsupported and debunked conspiracy theories, Plaintiffs display a startling ignorance of the electoral process, even claiming that the County of Wayne processes and tabulates ballots in the City of Detroit, when it is clear under Michigan election law that the initial processing and tabulation of ballots is controlled by the city clerk. *See*, *e.g.*, M.C.L. § 168.641 et seq.; M.C.L. § 168.654 et seq.[4]. Plaintiffs' allegations actually show that the process worked; what they construe as misconduct is evidence of best practices in processing and tabulating ballots.

Plaintiffs' Complaint and attached affidavits include numerous extraneous allegations, that even if true, would be entirely irrelevant to the claims in this case. For instance, affiants claim ballot workers "rolled their eyes" or that various people engaged in unpleasant behavior. Whether the claims are true or not—and most unbiased observers indicate they are not—they do not matter for this lawsuit.

There are a few allegations that could (charitably) be characterized as "material." They can be discerned from the "relief" Plaintiffs say they are seeking in on the first page of their Complaint in the "Summary of the Lawsuit" section and from the headings. Nearly all of the allegations relate

---

[3] "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Talton v. BAC Home Loans Servicing LP*, 839 F. Supp. 2d 896, 912 (E.D. Mich. 2012).

[4] In the Court of Claims case, Judge Cynthia Diane Stephens advised Plaintiff Donald J. Trump for President, Inc., of this Michigan law in her Opinion and Order. (Ex. 7 to DNC/MDP Brief). Nevertheless, although the Complaint is predicated on the processing and tabulation of ballots—mostly absentee ballots—in the City of Detroit, the Complaint repeatedly suggests that these activities were under the control of the County of Wayne.

to the City's Absent Voter Counting Board ("AVCB") which was in Hall E of the TCF Center (formerly Cobo Hall).

Most of the procedures followed for the 2020 election were used in the 2016 election. At that time, when Donald Trump carried Michigan by fewer than 11,000 votes, there were no objections to the vote count. Again, this year there were no objections to the process until the national media called the State of Michigan for Joe Biden. Then, facing an apparent loss in this State by more than 146,000 votes, more challengers descended on the TCF center, and the Trump campaign began leveling baseless allegations of vote fraud in Detroit. In 2016, Hillary Clinton received 234,871 votes in Detroit, and Donald Trump received 7,682. This year, the tally similar, but, notably, early unofficial results reported that Donald Trump received 12,654 votes, **increasing** his 2016 tally by nearly 5,000 votes. So, Plaintiffs ask this court to accept as "plausible" their allegations that a massive conspiracy to steal this election resulted in their candidate receiving 5,000 **more** votes in the urban epicenter of their claimed conspiracy.

Even Plaintiffs' "material" allegations could not possibly support their causes of action. If each and every one of the allegations were true (they are not true), at most, they relate to a small number of ballots, that could not possibly change the outcome of the election. Nor could the allegations possibly entitle Plaintiffs to any of the relief they seek. Election disputes, whether valid or frivolous, must be resolved in favor of protecting the right to vote. Yet, Plaintiffs would have their picayune and misplaced objections to something they claim the City did—not something any voter did—result in the cancellation of the votes of millions of Michigan citizens.

### C. Allegations Relating to Challengers at the TCF Center

Plaintiffs repeatedly assert that Republican challengers were not given "meaningful" access to the ballot processing and tabulation at the Absent Voter Counting Board located in Hall E of the TCF Center. Nearly all of Plaintiffs' requested relief is predicated on this claim. The

theory is that if certain challengers were not in the TCF Center, the ballots counted there should be deemed "unlawfully cast," somehow in violation of Plaintiffs' constitutional rights. As discussed in the DNC/MDP brief, the legal theory is nonsensical. But it is also important to note that the underlying claim is false. Republican challengers were not denied the opportunity to participate in the process; more than 200 Republican challengers were present at the TCF center.

Challengers are allocated one per respective party or organization to each counting board.[5] The only challenger right specifically listed with respect to absent voter ballots is to observe the recording of absentee ballots on voting machines. M.C.L. § 168.733(1)(e)(i) ("A challenger may do 1 or more of the following: … Observe the recording of absent voter ballots on voting machines.") This requirement was met at all times.[6]

In the *Costantino* matter the City submitted an affidavit and supplemental affidavit from Christopher Thomas disproving plaintiffs' claims. Since the claims in this lawsuit are duplicative of the claims in that lawsuit, the City is attaching to this concurrence, the affidavits submitted by Mr. Thomas in state court. (Exhibits 3 and 4). Mr. Thomas's knowledge of Michigan election law is unparalleled; he served in the Secretary of State Bureau of Election for 40 years beginning in May 1977 and finishing in June 2017. (Thomas Aff. ¶ 1, Ex. 3). In June 1981, he was appointed Director of Elections and in that capacity implemented four Secretaries of State election

---

[5] The Michigan Department of State Bureau of Election's Manual, "The Appointment, Rights and Duties of Election Challengers and Poll Watcher" provides in pertinent part: "Only one challenger per political party or sponsoring organization may serve in an absent voter counting board." Id, p 6.

[6] Even if the claim were true, since challengers are only part of the process because of Michigan law (see M.C.L. § 168.733), the "remedy" must comply with Michigan law. Unsurprisingly, wholesale disenfranchisement of hundreds of thousands of voters is not a remedy for an alleged violation of the challenger rules. There is no basis for any of the extraordinary relief sought; indeed, Plaintiffs cannot submit a shred of evidence that there is a risk that certification may include improperly cast ballots. Speculation and debunked conspiracy theories are woefully insufficient.

administration, campaign finance and lobbyist disclosure programs. (*Id.*). Mr. Thomas was brought in to serve as Senior Advisor to Detroit City Clerk Janice Winfrey beginning on September 3, 2020 until December 12, 2020. (*Id.* ¶ 2). In this capacity, he advised the Clerk and management staff on election law procedures, implementation of recently enacted legislation, revamped absent voter counting board, satellite offices and drop boxes, Bureau of Election matters and general preparation for the November 3, 2020 General Election. (*Id.*). Mr. Thomas had oversight and was involved in nearly all aspects of the election in the City, including the processing and tabulation at the TCF Center. (*Id.*).

As Mr. Thomas attested, while six feet of separation was necessary for health reasons, the Department of Elections at some expense, provided large monitors (photo attached to Mr. Thomas' affidavit) to keep the inspectors safe and provide the challengers with a view of what was being entered, without crossing the 6-foot distancing barrier. (Thomas Aff. ¶ 14, Ex. 3). The monitors made observing the process very transparent. (*Id.*).

As explained in the DNC/MDP Motion, when it became clear that the number of challengers had reached or exceeded the lawful quota and the room had become over-crowded, for a short period of time, *additional* challengers were not admitted until challengers from their respective parties voluntarily departed. This is affirmed by Christopher Thomas and others. (Thomas Aff., ¶¶ 32-35 Ex. 3; see also Garcia Aff., Exhibit 5).

Plaintiffs also claim that election workers at the TCF Center did not record certain challenges. Apparently, Plaintiffs are asserting that any "challenge" that someone makes up is required to be recorded. However, challengers' rights and responsibilities are subject to the law. At a polling place, a challenger can challenge "the voting rights of a person who the challenger has good reason to believe is not a registered elector." M.C.L. § 168.733. Under a separate section,

at a polling place, a qualified challenger may question "the right of an individual attempting to vote who has previously applied for an absent voter ballot and who on election day is claiming to have never received the absent voter ballot or to have lost or destroyed the absent voter ballot." M.C.L. § 168.727.[7] In that situation, an election inspector is to make a report about the challenge. The statute further provides that:

> A challenger shall not make a challenge indiscriminately and without good cause. A challenger shall not handle the poll books while observing election procedures or the ballots during the counting of the ballots. A challenger shall not interfere with or unduly delay the work of the election inspectors. An individual who challenges a qualified and registered elector of a voting precinct for the purpose of annoying or delaying voters is guilty of a misdemeanor.

M.C.L. § 168.727.

Plaintiffs provide little detail of the so-called challenges which were "disregarded." But, as Christopher Thomas attests, he is not aware of any valid challenge being refused or ignored. (Thomas Aff ¶ 39, Ex. 3). All election workers were instructed to record valid challenges. What election workers did not need to record were the numerous frivolous and legally invalid challenges which were made. Republican making wholesale challenges based on complete misunderstandings of law. (Thomas Aff ¶ 39). Challengers were congregating in large groups standing in the main aisles and blocking Election Inspectors' movement. (*Id.* ¶ 35). In one instance, challengers exhibited disorderly behavior by chanting "Stop the Vote." (*Id.*). Yelling "Stop the vote" or all absent ballots are invalid are not legitimate challenges and there was no requirement that they be record. That was an abuse of the process and a violation of the law.

---

[7] *See also* Exhibit 6, *The Challenge Process: Questions and* Answers, Michigan Department of State.

### D.  Allegations of "Pre-Dating"

Plaintiffs' allegations of "pre-dating" are based entirely on the affidavit of Jessica Connarn and a reference to the allegations made in the *Costantino* matter. (Compl. ¶¶ 54-55). Both have been thoroughly debunked. Ms. Connarn's claims were succinctly addressed by the Michigan Court of Claims which held:

> Plaintiffs have submitted what they refer to as "supplemental evidence" in support of their request for relief. The evidence consists of: (1) an affidavit from Jessica Connarn, a designated poll watcher; and (2) a photograph of a handwritten yellow sticky note. In her affidavit, Connarn avers that, when she was working as a poll watcher, she was contacted by an unnamed poll worker who was allegedly "being told by other hired poll workers at her table to change the date the ballot was received when entering ballots into the computer." She avers that this unnamed poll worker later handed her a sticky note that says "entered receive date as 11/2/20 on 11/4/20." Plaintiffs contend that this documentary evidence confirms that some unnamed persons engaged in fraudulent activity in order to count invalid absent voter ballots that were received after election day.
>
> This "supplemental evidence" is inadmissible as hearsay. The assertion that Connarn was informed by an unknown individual what "other hired poll workers at her table" had been told is inadmissible hearsay within hearsay, and plaintiffs have provided no hearsay exception for either level of hearsay that would warrant consideration of the evidence. See MRE 801(c). The note—which is vague and equivocal—is likewise hearsay. And again, plaintiffs have not presented an argument as to why the Court could consider the same, given the general prohibitions against hearsay evidence. See *Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 105; 776 NW2d 114 (2009). Moreover, even overlooking the evidentiary issues, the Court notes that there are still no allegations implicating the Secretary of State's general supervisory control over the conduct of elections. Rather, any alleged action would have been taken by some unknown individual at a polling location.

(*See* Ex. 7 to DNC/MDP Brief, Opinion and Order of Michigan Court of Claims).

Setting aside the fact that Plaintiffs are apparently attempting to incorporate by reference an entire Complaint filed in a different court, the reliance on the "pre-dating" allegations in the *Costantino* matter is misplaced. Those allegations have been shown to be false. The allegations were based on the claim of Jessy Jacob, a furloughed City employee, with no known prior election experience, who was given a limited assigned to the Department of Elections on a short-term

basis. Her claim appears to have been based on flawed semantics, because all absentee ballots she handled at the TCF Center had been received by 8:00 p.m. on November 3, 2020. The ballots had all been painstakingly verified by City employees (in a public process) before they were brought to the TCF Center for tabulation. No ballots were backdated; instead, for a small number of ballots, election workers at the TCF Center were directed to enter the date received into the computer system, as stamped on the envelope. Ms. Jacob was simply marking the date the ballot had been received. (*Id.* ¶¶ 12, 20). All dates on the envelopes were on or before November 3, 2020; no ballots received by the Detroit City Clerk after 8:00 p.m. on November 3, 2020 were even brought to the TCF Center. (*Id.* ¶¶ 20, 27). Absentee ballots were not "backdated" in the Qualified Voter File; they were properly "dated" in the system, based upon time stamps on the ballot envelopes. The court in Costantino agreed, holding:

> Ms. Jacob also alleges misconduct and fraud when she worked at the TCF Center. She claims supervisors directed her not to compare signatures on the ballot envelopes she was processing to determine whether or not they were eligible voters. She also states that supervisors directed her to "pre-date" absentee ballots received at the TCF Center on November 4, 2020. Ms. Jacob ascribes a sinister motive for these directives. Evidence offered by long-time State Elections Director Christopher Thomas, however, reveals there was no need for comparison of signatures at the TCF Center because eligibility had been reviewed and determined at the Detroit Election Headquarters on West Grand Blvd. Ms. Jacob was directed not to search for or compare signatures because the task had already been performed by other Detroit city clerks at a previous location in compliance with MCL 168.765a. As to the allegation of "pre-dating" ballots, Mr. Thomas explains that this action completed a data field inadvertently left blank during the initial absentee ballot verification process. Thomas Affidavit, #12. The entries reflected the date the City received the absentee ballot. *Id.*

(*See* Ex. 13 to DNC/MDP Brief, Opinion and Order of Wayne County Circuit Order).

It was physically impossible for any election worker at the TCF Center to have counted or processed a ballot for someone who was not an eligible voter or whose ballot was not received by the 8:00 p.m. deadline on November 3, 2020. No ballot could have been "backdated," because no ballot received after 8:00 p.m. on November 3, 2020 was ever at the TCF Center.

### E.  Allegations Regarding Ballot Duplication

Plaintiffs allege that the ballot duplication process was not followed. As Mr. Thomas attested, ballots were duplicated according to Michigan law. Contrary to Plaintiffs' assertion, Michigan election law does not require partisan challengers to be present when a ballot is duplicated; instead, when a ballot is duplicated as a result of a "false read," the duplication is overseen by one Republican and one Democratic inspector coordinating together. That process was followed. And, again, partisan challengers were at the TCF Center during the entire process. As the Wayne County Circuit Court held in the *Stoddard* matter:

> An affidavit supplied by Lawrence Garcia, Corporation Counsel for the City of Detroit, indicated he was present throughout the time of the counting of absentee ballots at the TCF Center. Mr. Garcia indicated there were always Republican and Democratic inspectors there at the location. He also indicated he was unaware of any unresolved counting activity problems.
>
> By contrast, plaintiffs do not offer any affidavits or specific eyewitness evidence to substantiate their assertions. Plaintiffs merely assert in their verified complaint "Hundreds or thousands of ballots were duplicated solely by Democratic party inspectors and then counted." Plaintiffs' allegation is mere speculation.

(Ex. 13 to DNC/MDP Brief, Opinion and Order).

### F.  Allegations Regarding Ballots Supposedly Counted More than Once

Plaintiffs claim challengers observed ballots repeatedly run through tabulation machines, including "a stack of about fifty ballots being fed multiple times into a ballot scanner counting machine." (Compl. ¶ 45). Whatever the challengers think they saw, the truth is that ballots cannot be counted in that manner. If what she said were true, hundreds of extra votes would show up in numerous precinct (or absent voter counting boards). This is something that would obviously be caught very quickly on site. (Thomas Supp. Aff., Ex. 4). What the challengers claim they saw would also be caught by the Detroit Department of Elections and the County Canvassing Board during the canvassing which occurs after every election as a matter of law. (*Id*.). While precincts

are often off by a few votes at the end of the process due to human error, the result of repeatedly scanning ballots would lead to precincts being off by hundreds or thousands of votes.

Plaintiffs also note that challengers reported that "when a voter was not in the poll book, the election officials would enter a new record for that voter with a birth date of January 1, 1900." (Compl. ¶ 47). This claim is actually true, but not evidence of anything improper. As Christopher Thomas attested, and as was explained to Republican challengers on Wednesday, November 4, 2020, the Detroit counting boards were using the Secretary of State e-pollbook, comprised of a downloaded instance (i.e. snapshot) of the Qualified Voter File ("QVF") as it existed late afternoon on Sunday, November 1. (Thomas Aff. ¶ 7, Ex. 3). Since the e-pollbook had not been specifically modified for the AVCB environment, procedural adjustments were required to record ballots. (*Id*. ¶ 15). Specifically, to add a voter in the e-pollbook (or "EPB"), the voter's birthdate needs to be entered. (*Id.*). This is not a legal requirement, but essentially a quirk in the design of the software. (*Id*.). In a **polling place**, where e-pollbook is designed to work, provisional ballots are entered into the e-pollbook manually by inspectors. (*Id*.). The voter as part of the provisional ballot process completes a new voter registration application which contains a birthdate. (*Id*.). In that situation, at a polling place, the date of birth is a data point used to verify the voter. (*Id.*). Thus, the system includes a tab for birthdates. (*Id.*). At an **AVCB**, the inspectors do not have access to a voter's date of birth; moreover, there is no need for that data point to be included, because the voter's signature is the data point used for verification purposes. (*Id.*). Nevertheless, to process the vote, the e-pollbook requires the date of birth data field to be filled out. (*Id.*). Thus, inspectors were directed to enter the consistent date of birth of January 1, 1900. (*Id.*). The use of January 1, 1900 as a substitute for an actual date of birth is a standard practice by election clerks. (*Id.*). The Republican challengers who questioned the process were satisfied with the explanation and did not lodge (what

19

would have been an obviously frivolous) challenge. (*Id.* ¶ 16). Nevertheless, that claim is raised repeatedly as evidence of "fraud" in this case and others.

### G.  Allegations Regarding Tabulating Machines

Perhaps the most baseless of Plaintiffs' allegations is a conspiracy theory about vote tabulators. Plaintiffs cite two instances of errors—one in Antrim County and one in Oakland County (Rochester Hills) to insinuate, not directly allege, that this means the entire system used throughout most of the State was flawed. The warped logic: because there was an isolated error in Antrim County which uses the same software as Wayne County. and an isolated error in Rochester Hills, which does not use the same software, the votes in Detroit must be thrown out. This is nonsensical.

The Michigan Department of State released a statement titled "Isolated User Error in Antrim County Does Not Affect Election Results, Has no Impact on Other Counties or States," explaining what happened in Antrim County. (Exhibit 7). The statement explains that the "error in reporting unofficial results in Antrim County Michigan was the result of a user error that was quickly identified and corrected; did not affect the way ballots were actually tabulated; and would have been identified in the county canvass before official results were reported even if it had not been identified earlier." (*Id.*). Essentially, the County installed an update on certain tabulators, but not others. (*Id.*). The tabulators worked correctly, but when they communicated back to the County, the discrepancy in the software versions led to a discrepancy in the reporting. (*Id.*). This was quickly discovered and would certainly have been uncovered in the post-election canvass. (*Id.*).

The Republican clerk of Rochester County, Tina Barton, discredited the allegations of fraud in that City. Officials realized they had mistakenly counted votes from the city of Rochester Hills twice, according to the Michigan Department of State. Oakland County used software from

a company called Hart InterCivic, not Dominion, though the software was not at fault. Ms. Barton stated in a video she posted online: "As a Republican, I am disturbed that this is intentionally being mischaracterized to undermine the election process .... This was an isolated mistake that was quickly rectified."[8]

Based on these two allegations, Plaintiffs ask that a "special election be held in the affected precincts as provided by MCL 168.831-168.839." However, the referenced statute deals with situations in which an elector is prevented from voting because of an error in a voting machine. M.C.L. § 168.831. That is not what is alleged to have occurred in Antrim County or Rochester Hills. Furthermore, even if Plaintiffs were correct—and they are not—the remedy in the statute is not to go to Court. It is for an aggrieved candidate to petition the secretary or clerk of local board of canvassers, no later than 10 days after the date of the election, for a special election *in the precincts* in which the votes were not accepted. *See* M.C.L. §§ 168.831-168.839. The petition must "[a]llege the facts that made it impossible to cast a vote for the petitioning candidate[;] [i]dentify the precinct and city or township, and, if applicable, the number of the voting machine or device[; and] [b]e signed and certified by the candidate or elector." *Id.* The law further specifies that if the county board of canvassers decides to order a special election upon receipt of a timely petition, they shall "order a special election for the office of the petitioning candidate or the ballot question *only in each precinct affected by a defect or mechanical malfunction* ... if all of the following are true: (a) An elector could not cast a valid vote in the precinct for the petitioning candidate ... because of the defect or mechanical malfunction [and] Based on the available canvass, the number of electors who could not cast valid votes for the office ... in an election because of the defect or

---

[8] https://www.bridgemi.com/michigan-government/gop-calls-michigan-election-probe-officials-say-their-claims-are-weak.

mechanical malfunction is greater than the number of votes separating the candidates getting the most and the second most number of votes ….'' Here, no elector claims they were prevented from voting (indeed, this lawsuit is about preventing electors from voting). This Court is not a secretary or clerk of local board of canvassers, making this the wrong forum. Plaintiffs have not submitted a petition alleging the facts that made it impossible to cast a vote for the petitioning candidate (they do not make that claim). Plaintiffs have not identified the supposed affected precincts. Plaintiffs have not identified the supposed affected voting machine or device. And, even if Plaintiffs were right, they would have had to petition Antrim County and Rochester Hills for a recount in precincts in Antrim County and Rochester Hills. Even then, Plaintiffs would have to make the impossible showing that the number of people who could not vote (by their own admission, zero) is larger than the number separating the Counties (statewide, approximately 146,000 votes).

## CONCLUSION

For the foregoing reasons, the City of Detroit respectfully requests that this Court dismiss Plaintiffs' Complaint in its entirety, with prejudice and with costs and attorneys' fees awarded to the Defendants.

November 18, 2020                    Respectfully submitted,

**FINK BRESSACK**

By:     /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
*Attorneys for City of Detroit*
38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel: (248) 971-2500
dfink@finkbressack.com
dbressack@finkbressack.com

**CITY OF DETROIT**
**LAW DEPARTMENT**
Lawrence T. Garcia (P54890)
Charles N. Raimi (P29746)
James D. Noseda (P52563)
*Attorneys for City of Detroit*
2 Woodward Ave., 5th Floor
Detroit, MI 48226
Tel: (313) 237-5037
garcial@detroitmi.goc
raimic@detroitmi.gov
nosej@detroitmi.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 18, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

**FINK BRESSACK**

By:   */s/ Darryl Bressack*
Darryl Bressack (P67820)
38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel.: (248) 971-2500
dbressack@finkbressack.com